Case 7:13-cv-01275-LSC   Document 142-1   Filed 07/28/17   Page 1 of 81

FILED

2017 Jul-28  PM 04:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

Labor Certification Process and Enforcement for Temporary..., 73 FR 78020-01

73 FR 78020-01, 2008 WL 5262663(F.R.)
RULES and REGULATIONS
DEPARTMENT OF LABOR
Employment and Training Administration
20 CFR Parts 655 and 656
RIN 1205-AB54

Labor Certification Process and Enforcement for Temporary Employment in Occupations Other Than
Agriculture or Registered Nursing in the United States (H-2B Workers), and Other Technical Changes

Friday, December 19, 2008

AGENCY: Employment and Training Administration, Department of Labor, in concurrence with the Wage and Hour Division, Employment Standards Administration, Department of Labor.

**\*78020** ACTION: Final rule.

SUMMARY: The Employment and Training Administration (ETA) of the Department of Labor (DOL or the Department) is amending its regulations to modernize the procedures for the issuance of labor certifications to employers sponsoring H-2B nonimmigrants for admission to perform temporary nonagricultural labor or services and the procedures for enforcing compliance with attestations made by those employers. Specifically, this Final Rule re-engineers the application filing and review process by centralizing processing and by enabling employers to conduct pre-filing recruitment of United States (U.S.) workers. In addition, the rule enhances the integrity of the H-2B program through the introduction of post-adjudication audits and procedures for penalizing employers who fail to comply with program requirements. This rule also makes technical changes to the regulations relating to both the H-1B program and the permanent labor certification program to reflect operational changes stemming from this regulation.

Although Congress has conferred the statutory authority to enforce H-2B program requirements on the Department of Homeland Security (DHS), recent discussions between DHS and the Department have yielded an agreement for the delegation of H-2B enforcement authority from DHS to the Department. This Final Rule contains the Wage and Hour Division (WHD) regulations establishing the H-2B enforcement procedures that the Department will institute pursuant to that agreement. Separately, this Final Rule institutes conditions and procedures for the debarment of employers, attorneys, and agents participating in the H-2B foreign labor certification process. As discussed further below, the Department intends to exercise its inherent authority under case law and general principles of program administration to determine what entities practice before it.

DATES: This Final Rule is effective January 18, 2009.

FOR FURTHER INFORMATION CONTACT: For information on the H-2B labor certification process governed by 20 CFR 655.1 to 655.35, contact William L. Carlson, Administrator, Office of Foreign Labor Certification, Employment and Training Administration, U.S. Department of Labor, 200 Constitution Avenue, NW., Room C-4312, Washington, DC 20210. Telephone: (202) 693-3010 (this is not a toll-free number). Individuals with hearing or speech impairments may access the telephone via TTY by calling the toll-free Federal Information Relay Service at 1-800-877-8339.
For information on the H-2B enforcement process governed by 20 CFR 655.50 to 655.80, contact Michael Ginley, Office of Enforcement Policy, Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor, 200 Constitution Avenue, NW., Room S-3502, Washington, DC 20210. Telephone (202) 693-0745 (this is not a toll-free number). Individuals with hearing or speech impairments may access the telephone number above via TTY by calling the toll-free Federal Information Relay Service at 1-800-877-8339.

SUPPLEMENTARY INFORMATION:

## I. Background Leading to the NPRM

### A. Statutory Standard and Current Department of Labor Regulations

Section 101(a)(15)(H)(ii)(b) of the Immigration and Nationality Act (INA or the Act) defines an H-2B worker as a nonimmigrant admitted to the U.S. on a temporary basis to perform temporary nonagricultural labor or services. 8 U.S.C. 1101(a)(15)(H)(ii)(b).

Section 214(c)(1) of the INA requires DHS to consult with "appropriate agencies of the Government" before granting any H-2B visa petition submitted by an employer. 8 U.S.C. 1184(c)(1). The regulations for the U.S. Citizenship and Immigration Services (USCIS), the agency within DHS charged with the adjudication of nonimmigrant benefits such as H-2B status, currently require, at 8 CFR 214.2(h)(6), that the intending employer (other than in the Territory of Guam) first apply for a temporary labor certification from the Secretary of Labor (the Secretary) advising USCIS whether U.S. workers capable of performing the services or labor are available, and whether the employment of the foreign worker(s) will adversely affect the wages and working conditions of similarly employed U.S. workers.

The Department's role in the H-2B visa program stems from its obligation, outlined in DHS regulations, to certify, upon application by a U.S. employer intending to petition DHS to admit H-2B workers, that there are not enough able and qualified U.S. workers available for the position sought to be filled and that the employment of the foreign worker(s) will not adversely affect the wages and working conditions of similarly employed U.S. workers. 8 U.S.C. 1101(a)(15)(H)(ii)(b); 8 U.S.C. 1184(c)(1); see also 8 CFR 214.2(h)(6).

The Department's role in the H-2B process is currently advisory to DHS. 8 CFR 214.2(h)(6)(iii)(A). DHS regulations provide that an employer may not file a petition with DHS for an H-2B temporary worker unless it has received a labor certification from the Department (or the Governor of Guam, as appropriate), or received a notice from either that a certification cannot be issued. 8 CFR 214.2(h)(6)(iii)(C), (iv)(A), (vi)(A).

Currently, the Department's regulations at 20 CFR part 655, Subpart A, "Labor Certification Process for Temporary Employment in Occupations other than Agriculture, Logging or Registered Nursing in the United States (H-2B Workers)," govern the H-2B labor certification process. Applications for labor certification are processed by the Office of Foreign Labor Certification (OFLC) in ETA, the agency to which the Secretary of Labor has delegated her advisory responsibilities described in the DHS H-2B regulations, after they are processed by the State Workforce Agency (SWA) having jurisdiction over the area of intended employment.[FN1] The SWA reviews the employer's application and job offer (comparing the employer's offered wage against the prevailing wage for the position); supervises U.S. worker recruitment; and forwards completed applications to OFLC for further review and final determination.

Under current procedures, the employer must demonstrate that its need for the services or labor is temporary as defined by one of four regulatory standards: (1) A one-time occurrence; (2) a seasonal need; (3) a **\*78021** peakload need; or (4) an intermittent need. 8 CFR 214.2(h)(6)(ii)(B). The employer or its authorized representative must currently submit to the SWA a detailed statement of temporary need and supporting documentation with the application for H-2B labor certification. Such documentation must provide a description of the employer's business activities and schedule of operations throughout the year, explain why the job opportunity and the number of workers requested reflects its temporary need, and demonstrate how the employer's need meets one of these four regulatory standards. Based on longstanding practice and DOL program guidance, the employer must also establish that the temporary position is full-time and that the period of need is generally one year or less, consistent with the standard under DHS regulations at 8 CFR 214.2h(6). This Final Rule clarifies that full-time employment, for purposes of temporary labor certification employment, means at least 30 hours per week, except that where a State or an established practice in an industry has developed a definition of full-time employment for any occupation that is less than 30 hours per week, that definition governs.

Additionally, the employer must recruit from the U.S. labor market to determine if a qualified U.S. worker is available for the position. In addition, in order to ensure an adequate test of the labor market for the position sought to be filled, the employer must comply with other program requirements. For example, it must offer and subsequently pay throughout the period of employment a wage that is equal to or higher than the prevailing wage for the occupation at the skill level and in the area of intended employment; provide terms and conditions of employment that are not less favorable than those offered to the foreign worker(s); and not otherwise inhibit the effective recruitment and consideration of U.S. workers for the job.

Historically, the Department's review and adjudication of permanent and temporary labor certification applications (including H-2B) took place through ETA's Regional Offices. However, in December 2004, the Department opened two new National Processing Centers (NPCs), one each located in Atlanta, Georgia, and Chicago, Illinois, to centralize processing of permanent and temporary foreign labor certification cases at the Federal level. The Department published a notice in the Federal Register, at 70 FR 41430, Jul. 19, 2005, clarifying that employers seeking H-2B labor certifications must file two originals of Form ETA 750, Part A, directly with the SWA serving the area of intended employment. Once the application is reviewed by the SWA and after the employer conducts its required recruitment, the SWA sends the complete application to the appropriate NPC. The NPC Certifying Officer (CO) issues a labor certification for temporary employment under the H-2B program, denies the certification, or issues a notice including the reasons why such certification cannot be made. Prior to June 1, 2008, the NPCs shared responsibility for processing of temporary labor certification applications; each NPC had jurisdiction over and processed applications from a different subset of states and territories. Effective June 1, 2008, the NPCs specialized, each assuming responsibility for different types of applications. Now, H-2B temporary labor certification applications approved by the SWAs are processed exclusively by the Chicago NPC. 73 FR 11944, Mar. 5, 2008.

Currently, the Department has no enforcement authority or process to ensure H-2B workers who are admitted to the U.S. are employed in compliance with H-2B labor certification requirements. Congress vested DHS with that enforcement authority in 2005. See 8 U.S.C. 1184, as amended by the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief of 2005, Public Law 109-13, 119 Stat. 231. As described more fully below, the Department in this Final Rule establishes the H-2B regulatory enforcement regime proposed in the NPRM, consistent with the agreement for a delegation of enforcement authority reached by the Department and DHS pursuant to 8 U.S.C. 1184(c)(14)(B). This enforcement regime also includes debarment procedures for ETA and the Employment Standards Administration, Wage and Hour Division (WHD), under the Department's inherent debarment authority, which is explained in greater detail below.

### B. Earlier Efforts To Reform the H-2B Regulatory Process

On January 27, 2005, DHS and the Department issued companion NPRMs to significantly revise each agency's H-2B processing procedures. 70 FR 3984, Jan. 27, 2005; 70 FR 3993, Jan. 27, 2005. As proposed, those changes to both agencies' regulations would have eliminated in whole the Department's adjudicatory role, ending the current labor certification process for most H-2B occupations and requiring employers to submit labor-related attestations directly to USCIS as part of a revised supplement accompanying the H-2B petition.

The two agencies received numerous comments on the joint NPRMs in 2005. Most commenters opposed the proposals to move the program adjudication to USCIS and to eliminate the Department's role in reviewing the need of employers and the recruitment of U.S. workers except in post-adjudication audits. Commenter concerns focused in part on the loss of the Department's experience in adjudicating issues of temporary need and the potential adverse impact on U.S. workers. Based on the significant concerns posed in those comments, and after further deliberation within each agency, the Department and DHS have not pursued their 2005 proposals. Consequently, the NPRM published by the Department on January 27, 2005 (RIN 1205-AB36) was withdrawn in the Department of Labor's Fall 2007 Regulatory Agenda. See http://www.reginfo.gov/public/do/eAgendaViewRule?ruleID=221117.

As stated in the May 22, 2008, NPRM preceding this Final Rule, the Department continued, however, to closely review the H-2B program procedures in order to determine appropriate revisions to the H-2B labor certification process. This ongoing systematic review was accelerated in light of considerable workload increases for both the Department and the SWAs (an approximate 30 percent increase in applications in Fiscal Year (FY) 2007 over those received in FY 2006, and a similar increase during the first half of FY 2008) as well as limited appropriations funding program-related operations.

On April 4, 2007, ETA issued Training and Employment Guidance Letter (TEGL) No. 21-06, 72 FR 19961, Apr. 20, 2007, to replace its previous guidance for the processing of H-2B applications (General Administration Letter No. 1-95, 60 FR 7216, Feb. 7, 1995) and update procedures for SWAs and NPCs to use in the processing of temporary labor certification applications. The Department then held national briefing sessions in Chicago and Atlanta on May 1 and May 4, 2007, respectively, to inform employers and other stakeholders of the updated processing guidance contained in TEGL 21-06. Attendees at those briefing sessions raised important questions and concerns with regard to the effective implementation of TEGL 21-06 by the SWAs and ETA's National Processing Centers (NPCs). In response to the *78022 substantive concerns that were raised, the Department further refined the process of reviewing applications in TEGL 27-06 (June 12, 2007), providing special procedures for dealing with forestry related occupations, and TEGL No. 21-06, Change 1 (June 25, 2007),

and updating procedures by allowing the NPC Certifying Officer (CO) to request additional information from employers to facilitate the processing of H-2B applications. 72 FR 36501, Jul. 3, 2007; 72 FR 38621, Jul. 13, 2007. Several issues were not addressed by those refinements, particularly concerns relating to increasing workload and processing delays, which required regulatory changes. This Final Rule addresses a number of those unresolved issues.

*C. Current Process Involving Temporary Labor Certifications and the Need for a Redesigned System*

As described in the May 22, 2008, NPRM, the process for obtaining a temporary labor certification has been described to the Department as complicated, time-consuming, inefficient, and dependent upon the expenditure of considerable resources by employers. The current, duplicative process requires the employer to first file a temporary labor certification with the SWA, which reviews the application, compares the wage offer to the prevailing wage for the occupation, oversees the recruitment of U.S. workers, and then transfers the application to the applicable ETA NPC, which conducts a final review of the application. This process has been criticized for its length, overlap of effort, and resulting delays. Application processing delays, regardless of origin, can lead to adverse results with serious repercussions for a business, especially given the numerical limitation or "cap" on visas under this program, as a result of which any processing delay may prevent an employer from securing visas for H-2B workers during any given half year period for which numbers are available. This occurs because employer demand for the limited number of visas greatly exceeds their supply, and all visas are typically allocated in the early weeks of availability. See 8 U.S.C. 1184(g)(1)(B) (setting H-2B annual visa cap at 66,000) and 8 U.S.C. 1184(g)(10) (setting a cap of 33,000 as the number of H-2B visas that may be allocated during each 6-month period of a fiscal year).

The increasing workload of the Department and SWAs poses a growing challenge to the efficient and timely processing of applications. As stated in the NPRM, the H-2B foreign labor certification program continues to increase in popularity among employers. While the annual number of visas available is limited by statute, the number of labor certifications is not. The number of H-2B labor certification applications has increased 129 percent since FY 2000. In FY 2007, the Department experienced a nearly 30 percent increase in H-2B temporary labor certification application filings over the previous fiscal year. This increasing workload is exacerbated because the INA does not authorize the Department to charge a fee to employers for processing H-2B applications.[FN2] At the same time, appropriated funds have not kept pace with the increased workload at the State or Federal level. This has resulted in significant disparities in processing times among the SWAs. Some observers have noted these disparities among States unfairly advantage one set of employers (those in which the SWAs are able to timely process applications) over others (those in which SWAs experience delays due to backlogs resulting from inadequate staffing or funding, or other causes).[FN3]

In light of these recurring experiences, this Final Rule institutes several significant measures to reengineer the Department's administration of the program. These changes improve the process by which employers obtain labor certification and where our experience has demonstrated additional measures would assist the Department in protecting the job opportunities and wages of U.S. workers. The Final Rule also provides greater accountability for employers through penalties, up to and including debarment, as an additional safeguard against abuse of the program.

*D. Overview of Redesigned H-2B Foreign Labor Certification Process*

As proposed in the NPRM and finalized in this rule, the redesigned application process will require employers to complete recruitment steps similar to those now required, but will require them to do so prior to filing the application for labor certification. Once recruitment is complete, this Final Rule maintains the requirement proposed in the NPRM that the completed application be submitted directly to DOL instead of being filed with a SWA. This Final Rule eliminates the SWA duplicative review of the H-2B application. In association with this Final Rule, the Department has redesigned the application form currently used for the H-2A and H-2B temporary labor certification programs and proposed a new ETA Form 9142. Additional information about the new application form appears in the Administrative Information section of this preamble. This rule does not eliminate or federalize SWA activities (e.g., the job order and interstate clearance process) that may ultimately support an employer's H-2B application but are funded and governed independently under the Wagner-Peyser Act. This rule does federalize prevailing wage determinations, previously performed by the SWAs under this program.

To test the U.S. labor market appropriately, employers will be required to first obtain from the Chicago NPC a prevailing wage rate to be used in the recruitment of U.S. workers. To make this request, employers in the non-agricultural labor certification programs will use a new ETA Form 9141, which was designed and will be implemented in conjunction with this Final Rule. As with the Form 9142, additional information about the Form 9141 appears in the Administrative Information

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

section of the preamble. The employer will then follow recruitment steps similar to those required under the current program. The NPRM proposed increasing the number of required advertisements to three. However, in response to comments, the Final Rule returns to the current requirement of two advertisements, although it retains the proposed requirement that one of those advertisements be placed on a Sunday.

Consistent with the NPRM, this Final Rule requires the employer to attest to and enumerate its recruitment efforts as part of the application but does not require the employer to submit **78023** supporting documentation with its application. To ensure the integrity of the process, the Final Rule requires the employer to retain documentation of its recruitment, as well as other documentation specified in the regulations, for 3 years from the date of certification. The employer will be required to provide this documentation in response to a request for additional information by the Certifying Officer (CO) before certification or by ETA pursuant to an audit or in the course of an investigation by the Wage and Hour Division (WHD) after a determination on the application has been issued. The Department has set the document retention requirement at 3 years rather than the proposed 5 years in response to comments received expressing concerns that five years would impose an unnecessary burden on small employers, especially those that are mobile or have a mobile component.

Employers or their authorized representatives (attorneys or agents) will be required to submit applications using a new form designed to demonstrate the employer's compliance with the obligations of the H-2B program. As described in the NPRM and the Final Rule, the application form will collect, in the form of attestations, information that is largely required already by the current H-2B labor certification process. These attestations are required from the employer to ensure adherence to program requirements and to establish accountability. As with recruitment, employers are required to retain records documenting their compliance with all program requirements. An application that is complete will be accepted by the NPC for processing and will undergo final review by the Department.

Based on the Department's experience, and in response to concerns voiced in public comments about the need for H-2B stakeholder guidance and ETA staff training, we have added a transition period to the Final Rule at new § 655.5. Although the Final Rule takes effect 30 days from publication, it phases in implementation based on employment start dates listed in the application. Employers with a date of need on or after October 1, 2009, will be governed by these new regulations. Employers with a date of need on or after the rule's effective date but prior to October 1, 2009, will follow the transitional process described in § 655.5. Additional information about the transition process appears below.

In order to further protect the integrity of the program, specific verification steps, such as verifying the employer's Federal Employer Identification Number (FEIN) to ensure the employer is a bona fide business entity, will occur during processing to ensure the accuracy of the information supplied by the employer. If an application does not appear to be complete or merit approval on its face but requires additional information in order to be adjudicated, the CO will issue a Request for Further Information (RFI), a process the program already employs. After Departmental review, an application will be certified or denied.

As proposed in the NPRM and adopted in the Final Rule, the introduction of new post-adjudication audits will serve, along with WHD investigations, as both a quality control measure and a means of ensuring program compliance. Audits will be conducted on adjudicated applications meeting certain criteria, as well as on randomly-selected applications. In the event of an audit or WHD investigation, employers will be required to provide information supporting the attestations made in the application. Failure to meet the required standards or to provide information in response to an audit or investigation may result in an adverse finding on the application in question, initiate Departmental supervised recruitment in future applications, and penalties.[FN4]

As stated in the NPRM, the Department expects the modernized processing of applications will yield a reduction in the overall average time needed to process H-2B labor certification applications. This process is expected to lead to greater certainty and predictability for employers by reducing processing times which have exceeded our historical 60-day combined State and Federal processing timeframe.

## II. Discussion of Comments on the Proposed Rule

In response to the proposed rule, the Department received 134 comments, of which 88 were unique and another 46 were duplicate form comments. Commenters represented a broad range of constituencies for the H-2B program, including individual employers, agents, industry coalitions and trade groups, advocacy and legal aid organizations, labor unions, a bar

association, congressional oversight and authorizing committees, and individual members of the public.

The Department received comments both in support and opposition to the proposed regulation. Comments supported, for example, the anticipated efficiencies of the proposed streamlined process and the potential conversion to electronic filing. Broadly, other commenters opposed the rule because they felt it would undermine program integrity or weaken worker protections and U.S. worker access to job opportunities. Still others believed the rulemaking untimely, given the general weakening of the economy, or that the proposed rule failed to address what they believed to be key problems underlying the program. Several of those problems, such as the annual cap of 66,000 H-2B visas per year, are statutory and cannot be changed through regulation.

In addition, as described in greater detail below, the Department received comments raising a variety of concerns with specific proposals and provisions within the rule. After reviewing those comments thoughtfully and systematically, the Department has modified several provisions and retained others as originally proposed in the NPRM.

Provisions of the NPRM that received comments are discussed below; provisions that were not commented on or revised for technical reasons have been adopted as proposed. The Department has made some technical changes to the regulatory text for clarity and to improve readability, but those changes were not designed to alter the meaning or intent of the regulation.

### A. Section 655.2—Territory of Guam
In the Final Rule, the Department has revised the discussion on the authority of the Governor of Guam to clarify that the enforcement of the provisions of the H-2B visa program in Guam resides with the Governor, pursuant to DHS regulations.

### B. Section 655.4—Definitions
Of the definitions proposed in the NPRM, comments were received on the definitions for "agent," "attorney," "employ," "employer," "full time," "representative," and "United States worker."

The proposed rule defined an agent as "a legal entity or person which is authorized to act on behalf of the employer for temporary agricultural labor certification purposes, and is not itself an employer as defined in this subpart. The term 'agent' specifically excludes associations or other organizations of employers." In response to comments, the Department has corrected the typographical error and replaced "agricultural" with "nonagricultural."

Some commenters supported the proposed definition of agent with regard to its barring of associations or organizations of employers. One bar **\*78024** association commented there had been many abuses by agents in the past, including the unauthorized practice of law, and recommended the Department adopt the definition under DHS regulations at 8 CFR 292.1. We have reviewed the guidelines under that section and concluded it is inappropriate for the labor certification process. The standard set by 8 CFR 292.1 is not tailored to the Department's needs. For example, it includes, among others, law students and "reputable individuals." We have determined such persons may not be appropriate to practice before the Department, in particular for purposes of foreign labor certification activities. That definition was designed to fit the needs of another Federal agency and would eliminate many current individuals who act on behalf of employers in the labor certification process with the Department.

The Department acknowledges that allowing agents who are not attorneys does not fit into the categories recognized by DHS and creates a difference between the two agencies. The Department has permitted agents who do not meet these criteria to appear before it for decades. Agents who are not attorneys have represented claimants before the Department in a wide variety of activities since long before the development of H-2A program, and DOL's programs, where they intersect with those of DHS, permit a broader range of representation. To change such a long-standing practice in the context of this rulemaking would represent a major change in policy that the Department is not prepared to make at this time and was suggested in the NPRM seeking comments. Consequently, the Department has not adopted this recommendation. The Department will maintain its long-standing practice and policy with respect to who may represent employers.

For greater clarity, a definition for "Administrator, Wage and Hour Division (WHD)" has been added to the definition section of the regulation to distinguish this official from the "Administrator, Office of Foreign Labor Certification (OFLC)." Regulatory text has been added where needed to distinguish between these officials.

The proposed rule defined an attorney as:

Any person who is a member in good standing of the bar of the highest court of any State, possession, territory, or commonwealth of the U.S., or the District of Columbia, and who is not under suspension or disbarment from practice before any court or before DHS or the U.S. Department of Justice's Executive Office for Immigration Review. Such a person is permitted to act as an attorney or representative for an employer under this part; however, an attorney who acts as a representative must do so only in accordance with the definition of "representative" in this section.

In the Final Rule, the Department has reworded the definition to provide more clarity regarding the bodies or courts that could suspend or disbar an attorney. The Department has also revised the final sentence in the definition to read: "Such a person is permitted to act as an agent or attorney for an employer and/or foreign worker under this subpart."
In the NPRM, the Department added a definition for "employ" and made revisions to the definition of "employer." A trade association suggested that the Department eliminate the definition of "employ" but retain the definition of "employer," stating that the definition of "employ" adds nothing to clarify status or legal obligations under the H-2B program and insinuates broad legal concepts that add unnecessary confusion. As suggested by commenters, the Department has deleted the definition of "employ." We agree this definition did not provide any additional clarification regarding status or legal obligations related to the H-2B program and may generate some confusion with other statutes.

The Department received comments that the requirement for a Federal Employer Identification Number (FEIN) as incorporated in the definition of "employer" could be problematic for some employers. One commenter recommended the use of the DUNS number as a complement to the FEIN. The "data universal numbering system" (DUNS), which is operated by Dunn & Bradstreet, issues nine-digit numbers that serve as unique identifiers and are used, in cases, by the Federal Government or individual businesses to track business entities. The Department has decided to retain the definition as proposed, and notes that it is easy for employers to obtain FEINs, which have the advantage of being assigned by the Internal Revenue Service, although in paragraph (1)(iii) of the definition we have added the phrase "for purposes of the filing of an application," to clarify the FEIN is information gathered specifically at the point of application for H-2B labor certification. In paragraph (1)(i) of the definition, the Department has replaced "may" with "must" to clarify U.S. workers must be referred to a U.S. location for employment.

Commenters supported the inclusion of a definition for "full time." The Department agrees with one commenter's assertion that, consistent with program practice, the definition should not be construed to establish an actual obligation of the number of hours that must be guaranteed each week. The parameters set forth in the definition of "full time" refer to the number of hours that are generally perceived to constitute that type of employment, as distinguished from "part time," and are not a requirement that an employer offer a certain number of hours or any other terms or conditions of employment.

The Department has also made changes to the definition of a job contractor for purposes of clarity. The changes make clear that the job contractor, rather than the contractor's client, must control the work of the individual employee.

One trade association commented that to the extent the intent of the rule is to define the respective liability of agents and representatives, it should articulate a clear set of standards for liability. The association found the definition of "representative" to be problematic and suggested deleting or revising it. The commenter questioned whether the intent of the regulation was to make the representative liable for any misrepresentations in an attestation made on behalf of an employer. Because of potential overlaps with the definition and role of agent, the commenter also requested the rule clarify if, and under what circumstances, an agent is liable for activities undertaken on behalf of an employer. The commenter recommended the Department delete the provision on the representative's role in the consideration of U.S. workers, questioning what rationale the Department had for dictating under what circumstances an attorney or other person can interview U.S. applicants for the job, and why the Department is "singling out" attorneys within the definition.

The Department disagrees with the commenter's interpretation of the liability of an agent or attorney for the acts of the employer. The duties of an agent or attorney may vary widely and not all duties that an agent or attorney undertakes may lead to liability. The Department recognizes, however, that some of an agent's or attorney's duties in representing an employer may put the agent or attorney in the role of the employer and be a basis for assigning liability for the employer's acts or omissions. For example, in undertaking to represent an employer in the H-2A program, an agent or attorney not only

performs administrative tasks but also **\*78025** submits attestations regarding the employer's obligations under the program. Attorneys and agents undertake a significant duty in making such representations. They are, therefore, responsible for reasonable due diligence in ensuring that employers understand their responsibilities under the program and are prepared to execute those obligations. Agents and attorneys do not themselves make the factual attestations and are not required to have personal knowledge that the attestations they submit are accurate. They are, however, required to inform the employers they represent of the employers' obligations under the program, including the employers' liability for making false attestations, and the prohibition on submitting applications containing attestations they know or should know are false. Failure to perform these responsibilities may render the agent or attorney personally liable for false attestations. The Department has decided to retain the definition as proposed.

One commenter believed that the definition of "United States worker" presented in the NPRM was too narrow and that there are other persons in the United States legally entitled to work in addition to those in the categories listed. The Department disagrees and has retained the proposed definition, as it is inclusive and consistent with other provisions of immigration law and regulations that define U.S. workers and persons authorized to work in the U.S.

The Department also added definitions for the terms "Administrative Law Judge," "Chief Administrative Law Judge," "Department of Homeland Security," and "United States Citizenship and Immigration Services," mirroring the definitions in the Department's H-2A Final Rule. These terms and definitions were inadvertently omitted from the proposed rule.

The Department has added a definition of the term "strike" to the Final Rule. The definition clarifies that the Department will evaluate whether job opportunities are vacant because of a strike, lockout, or work stoppage on an individualized, position-by-position basis.

The Department also has added a definition of "successor in interest" to make clear that the Department will consider the facts of each case to determine whether the successor and its agents were personally involved in the violations that led to debarment in determining whether the successor constitutes a "successor in interest" for purposes of the rule.

### C. Section 655.5—Transition

The Department recognizes that implementing the provisions of the Final Rule may be somewhat difficult for employers who have already filed their applications with the SWA to begin recruiting U.S. workers. Even though the NPRM put current and future users of H-2B workers on notice regarding the Department's intention to publish a Final Rule, the rule represents a departure from the current administration of the program. H-2B employers, including those who expressed concern regarding the time frame for a Final Rule, will require some period of time to prepare and adjust their requests for nonimmigrant workers to perform temporary or seasonal nonagricultural services or labor, particularly in tandem with changes to DHS processing of cases, and understand how to complete the Department's new forms for requesting a prevailing wage and applying for temporary employment certification.

In response to comments, the Department is accordingly adopting a transition period, outlined in new § 655.5 (previously reserved). Employers filing applications for H-2B workers on or after the effective date of these regulations where the date of need for the services or labor to be performed is before October 1, 2009, will be required to obtain a prevailing wage determination from the SWA serving the area of intended employment, rather than the NPC, but must meet all of the other pre-filing recruitment requirements outlined in this regulation before an Application for Temporary Employment Certification can be filed with the NPC. However, employers filing applications on or after the effective date of these regulations where the date of need for H-2B workers is on or after October 1, 2009, must obtain a prevailing wage determination from the NPC and comply with all of the obligations and assurances detailed in this subpart. The SWAs will no longer accept for processing applications filed by employers for H-2B workers on or after the effective date of these regulations. Rather, the SWAs will assist the Department's transition efforts by issuing prevailing wage determinations where the employer's need for H-2B workers is prior to October 1, 2009. This will allow the rest of the pre-filing recruitment requirements, obligations and assurances to become effective immediately. During this transition period, the Department expects that SWAs will continue to allow employers to file prevailing wage requests on forms they currently use in other visa programs in order to minimize any confusion and expedite the prevailing wage review process.

In order to complete the processing of applications filed with the SWAs prior to the effective date of these regulations, the transition procedures require the SWAs to continue to process all active applications under the former regulations and

transmit all completed applications to the NPC for review and issuance of a final determination. In circumstances where the SWA has already transmitted the completed application to the NPC, the NPC will complete its review in accord with the former regulations and issue a final determination. OFLC intends to conduct several national stakeholder briefings to familiarize program users with these requirements.

### D. Section 655.6—Temporary Need

Congress mandated the H-2B program be used to fill only the temporary needs of employers where no unemployed U.S. workers capable of performing the work can be found. 8 U.S.C. 1101(a)(15)(H)(ii)(b). Therefore, as explained in the NPRM, the Department will continue to determine whether the employer has demonstrated that it has a need for foreign labor that cannot be met by U.S. workers and that the need is temporary in nature.

The controlling factor continues to be the employer's temporary need and not the nature of the job duties. Matter of Artee Corp., 18 I&N Dec. 366 (Comm. 1982); cf. Global Horizons, Inc. v. DOL, 2007-TLC-1 (Nov. 30, 2006) (upholding the Department's position that a failure to prove a specific temporary need precludes acceptance of temporary H-2A application).

DHS regulations at 8 CFR 214.2(h)(6)(ii)(B) provide that a petitioner's need be one of the following: (1) A one-time occurrence, in which an employer demonstrates it has not had a need in the past for the labor or service and will not need it in the future, but needs it at the present time; (2) a seasonal need, in which the employer establishes that the service or labor is recurring and is traditionally tied to a season of the year; (3) a peakload need, in which the employer needs to supplement its permanent staff on a temporary basis due to a short-term demand; or (4) an intermittent need, in which the employer demonstrates it occasionally or intermittently needs temporary workers to perform services or labor for short periods.

As proposed in the NPRM, for purposes of a one-time occurrence, under this Final Rule the Department will consider a position to be temporary **\*78026** as long as the employer's need for the duties to be performed is temporary or finite, regardless of whether the underlying job is temporary or permanent in nature, and as long as that temporary need—as demonstrated by the employer's attestations, temporary need narrative, and other relevant information—is less than 3 consecutive years. This interpretation is consistent with the rule proposed by USCIS on August 20, 2008, 73 FR 49109, which is being finalized in conjunction with this regulation.

Consistent with the final USCIS regulations, the Department proposed—and the Final Rule permits—a one-time occurrence to include one-time temporary events that have created the need for temporary workers for up to 3 years. The Final Rule requires those employers to request annual labor certifications based on new tests of the U.S. labor market. As stated in the NPRM, we believe this is the best method by which to ensure U.S. worker access to these job opportunities, but recognize that an employer's need for workers to fill positions could, in some cases, last more than one year.

The Department received a number of comments in response to the proposed expansion of the one-time occurrence definition. A job contractor commented that it did not believe the Department needed to specifically authorize the possibility of a 3-year, one-time need, since it could be inferred as already having the authority to certify such situations as long as the employer's situation as described in the application was compelling. However, the commenter believed that establishing a maximum 3-year stay may be limiting under certain circumstances such as rebuilding after natural disasters. It also creates confusion and complexity for the employer applicants who may not understand the distinction between a 3-year labor need broadly speaking and a one-time occurrence. Under the NPRM and this Final Rule, the extension of the temporary need definition from 1 year or less to potentially up to 3 years does not apply to all categories of need. The Department believes employers should understand that an H-2B visa will only be granted for longer than 1 year in the case of a one-time occurrence.

Neither the Department nor DHS is changing the long-established definition of one-time occurrence which encompasses both unique non-recurring situations but also any "temporary event of a short duration [that] has created the need for a temporary worker." For example, an employer could utilize the H-2B program to secure a worker to replace a permanent employee who was injured. Further, if that permanent employee, upon returning to work, subsequently suffered another injury, the same employer could utilize the H-2B program again to replace the injured employee on the basis of a one-time occurrence. A one-time occurrence might also arise when a specific project creates a need for additional workers over and above an employer's normal workforce. For example, if a shipbuilder got a contract to build a ship that was over and above its normal workload, that might be a one-time occurrence. However, the Department would not consider it a one-time occurrence if the

same employer filed serial requests for H-2B workers for each ship it built.

The NPRM required that employers request recertification annually where their one-time occurrence extends beyond 1 year. The Department agrees with public comments that, where the need is one-time only, the added burden and expense of an additional labor market test does not make sense where the total period of need is less than 18 months. Therefore, an employer with a one-time need that has been approved for more than 1 year but less than 18 months will receive a labor certification covering the entire period of need, and will not be required to conduct another labor market test for the portion of time beyond 12 months. An employer requesting certification based on a one-time occurrence it expects to last 18 months or longer, however, will be required to conduct one or more additional labor market tests.

A number of individual small business commenters were concerned that the proposed changes went beyond the original intent of the program and would leave the seasonal and peakload businesses for which it was intended without adequate numbers of visas. They raised longstanding concerns with what many believe is an arbitrarily low visa cap and the strong competition among industries for the limited visas. These commenters posited that expanding the term to 3 years would open up the program to a wider number of industries, further increasing competition for visas and effectively crowding out those employers for which these commenters believe the visa was intended. One small employer thought it would allow high tech businesses to participate in the H-2B program to use up all the visas and leave other employers with real peakload needs wanting. This employer also thought it would create a security threat by letting visas be sold on the black market. SWAs commenting also questioned the change in definition as being what they described as a significant program change. While most employers of highly skilled workers currently avail themselves of the H-1B visa program, they are not precluded from seeking, as an alternative, H-2B nonimmigrant status, if they otherwise meet the requirements of the H-2B program. None of the changes proposed by the Department would make the H-2B visa program any more or less available to highly skilled workers or provide employers who might wish to use such persons as H-2B workers with any greater advantage than other H-2B employers. In addition, with respect to visas issued by the State Department based on an approved DHS petition, the Department is unaware of any contemplated change in this or the DHS rulemaking that would create an automatic 3-year H-2B visa. Depending on reciprocity schedules, under current State Department regulations, an initial H-2B visa is generally issued for a year or less, or for the validity period of the approved H-2B petition, but can be extended for additional periods of time to correspond to any period of time DHS might extend such H-2B petition. Nothing in this rule would change that.

Several Members of Congress submitted separate comments on behalf of congressional committees. One U.S. Senator opposed the expansion of the definition of a one-time occurrence as contrary to the 1987 legal opinion of the Department of Justice, Office of the Legal Counsel. The comment stated that the Department of Justice considered various views of the proposed construction of "temporarily" in the context of the H-2A visa program and declined to define temporary as up to 3 years. According to the comment, the Justice opinion concluded that the statutory text, Congressional intent, and sound policy compelled a definition of temporary to be 1 year or less for all H-2 classifications. The comment also pointed to the Department's and DHS's proposed rules on the H-2A program that retained the one year or less definition of temporary (absent extraordinary circumstances) as evidence that the current construction should be retained. The commenter was concerned that the regulation would lead to abuse of the H-2B program by encouraging some employers who want to take advantage of the program to characterize long-term or permanent jobs as temporary. The commenter believed that these longer-term jobs should be filled by U.S. workers and, if none are available, only then through the employment-based immigration visa process.

Several labor unions also commented on this provision, largely in opposition. **78027** One believed the proposal to be at odds with years of precedent and immigration and workforce policy, as well as current law. The commenter asserted that expanding the definition conflicts with DHS regulations, runs counter to the purpose of the H-2B program, and undermines the Congressional mandate to protect U.S. workers. Another labor organization contended that if an employer's need is longer than a short duration it is not a temporary need, and a period longer than a year is not of short duration. This commenter opposed the inclusion of this provision and urged the Department to withdraw this proposed change. Another union proposed temporary employment be limited to six months and "certainly no longer than [1] year." Another labor organization opposing the proposed provision did not believe that the requirement that employers retest the labor market each year represented a meaningful safeguard for domestic workers, particularly if the Department were to adopt an attestation-based system where recruitment of U.S. workers is not actively supervised by the SWAs. It recommended the H-2B program be made consistent with the H-2A program concerning the definition of temporary.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Several worker advocacy organizations also opposed this provision, indicating their belief it was not in keeping with the objectives of the program and would open most construction jobs in the country to be potentially part of the program. An individual employer commented that seasonal should mean 8 months or less so as to not compete with local permanent jobs.

A law firm commented that the proposed changes went beyond what it believed Congress intended and claimed anecdotally it would directly and proportionally adversely affect the industries for which it felt the program was designed. It believed that the problems with the program are more associated with the delays and uncertainties related to the inadequate number of visas as well as inadequate budget and staffing at all levels of the application process. The commenter recommended these problems would be best addressed by Congress and by increased fees at each step. It also believed that this expansion of the definition would encourage additional industries, most notably the information technology industry, to participate and to put undue pressure on an already pressured program.

Conversely, several employer and trade associations supported the expanded provision. One employer association welcomed the change as long in coming. Another supported it as a means to provide greater flexibility across industries and regions. Still another recommended that the 3-year provision be expanded beyond "one-time need" to the other three categories of temporary need.

A legal association supported the proposal to expand temporary need but suggested the Department rethink the requirement that employers retest the market each year. According to the comment, requiring employers to get a new prevailing wage and perform additional recruitment and filing each year would increase workload for the Department, increase costs to employers, and fails to recognize the advantages of the employer having the availability of trained, experienced workers. It recommended that a reasonable alternative would be for employers to check the prevailing wage determination annually to ensure that the workers are being paid the appropriate wage but not to have to undertake further recruitment efforts.

Many SWAs commented on the proposed rule. On the issue of temporariness, one SWA stated its support for retesting the labor market each year. An employer association supported retesting the labor market each year only in situations where there was a significant time period beyond the ordinary 10-month period left on the labor certification. It believed that this requirement would be too onerous on employers if applied to jobs lasting only 18 months, for example.

Finally, a worker advocacy group recommended the addition of a process either through the Department or the SWAs under which workers could challenge the determination that the jobs are temporary.

The Department defers to the Department of Homeland Security and will use their definition of temporary need as published in their Final Rule on H-2B. Currently, that definition, including the four categories of need, appears at 8 CFR 214.2(h)(6)(ii), and requires the employer show extraordinary circumstances in order to establish a need for longer than 1 year. DHS's Final Rule amends 8 CFR 214.2(h)(6)(ii)(B) to eliminate the requirement for extraordinary circumstances and clarify that a temporary need is one that ends in the near, definable future, which in the case of a one-time occurrence could last longer than 1 year and up to 3 years. Accordingly, we have deleted the definitions we had in our regulatory text in the NPRM and instead provided a reference to the DHS regulations.

### *E. Section 655.10—Determination of Prevailing Wage for Labor Certification Purposes*

#### 1. Federalizing Prevailing Wage Determinations

The Department proposed a new reengineered system to federalize the issuance of prevailing wages, under which employers would obtain the prevailing wage for the job opportunity directly from the NPC. As proposed, the new federalized process would allow employers to file prevailing wage requests with the appropriate NPC—designated as the Chicago NPC for prevailing wage requests—no more than 90 days before the start of recruitment. The proposed rule also clarified the validity period for wage determinations. Based on annual updates to the Occupational Employment Survey (OES) database, and depending on the time of year that the prevailing wage determination (PWD) was obtained from the Department, relative to the date of the most recent update, the wage determination provided could be valid from several months up to 1 year. The NPRM sought comments from employers who had utilized the program in the past on the efficacy of this proposed action.

The Department received numerous comments on this new process. After consideration of all comments, we have decided to implement the PWD process as proposed in the NPRM. However, to reflect the transition from the current system to the new,

the Final Rule now clarifies that employers with a date of need on or after October 1, 2009, must seek a PWD from the Chicago NPC prior to beginning recruitment, while employers with prior dates of need will continue to seek PWDs from the SWAs. However, consistent with the Department's intent to immediately implement the Final Rule, and as set forth in § 655.5 of this Final Rule, SWAs will be required to follow the procedures instituted under § 655.10 for any prevailing wage determination requests submitted on or after the date this Final Rule takes effect.

Overwhelmingly, commenters were concerned about the capability of the NPC to provide timely and accurate prevailing wage determinations. Commenters supporting the new centralized process included trade associations, employer-based organizations, businesses, and individual professionals with significant experience in the foreign labor certification field. Of those, some requested reassurance that the Department would allocate sufficient resources and training to the PWD **78028** activity at the NPCs to prevent processing delays. They urged the Department to institute mechanisms to ensure consistency between NPCs and across job titles, descriptions, and requirements; and to offer comprehensive training to employers, attorneys, and agents prior to implementation.

Many commenters, including labor unions, advocacy organizations, academic institutions, and SWAs expressed concern that the NPC staff would not possess the same level of expertise, particularly locally-oriented expertise, required to provide accurate, context-appropriate prevailing wage determinations as the SWA staff. They believed this could lead to reduced scrutiny, inaccuracy, backlogs, and delays, and adversely affect U.S. worker wages and job opportunities. The SWAs that commented on this issue were concerned that transferring the determination to the NPCs would also degrade customer service, and some questioned whether OES really keeps pace with changes in local standards. One state has had success with its own system and recommended the Department replicate that system on a national scale.

One advocacy organization expressed the view that centralization would be particularly harmful to amusement park industry workers, which currently use a weekly rate rather than an hourly rate. One employer was concerned that NPC-issued PWDs would be inaccurate and biased in favor of higher wages, raising program costs. Several commenters opposed PWD federalization in its entirety and proposed full funding of SWAs for these activities. In the alternative, they recommended that, if the Department were to move forward, it hire staff with strong PWD backgrounds and create a separate PWD unit within the NPC.

To guard against potential delays, some commenters requested that a timeframe for the process be established, or recommended adjustments to the process as proposed. A small business coalition recommended the Department permit employers to recruit without first getting the PWD from the NPC, so long as the employer accompanied its H-2B application with a printout of a current and appropriate wage from O*NET, which is the Internet wage survey the Department updates on an annual basis. A large trade association made a similar recommendation, with a proviso that if the employer has not used the correct wage from the database, it would be required to restart the application process after obtaining a PWD from the NPC. The Department also received a suggestion that employers be allowed to get the OES rate themselves unless they want a safe harbor which would be provided by getting the wage rate from the NPC or SWA. Another commenter was concerned that employer surveys do not provide the same safe harbor as SWA determinations and another commenter was concerned that eliminating the SWA from the process meant that the safe harbor would also be eliminated.

This Final Rule establishes rules under which employers may provide their own information. Apart from those instances, the Department believes there is greater value and potential for greater consistency and efficiency in having the NPC provide the wage. The Department believes that continued oversight at the Federal level is essential to ensuring that the job opportunities are advertised and paid at the required wage and therefore does not adversely affect U.S. worker wages.

A number of commenters urged that within this new process, the Department provide a vehicle for communication between program users and NPC staff to resolve disagreements on the job opportunity or wage level and educate program users on the Department's methodology. One trade association recommended the Department disclose its methodology for a PWD upon request from an employer with sufficient time to avoid delaying the application. Other organizations conditioned their support of the new process specifically on the creation of a mechanism for communicating or interacting with the public. Some commenters observed that the appeal process for wage determinations can be quite lengthy, and not a viable option in the context of H-2B or H-1B, where timing is critical; those commenters were particularly concerned that without such communication the timeframe for resolving any prevailing wage determination issues would be lengthened.

The Department recognizes its responsibility to provide an efficient process for prevailing wage determinations. Now that the backlog in the permanent labor program has been eliminated, resources are being redirected to other OFLC priorities, including offsetting some costs associated with the re-engineering of the temporary labor certification programs. As the new program design is implemented, we will allocate available appropriated resources to key activities, including the PWD function. As part of this process, the Department will focus on identifying areas where improvements could be made, including developing and providing needed training. The Department will also look to its stakeholder community for input and suggestions for improvements.

The Department will provide stakeholder briefings on H-2B Final Rule, is updating its Prevailing Wage Guidance for agricultural and nonagricultural programs, and will provide additional training and educational material as appropriate.

The Department will, to the extent feasible and within available resources, seek to hire qualified staff, will train staff already on board, and if appropriate, will consider establishing a separate PWD unit at the Chicago NPC. In addition, the Department will strive to provide timely, appropriate guidance to program users and SWAs to ensure a successful transition and implementation. We remain confident that federalizing the prevailing wage application component will instill a high level of efficiency and consistency in the process which has been a past problem. This increased efficiency and consistency will help ensure more accurate wage determinations, which result in improved protections for U.S. workers.

As stated in the NPRM, the Department strongly believes that shifting wage determination activities to NPC staff will reduce the risk of job misclassification because of centralized staff experience, thereby not only strengthening program integrity, but also ensuring consistency in classification across States, resulting in improved protections for U.S. workers.

As discussed in the NPRM, the Department has received numerous reports that in cases where job descriptions are complex and contain more than one different and definable job opportunity, some SWAs have made inconsistent classifications that resulted in inconsistent PWDs. Furthermore, where H-2B workers are required to work in several different geographic areas that may be in the jurisdiction of several SWAs (examples include the New York, New Jersey, Connecticut "Tri-state Region" or the Washington, DC-Maryland-Virginia metropolitan area), questions have arisen about where to file a prevailing wage request and how that wage should be determined. Utilizing a federalized system will alleviate such confusion. Moreover, the Department's current prevailing wage guidance requires SWAs refer—with certain exceptions—to federally provided OES data to determine the appropriate prevailing wage for jobs. Therefore, the NPC can provide the data **\*78029** and there is no requirement for any local input or expertise.

The Department understands the desire for a fixed timeframe within which an employer will receive a prevailing wage determination. The timeframe depends on a number of factors, including the volume and timing of requests received, the method by which the requests are received (whether paper or electronic), the complexity of the request, and the resources available. Nevertheless, the Department has committed as part of the Final Rule to processing employer requests for prevailing wage determinations within 30 days of receipt.

However, the Department acknowledges that this process of obtaining a prevailing wage may endure a period of processing time fluctuation as a result of the transition. We therefore recommend that, as an initial matter, employers filing H-2B applications should file a Prevailing Wage Determination Request, Form 9141, with the NPC at least 60 days in advance of their initial recruitment efforts. The Department will make every effort to process these requests within the 60 days. The Department will analyze its experience with application patterns and workload, as the NPCs take on the prevailing wage determinations in the other programs handled by OFLC. During that time, the Department will review not only the level of requests it receives, but the information contained in the requests and whether the information received is typically sufficient to be able to generate accurate prevailing wages, or whether employers are providing deficient information. The Department's intent is to substantially reduce the response time for prevailing wage determinations and to design procedures, based upon the results of its analyses to provide employers with greater certainty in their expectation of response time from the NPC.

One commenter thought the prevailing wages would be based on a national average as a result of the centralization in the NPC. That commenter misunderstood the proposal; the wages will continue to be based on applicable data for the area of intended employment. The Department did not propose any change to the methodology used to determine the wage rates under the H-2B program and continues to support the use of OES data as the basis for the prevailing wage determinations.

The OES program produces occupational estimates by geographic area and by industry. Estimates based on geographic areas are available at the national, State, and metropolitan area levels. Industry estimates are available for over 450 industry classifications at the national level. The industry classifications correspond to the sector, 3, 4, and 5-digit North American Industry Classification System industrial groups. The OES program also provides data at the substate level in addition to the State level. Data is compiled for each metropolitan statistical area and for additional areas that completely cover the balance of each state. It also offers the ability to establish four wage-level benchmarks commonly associated with the concepts of experience, skill, responsibility and difficulty variations within each occupation.

In the Final Rule, the Department has revised § 655.10(d) to clarify that where the duration of a job opportunity is less than one year or less, the prevailing wage determination will be valid for the duration of the job opportunity.

### 2. Automating the PWD Process

Initially the PWD process will be a manual process. It is the Department's goal to allow the PWD activity eventually to be conducted electronically between the NPC and the employer. The Department sought comment from potential program users on all aspects of its PWD proposal, but in particular regarding the required use of an online prevailing wage system and corresponding form for interaction with the NPC.

The Department received several comments in support of an electronic process. One commenter suggested the centralization of prevailing wage determinations be delayed until the electronic process was available. Another commenter suggested the electronic process should not be mandatory for all employers, since not all employers have access to the Internet. One commenter expressed concern that employers would use an electronic system to "shop" for occupations with the lowest wages to use in describing their job opportunities. The Department disagrees with the suggestion we delay implementation of the prevailing wage function until an electronic version is available. If and when the Department implements an electronic application system, it customarily makes special provisions for those who cannot access the electronic system, and advises the public accordingly. The Department appreciates the input on an electronic system and will take the comments into consideration should a new system be proposed.

### 3. Extending the PWD Model to PERM, H-1B/H-1B1, E-3, and H-1C Programs

The Department received comments on its proposal to extend the federalized wage determination process to other permanent and temporary worker programs. Some believed that the Department should not include other programs in an H-2B rulemaking. One commenter suggested that the process should not be extended until the new system has proven to be workable. Another commenter was concerned that extending the process to these other programs would result in the total elimination of the States when enforcement capacity is best kept at the State level. One commenter who supported the federalization mentioned that the assignment of occupational codes from the Standard Occupational Classification (SOC) system is also key and should be reviewed. The SOC system is used by many Federal agencies to classify workers into occupational categories.

### a. H-1B and PERM Programs

As proposed in the NPRM, for consistency and greater efficiency across non-agricultural programs, this Final Rule extends the new prevailing wage request processing model to the permanent labor certification program, as well as to the H-1B, H-1B1, H-1C and E-3 specialty occupation nonimmigrant programs. As stated in the NPRM, the new process will not alter the substantive requirements of foreign labor certification programs, and we anticipate that, at least in the foreseeable future, the methodology for determining appropriate wage rates will remain much the same as it stands today. Our intent is to modernize, centralize, and make the mechanics and analysis behind wage determination more consistent. Much as the SWAs do now, the NPCs will evaluate the particulars of the employer's job offer, such as the job duties and requirements for the position and the geographic area in which the job is located, to arrive at the correct PWD based on OES data, CBA rates, employer-provided surveys, or other appropriate information. The Department's current prevailing wage guidance for non-agricultural foreign labor certification programs has been in effect since 2005 and is posted in the form of a memorandum on the OFLC Web site. In the near term, the Department will update and formalize its guidance for making prevailing wage determinations to maintain some existing procedures and revise others such as to conform to these regulations. As program experience administering **\*78030** the PWD process grows, the Department may revise its guidance to explain and assist employers in navigating the process.

To implement and standardize the new process, ETA has developed a new standard Prevailing Wage Determination Request (PWDR) form for employers to use in requesting the applicable wage regardless of program or job classification. As stated in the NPRM, the Department is considering means by which eventually such requests could be submitted, and a prevailing wage provided, electronically.

For purposes of the permanent labor certification (PERM) program, this rule amends the regulations at 20 CFR part 656 to reflect the transfer of prevailing wage determination functions from the SWAs to the NPCs and makes final the technical changes described in the proposed rule.

For purposes of the H-1B program, this rule amends the regulations at 20 CFR part 655 to reflect the transfer of PWD functions from the SWAs to the NPCs and makes final the technical changes described in the proposed rule. Department regulations covering the H-1B program also govern the H-1B1 and E-3 programs, which both require the filing and approval of a "Labor Condition Application," or LCA, rather than a "labor certification application." The Final Rule also amends § 655.1112 governing the H-1C program, to provide for the federalization of prevailing wage determinations.

As described in the NPRM and included in the Final Rule, under the new process, for purposes of H-2B job classifications, NPC staff will follow the requirements outlined under new §§ 655.10 and 655.11 when reviewing each position and determining the appropriate wage rate. These new regulatory sections are consistent with existing provisions at 20 CFR 656.40 and the Department's May 2005 Prevailing Wage Determination Policy Guidance, Nonagricultural Immigration Programs, but would supersede current regulations and guidance for the H-2B program to the extent there are any perceived inconsistencies.

These new regulatory sections supersede current regulations and guidelines for all prevailing wage requests in the H-1B, H-1B1, E-3 and PERM programs made on or after January 1, 2010, and for H-1C prevailing wage requests made on or after the effective date of this Final Rule. The Department appreciates that employers will require some time to become accustomed to the new method of securing a prevailing wage determination. The SWAs will also need a time of transition to complete pending prevailing wage determination requests, just as the NPC will require a corresponding time to fully implement the new form and process. The Department believes keeping PWD activities with the SWAs for PERM, H-1B and related programs until January 2010 will facilitate the transition of Federal staff and program users to complete federalization of prevailing wage determinations. Therefore, the Chicago NPC will begin to provide prevailing wage determinations in programs other than H-2B and H-1C on January 1, 2010. Given the limited size of the H-1C program, and the possibility it may sunset in 2009, the Department believes it can begin processing prevailing wage determination requests shortly after this Final Rule takes effect. Prevailing wage requests under the H-1C program made prior to the effective date of this Final Rule will be governed by the Department's current procedures and its 2005 guidance. Any prevailing wage requests for other non-H-2B programs governed by this regulation made prior to January 1, 2010, must be submitted to the SWA having jurisdiction over the area of intended employment and will be valid for the period listed on the determination issued by the SWA. Prevailing wage determinations issued prior to January 1, 2010, by a SWA will be valid after October 1, 2010, if so determined by the SWA issuing them, and fully enforceable as determined by the applicable regulation (H-1B, H-1B1, E-3, H-1C or PERM).

**b. H-1C Program**

In the same way that the Department is in this Final Rule establishing national processing for the obtaining of prevailing wages through its National Processing Center for both H-1B (and by extension H-1B1 and E-3) and PERM, it will also amend its H-1C regulations to incorporate the same changes. This program, whose prevailing wage processing amendments were inadvertently removed from the NPRM, previously lapsed, but was reauthorized in December 2006, and is scheduled to sunset again in December 2009.[FN5] The Department has determined that it is administratively prudent to move the prevailing wage determination function to the Chicago NPC in the H-1C program as in the other programs. This affects a very small number of employers (only 14 hospitals are eligible to participate) and is consistent with the reasoning for federalizing prevailing wage determinations that applies to the other programs. As stated in the preamble to the NPRM, the conversion to a federalized prevailing wage system has no effect on the substantive requirements of foreign labor certification programs or on the methodology by which the NPC will determine the prevailing wage for workers to be admitted under any of the applicable visas. This applies equally to H-1C. In fact, the majority of prevailing wage determinations in the H-1C program are based on the wages contained in collective bargaining agreements, making the need to obtain a wage

determination by the NPC frequently unnecessary. Facilities may begin submitting H-1C prevailing wage requests to the Chicago NPC on the date this Final Rule takes effect.

**4. Section 655.10(b)(3)—Paying the Highest Prevailing Wage Across MSAs**
As proposed in the NPRM, this Final Rule requires that, where a job opportunity involves multiple worksites in areas of intended employment and cross multiple Metropolitan Statistical Areas (MSAs) in multiple counties or States with different prevailing wage rates, an employer must pay the highest applicable wage rate of the applicable MSAs throughout the term of employment. The U.S. worker responding to recruitment and the foreign H-2B worker are entitled to know and rely on the wage to be paid for the entire period of temporary employment.

The Department received comments on this requirement, both in support and in opposition. One trade association supported the proposal, concluding it would strengthen protections for U.S. workers while not adding burden to its members, whom it said already paid the highest prevailing wage rate in every MSA. A number of other employer associations opposed the proposal, stating it was arbitrary, unfair, would artificially increase costs for H-2B labor, and would undermine the basic decision-making of many employers, who locate in areas with low labor costs in order to save money.

The Department has decided to retain the requirement that employers advertise and pay the highest of the applicable prevailing wages when the job opportunity involves multiple worksites across multiple MSAs with varying prevailing wage rates for that occupation and at those worksites. This provision is retained because it provides greater consistency and predictability **\*78031** for both employers and the workers and ensures that U.S. workers who are interested in the job opportunity would not be deterred due to varying wage rates. It also ensures greater protection for workers against possible wage manipulation by unscrupulous employers.

**5. General Process or Data Integrity Concerns**
Some commenters raised concerns about the integrity of the data currently being used for prevailing wage determinations and recommended changes to the OES survey itself. Others commented on different aspects of the methodology and procedures. One commenter suggested that the Department set the minimum wage rate for H-2B workers at or above the wage (presumably the adverse effect wage rate) for H-2A workers in that State. Another commenter suggested the Department require employers in the construction industry to use, first, the Davis-Bacon Act (DBA) survey wage rate; second, if no DBA wage existed, the collective bargaining agreement rate; and as a last resort, the OES rate, if neither of the other rates was available. Another commenter suggested that the provision regarding when an employer may utilize a wage determination under the Davis-Bacon Act also cover when an employer can choose not to utilize that wage rate. One commenter believed that the proposal did not correct what they claimed was a problem with the Department's Bureau of Labor Statistics (BLS) wage rates being 2 years out of date and also expressed concerns that piece rate policies have led to depressed wages and suggested that the Department should require advance written disclosure of piece rates on the job orders.

The Department appreciates these suggestions and concerns. However, the Department did not propose changes to the sources of data to be used for prevailing wage determinations and, therefore, these comments are beyond the scope of the current rulemaking. The Department notes that the proposed procedures that were retained in the Final Rule already cover the use of wages specified in a collective bargaining agreement. Similarly, these procedures provide that an employer may use the Davis-Bacon wage and that such use is at the employer's option unless the employer is a Federal construction contractor. There is a similar provision that applies to Service Contract Act wage rates.

Some commenters suggested that employers should not be allowed to submit their own wage surveys. The Department, however, believes that employers should continue to have the flexibility to submit pertinent wage information and therefore, the Final Rule continues the Department's policy of permitting employers to provide an independent wage survey under certain guidelines. It also continues to provide for an appeal process in the event of a dispute over the applicable prevailing wage.

*F. Section 655.15—Employer Conducted Pre-Filing Recruitment*
Under the Final Rule, employers will continue to be required to test the labor market for qualified U.S. workers at prevailing wages no more than 120 days before the date the work must begin ("date of need"). This will ensure the jobs are made

available to U.S. workers most likely to qualify for the positions in question. As described in the NPRM and finalized under this rule, U.S. worker recruitment will continue to consist of prescribed steps designed to reflect what the Department has determined, based on program experience, are most appropriate to test the labor market. These steps are similar to those required under the current H-2B program. However, application processing and consistency will be improved by having employers conduct the recruitment before forwarding the recruitment report and application to the Department for review. Additionally, we will continue the Department's current requirement that recruitment take place no more than 120 days before the date of need to ensure jobs are advertised to U.S. workers with adequate notice.

This Final Rule retains the requirement in the proposal that employer recruitment efforts be documented and retained for production to the Department or other Federal agencies. As stated in the NPRM, the recruitment documentation requirements will be satisfied by copies of the pages containing the advertisement from the newspapers in which the job opportunity appeared and, if appropriate, correspondence signed by the employer demonstrating that labor or trade organizations were contacted. Documentation of a SWA job order will be satisfied by copies of the job order downloaded from the Internet showing the beginning and the ending date of the posting or a copy of the job order provided by the SWA with the dates of posting listed, or other proof of publication from the SWA containing the text of the job order. However, in response to public comments, the Final Rule requires record retention for 3 years, which is 2 years less than the Department originally proposed.

As proposed, the Final Rule permits employers to place their own newspaper advertisements. The Department has revised the proposed requirement of three advertisements and will in this Final Rule revert to the current requirement of two advertisements. The Department, however, has maintained in this Final Rule the proposed requirement that one of the two advertisements must be placed in a Sunday edition of a newspaper closest to the area of intended employment. The Department has also added a clarification that the newspaper chosen needs to have a reasonable distribution.

The Department received several comments that supported the shift to a pre-filing recruitment model. One of these commenters recommended that the job order process should also be centralized or that timelines for posting job orders should be established and SWAs should have staff dedicated to working with H-2B job orders. The centralization of the job order process was not envisioned by this regulation, and would require separate rulemaking. Moreover, posting job orders and referring individuals to those jobs is a core function of the SWAs and one that remains at the local level in this rule. Additionally, the Department believes the SWAs must have the flexibility to assign their limited resources based on needs and priorities and declines to establish a timeline for SWAs to post job orders.

The Department received a number of comments about the proposed timeframe for pre-filing recruitment; some opposing recruitment so far in advance of the date of need and others suggesting the timeframe be lengthened. The commenters who were opposed to the proposal generally believed that U.S. workers would not be able or willing to commit to temporary jobs so far ahead of the actual start date or would indicate they would accept the jobs but then fail to report on the actual start date. These commenters believed this would result in delays, additional costs to employers and the Department, and the late arrival of H-2B workers because new applications would have to be filed. One commenter opposed the early pre-filing recruitment and believed the result would be a false indication that no U.S. workers were available. Another commenter opined that employer compliance would be reduced due to the pre-filing recruitment. One SWA recommended that the period for recruitment be shortened because 120 days in advance is not suitable when serious job seekers are looking for **\*78032** temporary employment and stating their view that those U.S. workers who apply are rarely offered employment because the employer knows foreign workers are available. The commenter was further concerned that the U.S. workers who are hired that far in advance of the date of need are not reliable and will not report for work. In contrast, two commenters suggested a longer recruitment period—one recommended 180 days in advance of the date of need—to provide employers with greater flexibility. The Department declines to extend the period of recruitment to 180 days prior to the date of need because we do not believe recruitment that far in advance would be effective given the concerns expressed by some of the commenters and our own extensive program experience.

One commenter was concerned that the proposed pre-filing recruitment period, when combined with a prevailing wage determination request submission 90 days prior to the recruitment start date, advanced the timeframe for beginning the application to more than 6 months prior to the date of need. This commenter stated this was not characteristic of a user-friendly program. The Department understands that there are trade-offs when designing a new system. In this case, in order to provide the employer more flexibility and eliminate an extra layer of government bureaucracy, the process must

begin earlier.

One commenter was concerned about the validity of the pre-filing recruitment when, after completing the recruitment and submitting the application, the employer's needs change and it requires a modification to a term or condition on the application. This commenter questioned whether the recruitment would be considered a valid test of the labor market since, unlike the current process, the underlying application and job order will not have been approved prior to the recruitment effort. The commenter recommended that the Department provide in the regulation that as long as the recruitment was conducted based on the job description and offered wage as determined by the CO and the job order was accepted by the SWA, the recruitment would be considered valid irrespective of any required modifications. It is unclear what kind of modifications would be warranted and, therefore, the Department cannot respond directly to this comment. For example, if a timely-filed application requires a technical modification, but the modification cures the defect and allows the application to resume processing, then the recruitment will continue to be valid for as long as the petition is pending at the NPC and valid for purposes of a final determination. However, if an employer's needs change in a way that requires a substantive correction in one or more key terms and conditions of employment—for example, wages or occupation—the NPC will require that the position be readvertised. Changes in terms of employment contained in the underlying job offer will trigger a requirement for a new labor market test.

The Department's requirement that the employer submit an acceptable job order to the appropriate SWA for posting mandates that the employer complete and submit information regarding all of the job duties and terms and conditions of the job offer: The job duties, the minimum qualifications required for the position (if any), any special requirements, and the rate of pay. This information is normally submitted to the SWA for acceptance prior to the employer's recruitment; as long as the employer's advertisements do not depart from the descriptions contained in the accepted job order, they will be deemed acceptable by the Department. At the same time, the SWA will be the arbiter of the job's acceptability for the job order, and as the job order must be accepted prior to the commencing of recruitment in this Final Rule, all recruitment must reflect the job as accepted by the SWA as well.

The Department has decided to eliminate the document retention requirement in its entirety with respect to applications not certified; therefore, any employer whose application has been denied can discard the records relevant to the denied application immediately upon receiving the denial notice or whenever the decision becomes final if the employer appeals the decision. If the denial is overturned, the application becomes subject to the document retention requirements for approved cases. The Department determined that a document retention requirement in such cases serves no governmental purpose and is unnecessarily burdensome on employers. The Department would, in virtually all such cases, already have copies of the employer's supporting documentation rendering such a retention requirement unnecessary.

### 1. Section 655.15(g)—Unions as a Source of Labor

As proposed, the rule would have required that if the job opportunity were in an industry, region and occupation in which union recruitment is customary, the appropriate union organization must be contacted. A number of commenters were concerned that the proposed provision placed too great a reliance on the employer's ability to determine what the Department will later decide is "appropriate for the occupation and customary to the industry and area of intended employment." One of these commenters suggested that even if contacting a union may be appropriate in some industries, it would be entirely inappropriate in the construction industry and, at a minimum, the construction industry should be expressly excluded from this requirement under a Final Rule. Another commenter suggested that the requirement was unnecessary, as the required newspaper advertising would reach the same pool of applicants. Another commenter believed the requirement was not authorized by statute and the Department has no basis to impose it. Additionally, the commenter expressed concern that the requirement also has the potential to subject non-unionized employers to "salting" campaigns, during which union organizers retain employment in union shops for the sole purpose of organizing the workforce. According to this commenter, the requirement could unfairly and unnecessarily inject the Department into an area in which it should not be involved.

One specialty bar association opined that the requirement to use unions as a recruitment source would be unworkable in practice, stating that in their experience, unions will not refer workers to non-union shops. The commenter recommended the regulation instead use the approach of the permanent labor certification program, which requires union contact for unionized employers only.

The Department has considered these comments and agrees with the many concerns raised about the proposed requirement,

in particular concerns about vagueness and ambiguity, and the dilemma employers would face in trying to interpret and implement the requirement. Accordingly, we have revised the provision to require an employer to contact a labor organization only in cases where the employer is already a party to a collective bargaining agreement that covers the occupation at the worksite that is the subject of the H-2B application. The employer's obligation is only to contact the local affiliate of labor organization that is party to the existing collective bargaining agreement that covers the occupation at the worksite that is the subject of the H-2B application.

**\*78033 2. Section 655.15(i)—Referral of U.S. Workers and SWA Employment Verification**

To strengthen the integrity of the Secretary's determination of the availability of U.S. workers, and to help bolster employers' confidence in their local SWAs and the H-2B program, the Department proposed that SWAs verify the employment eligibility of U.S. workers they refer for nonagricultural employment services with the SWA. The Department received a significant number of comments on the practicality of this provision.

Comments on this subject were received from national associations, numerous SWAs, several labor advocacy organizations, and members of Congress. Commenters generally opposed the proposal for a variety of legal, programmatic, resource-related, and policy-based reasons.

Most of the commenters were SWAs that noted the burden this new provision would create. Many saw it as an unfunded Federal mandate in violation of the Unfunded Mandates Reform Act. More than one referred to the Department's recent inclusion of the requirement as a condition for receiving further labor certification grant funding.

As stated in the preamble to the NPRM, the Department is not insensitive to the resource constraints facing state agencies in their administration of the H-2B program. However, as we stated in the NPRM, we do not believe that the requirement will result in a significant increase in workload or administrative burden not covered by Department-provided resources.

In addition, notwithstanding funding limitations, there is a strong, longstanding need for a consistent verification requirement at the State government level. The Department is not leaving States to their own devices. Precisely to ensure that available Federal funding supports verification activities, the Department has added the verification requirement as an allowable cost under the foreign labor certification grant agreement. The Department also funds State employment services under the Wagner-Peyser Act, and for many years States have made Wagner-Peyser grant funding a part of their annual financial plan. To the extent that State functions related to foreign labor certification depend extensively on activities that are already part and parcel of the employment service system, State labor agencies can continue to rely on Wagner-Peyser to support that portion of activity. Ultimately, while cognizant of the challenges posed by funding limitations, we expect States to comply as they do with other regulatory requirements and other terms and conditions of their foreign labor certification grant.

SWAs also expressed concern about possible discrimination suits. The requirement to verify employment eligibility does not violate constitutional prohibitions against disparate impact. The eligibility requirement is similar to verification requirements to gain access to other similar public benefits.

One SWA said it would be impossible to implement verification of work eligibility because they have a virtual one-stop system that is self-service for both employers and job seekers and the SWA would be unable to certify that applicants referred to those job orders are employment-eligible. While we do not disagree that an in-person verification requirement may impact the decisions of a limited number of otherwise eligible workers, such impact does not outweigh the significant value of verification. Moreover, SWAs can respond to any possible inconvenience to workers by designating or creating additional in-person locations where eligibility can be verified. This is not a problem unique to SWAs—workers may be required to travel great distances to reach a prospective employer, who then (absent a SWA certification) would be required to verify work eligibility. In the end, although employment eligibility verification does require some amount of extra time and effort, the Department has determined that simple convenience must cede to the overarching goal of a legal workforce and has drafted its regulations accordingly.

Several SWAs also pointed out that under the new regulations it will be impossible to identify H-2B job orders, especially now that the SWA will no longer receive a copy of the application or determine prevailing wages and be only responsible for placing the job order. The Final Rule now requires the job order carry a notation identifying it as a job order to be placed in connection with a future application for H-2B workers.

Several other commenters supported the contention made by the SWAs that this requirement will drain SWA resources. A few commenters seem to have interpreted this requirement as mandating the use of the "E-Verify" electronic system. However, although both the NPRM and the Final Rule require the use of the DHS process, which requires the completion of I-9 forms and process, the use of the electronic E-verify system is optional.

The Department's expectation is that SWAs will not expend public resources to refer undocumented workers to H-2B job opportunities. The employment verification provisions included in this regulation are part of a concerted effort—one that includes regulation, written guidance, and ongoing outreach and education—to address longstanding weaknesses and to strengthen the integrity of the program.

### 3. Section 655.15(h)—Layoff Provisions

Under the NPRM, an employer seeking to employ H-2B workers would have been required to attest that it is not displacing any similarly employed permanent U.S. worker in the occupation in the area of intended employment within the period beginning 120 days before the date of need and throughout the entire employment of the H-2B worker(s). The Department received a number of comments from various groups on this provision. We have addressed those below, in conjunction with comments on the layoff provisions at § 655.22(k).

### *G. Section 655.17—Advertising Requirements*

As proposed in the NPRM, the Final Rule requires employers to advertise for available U.S. workers. The advertisement must: (1) Identify the employer with sufficient clarity to notify the potential pool of U.S. workers (by legal and trade name, for example); (2) provide a specific job location or geographic area of employment with enough specificity to apprise applicants of travel or commuting requirements, if any, and where applicants will likely have to reside to perform the services or labor; (3) provide a description of the job with sufficient particularity to apprise U.S. workers of the duties or services to be performed and whether any overtime will be available; (4) list minimum education and experience requirements for the position, if any, or state that no experience is required; (5) list the benefits, if any, and the wage for the position, which must equal or exceed the applicable prevailing wage as provided by the NPC; (6) contain the word "temporary" to clearly identify the temporary nature of the position; (7) list the total number of job openings that are available, which must be no less than the number of openings the employer lists on the application (ETA Form 9141); and (8) provide clear contact information to enable U.S. workers to apply for the job opportunity. The advertisement cannot contain a job description or duties which are in addition to or exceed the duties listed on the Prevailing Wage Determination Request or on the application, and must not contain terms and conditions of **\*78034** employment which are less favorable than those that would be offered to an H-2B worker.

The Department received multiple comments on the newspaper advertising requirements. Several commenters believed that the requirements, especially the requirement for three ads that was proposed in the NPRM (rather than the two required under the current program), would increase employer costs and time devoted to the application process but not yield additional U.S. workers. The requirement for advertising in a Sunday edition of a newspaper was seen as particularly objectionable due to the higher costs for Sunday ads and the belief that many nonprofessional workers do not read Sunday newspaper editions. Some commenters suggested employers should have the flexibility to use other recruitment methods, such as Web sites that have proved successful in locating seasonal workers. Others were concerned that without SWA guidance, employers would have to guess as to the correctness of their ads, risking that if the CO subsequently determined there were errors in the advertisements, it would be too late to get the workers needed. One commenter was concerned that no process was provided for requiring an employer to revise its ad if the content was determined to be unduly restrictive.

As previously discussed, this Final Rule requires two newspaper advertisements which must include one Sunday edition. Sunday editions have traditionally provided the most comprehensive job advertisements and many U.S. workers potentially seeking employment would normally choose the Sunday paper to review. Employers can, however, always conduct more recruitment than is required, such as posting the opportunity on job search Web sites.

One commenter inquired about the process for employers to follow in selecting an alternate publication in lieu of one of the newspaper ads. Other commenters were concerned about the choice of the specific newspaper in which to advertise and believed that the NPC would not be able to determine the most appropriate newspaper in all cases. One commenter suggested

that the SWA should be involved in the process and provide guidance regarding newspaper choices. Another commenter asked whether there would be specific guidance regarding advertisements for live-in jobs, such as those for housekeepers, child monitors, and similar positions. The Department believes that staff at the NPC will be able to handle such issues. The Department declines in the Final Rule to specify the requirements to a high level of detail, as appropriate publication may vary, for example by industry or industry practice, and as the Department normally issues such guidance in the form of Standard Operating Procedures or other policy guidance.

### *H. Section 655.20—Direct Filing With the NPC and Elimination of SWA Role*

Consistent with the proposed rule, the Final Rule eliminates the role of the SWAs in accepting and reviewing H-2B labor certification applications. Once the Final Rule is effective, employers will file H-2B applications directly with the NPC, consistent with the transition provisions of the regulation and with the Department's specialization of its two processing centers effective June 1, 2008. Employers with dates of need prior to October 1, 2009, will submit prevailing wage determination requests SWA, which will process them under the PWD procedures established under § 655.10 of this Final Rule. In the long term, under these regulations, each employer will continue to be required to place a job order with the appropriate SWA as part of pre-filing recruitment, and SWAs will continue to place H-2B-associated job orders in their respective Employment Service systems. This proposal received comments from a broad range of constituencies, including employers, employer associations, advocacy organizations, labor unions, State agencies, and elected officials. Most of the commenters opposed this provision.

Many commenters remarked that the elimination of the SWA portion of the process only shifted activities previously performed by the SWAs to the NPCs without actually improving the process. These commenters believed that eliminating the duplicate SWA review and increasing the Federal role in reviewing applications would result in increased delays, particularly when the Department has acknowledged that its funding has not kept pace with increased workloads in the H-2B program. Others also mentioned possible processing delays and were especially concerned that those industries with later dates of need could be locked out of the program.

Other commenters were concerned the new process would result in the loss of local labor market and prevailing practice expertise in the review process, including checks and balances now in the system, and would increase the potential for fraud. These commenters asserted that the knowledge and expertise of local staff in reviewing and processing applications was essential to the integrity of the H-2B certification process. Some commenters also criticized the NPCs for what they view as "ignoring their own regulations" and "misconstruing the certification process." Several commenters also believed elimination of the duplicate SWA review would result in decreased assistance for employers. One SWA stated that employers would be left without a source for guidance which would drive up the demand for agents, thereby increasing the costs to employers. An employer expressed the opinion that the new process would replace longstanding relationships with SWA employees and reliable determinations with unpredictable determinations and potentially overly stringent penalties.

The Department remains committed to modernizing the application process and continues to believe that the submission of applications directly to the NPC is the most effective way of accomplishing this goal. Processing of H-2B applications by NPC staff will allow for greater consistency for employers, regardless of their industry or location, in both the time required and quality of the application review. The Department believes that by specializing in H-2B application processing, NPC staff will have greater program expertise than SWA staff who are often required to implement a number of diverse programs during the course of their workday, and will generate additional efficiencies in application processing. Therefore, this federalized review of applications will lead to more efficient processing, greater consistency of review, and more effective administration. It will also enable the Department to better identify and implement program improvements.

Eliminating the SWAs' participation in the application review process will provide more efficient review of applications, as well as greater consistency of review. The Department disagrees that NPC staff have insufficient knowledge to undertake this role given that they already perform it. In fact, NPC reviewers who currently review H-2B applications have, in some cases, more experience with such applications than many SWA staff.

Moreover, the SWAs have not been removed from the process—they will continue their traditional role in the recruitment process and working with employers on the specifics of the job order. SWAs will be responsible for clearing and posting job orders, both intrastate and interstate, thus reducing the risk for employers to make mistakes with respect to job descriptions, **\*78035** minimum requirements, and other application particulars. SWAs will, as part of these duties, review the job offer, its

terms and conditions, any special requirements, and the justifications as part of the SWAs' duties to clear and post such orders.

### I. Section 655.20—Form Submission and Electronic Filing

The Final Rule requires employers to submit applications on paper, through an information collection (form) modified significantly from the current form to reflect an attestation-based filing process. As stated in the NPRM, the Department will consider in the future an electronic submission system similar to that employed in other programs administered by OFLC, should resources be made available.

The Department received a number of comments from SWAs, a specialty bar association, a large trade association, a small-business coalition, and several industry groups largely supportive of the potential conversion to electronic applications. One commenter encouraged prompt migration to electronic filing, as the commenter felt this would make program data easier to gather, more accurate, and more shareable across federal agencies. A few comments expressed concern that electronic filing would be mandatory for everyone, and recommended that, in the event the Department converted to electronic submission, it maintain paper filing as an option. Two commenters were concerned making electronic submission mandatory could cause undue hardship to employers that do not have Internet access, are not computer literate, or do not have access to a computer. One bar association recommended the Department not require electronic filing until the system was error-free, that any electronic filing system not include system-generated denials as the PERM system does, and that any defects receive an RFI. The Department takes seriously these recommendations. We will determine appropriate timing for the development and implementation of an electronic system based on program need and available resources. We have learned—as have programs users—from our experience with the electronic filing process used in the permanent program, and will apply those lessons to any system we institute for the H-2B program.

### J. Section 655.21—Supporting Evidence of Temporary Need

As proposed, this Final Rule provides the employer a variety of options for documenting the basis of its temporary need, to be retained by the employer and submitted in the event of a Request for Further Information (RFI), a post-adjudication audit, a WHD investigation, or another agency investigation. As explained in the NPRM, for most employers participating in the H-2B program, demonstrating a seasonal or peakload temporary need can best be evidenced by summarized monthly payroll records for a minimum of one previous calendar year that identify, for each month and separately for full-time permanent and temporary employment in the requested occupation, the total number of workers employed, the total hours worked. Such records, however, are not the only means by which employers can choose to document their temporary need. The proposed regulation accordingly leaves it to the employer to retain other types of documentation, including but not limited to work contracts, invoices, client letters of intent, and other evidence that demonstrates that the job opportunity that is the subject of the application exists and is temporary in nature. Contracts and other documents used to demonstrate temporary need would be required to plainly show the finite nature of that need by clearly indicating an end date to the activity requested.

The Department's new H-2B temporary labor certification application form is designed to require both a short narrative on the nature of the temporary need and responses to questions to determine the time of need and the basis for the need. The narrative will enable the employer to demonstrate in its own words the scope and basis of the need in a way that will enable the Department to confirm the need meets the regulatory standard, with additional questions on the form providing context and clarification. If further clarification is required, the RFI process will be employed. The form also contains an attestation to be signed under penalty of perjury to confirm the employer's temporary H-2B need.

As explained in the NPRM and consistent with current program practice, employers should be wary of using documents demonstrating a "season" in general terms (hotel occupancy rates, weather charts, newspaper accounts); in the Department's experience, such generalized statements fail to link a season to a specific position sought to be filled by the employer, which is required under the program. The Department also recognizes that conventional evidence such as payroll information may not be sufficient to demonstrate a one-time or intermittent need, or seasonal or peakload need in cases in which the employer's need has changed significantly from the previous year. In such cases, the employer should retain other kinds of documentation with the application that demonstrates the temporary need.

### K. Section 655.22—Obligations of H-2B Employers and Attestation-Based Application

The Department proposed, and this Final Rule institutes, the shift to an attestation-based filing system. The new application form contains a series of attestations to confirm employers' adherence to its obligations under the H-2B program. The information and attestations on the form will provide the necessary assurances for the Department to initially verify program compliance. As described in the NPRM, the Department anticipates the shift to an attestation-based application will have a number of benefits, including a reduction in processing times while maintaining program integrity.

The Department received numerous comments, many of them negative, on the move to an attestation-based application. Some commenters believed that an attestation-based application would reduce the role of the SWA and thus eliminate local expertise; decrease employer compliance; increase erroneous approvals; and increase the likelihood that the Department will simply "rubber stamp" the certifications and weaken U.S. worker protections. The Department disagrees with these assumptions and conclusions. The Department believes that an attestation-based application, backed by audits, is within the Secretary's statutory discretion to implement and is an effective means to ensure that all statutory and regulatory criteria are met and all program requirements are satisfied. Similar approaches have been used successfully by the Department in other contexts, such as in the current permanent labor certification process.

One commenter suggested the Department require that the employer always be the applicant, even if an agent is used, because neither an agent nor the employer would be able to attest to all of the required obligations. This commenter also feared that an employer could shield itself from responsibility by using an agent for such prohibited acts as requiring recruitment fees to be paid by the foreign worker. The Department disagrees with this commenter. In the H-2B program, the agent simply represents the employer in the labor certification process. The employer is ultimately responsible for its obligations under the program and it **\*78036** is the employer who signs the application form, and attests to the veracity of the information provided and that it will meet all of its obligations.

One commenter appeared to confuse the H-2B and H-2A programs. This commenter referred to the 50 percent rule, an H-2A program feature, and requested that the Department include a grace period for a foreign worker to find another employer if dismissed under the 50 percent rule. In the current H-2A temporary agricultural program, employers must hire a qualified U.S. worker who applies for a position certified under a temporary labor certification, if that worker applies during the first half of the certified period of employment. The H-2B program has no such provision and the Department declines to impose one, especially as this was not proposed in the NPRM.

The Department received a number of comments on the specific obligations of H-2B employers outlined in the proposed rule. One commenter pointed out a semantic error in proposed § 655.22(a), which stated the employer must attest that "no U.S. workers" are available. The commenter correctly pointed out that an employer cannot possibly have such broad knowledge and that the statute does not require such knowledge. The Department has deleted that provision. There were other comments about word choice and semantics and, where appropriate, the Department has changed the wording to make the attestations easier to understand.

The Department has also added language to the provision, in § 655.22(a), that requires that H-2B job opportunities offer terms and working conditions that are "normal to U.S. workers similarly employed" to clarify that normal is synonymous with not unusual. This is within the range of generally accepted meanings of the term. See, e.g., Black's Law Dictionary 1086 (8th ed. 2004) ("The term describes not just forces that are constantly and habitually operating but also forces that operate periodically or with some degree of frequency. In this sense, its common antonyms are unusual and extraordinary."); Webster's Unabridged Dictionary 1321 (2d ed. 2001) (supplying "not abnormal" as one of several definitions). Thus, "normal" does not require that a majority of employers in the area use the same terms or working conditions. If there are no other workers in the area of intended employment who are performing the same work activity, the Department will look to workers outside the area of intended employment to assess the normality of an employer's proposed productivity standard.

Unless otherwise noted, no substantive change is intended. Below, we respond to comments on specific obligations and describe substantive changes made to those subsections. In cases where the Final Rule deletes or adds provisions, the numbering has changed accordingly from that published in the NPRM.

## 1. Section 655.22(a)—U.S. Worker Unavailability

The Department proposed that employers seeking to hire H-2B workers attest there were no U.S. workers in the area of intended employment capable of performing the temporary services or labor in the job opportunity. Comments on this

provision reflected strong concern that employers cannot attest to the actual unavailability of U.S. workers, but simply that the employer has tested the labor market appropriately and in good faith to demonstrate that capable U.S. workers did not respond to its recruitment efforts or ultimately were not available (either due to lawful rejection by the employer, failure on the worker's part to follow through or remain on the job, etc.) to perform the labor or services. The Department agrees and has deleted this provision from the Final Rule.

## 2. Section 655.22(f)—Worker Abandonment and Employer Notification to the Department and DHS

The Department's NPRM would have required employers to notify the Department and DHS within 48 hours if an H-2B worker separated from employment prior to the end date of employment in the labor certification. This notification requirement would have also applied if the H-2B worker absconded from or abandoned employment prior to the end date of employment. This requirement was included to ensure that if the basis for the worker's status ended before the end date on the application, both DHS and the Department could take appropriate action to monitor the program.

The Department received a number of comments in opposition to this requirement, primarily from employers and employer and trade associations. Several employer associations shared the concern that, in their view, the requirement represented a new and unfair liability for employers, opening them up to potential legal action from H-2B employees if the employee left to pursue other legal employment before the end of the contract period. One association found it problematic, given the perception that this worker population is more transient than the workforce at large. It also was concerned about the administrative burden on employers to comply with the requirement. It asserted that employers were unlikely to know the real circumstances of the worker's departure, if it was a legal extension or change of status or something else. Consistent with a number of other comments either seeking or recommending clarification to the notice requirement, this association stated that such status determinations are complex legal issues and employers should not be required to make them. It also believed that the reporting requirement was unlikely to accomplish anything without imposing additional significant burdens on employers and that it was unlikely that DHS would pursue individuals who are the subject of these reports. A small business association agreed about the unreasonableness of the potential burden on employers and was concerned that the requirement would ask small businesses to become unpaid Immigration Service agents responsible for enforcing immigration laws.

A trade association found the required 48 hours for notification to be an extremely limited period of time for notification, and a burden on employers. It recommended that, if the requirement were continued, it should be extended to 30 days. Further, this trade association recommended that DHS create a simple reporting method to allow employers to provide the information directly through the Internet or by telephone. The requirement was described as too vague and not providing enough specifics as to when the employer would be required to do such notification.

An individual employer found insufficient safeguards in the proposal, as there was no indication of actions that the bureaucracy at the Department or DHS would take based on the information. The employer wanted the two departments to be more specific as to how the information was to be used.

An employer agent believed the requirement was inappropriate in these regulations, as it was tangential to the Department's role regarding the availability of U.S. workers or preventing adverse affect on U.S. workers, and believed that it created additional confusion and potential liability for employers. Similarly, an employer association thought the requirement inappropriate and did not clearly outline the process by which employers would make such notifications. Additionally, the employer association asked for **78037** additional guidance as to what information would be required for employers to document separation or job abandonment and was concerned that violations of this provision could lead to debarment from future participation in the program.

The Department reviewed the comments received on this specific reporting requirement and the concerns raised by the employers and associations on its implementation. The Department acknowledges that many of these concerns have merit, and has therefore sought to provide clarifications and limitations in the Final Rule to address these concerns. The Department did not, however, discern sufficient justification from these comments to eliminate the requirement in its entirety. The notification is necessary in all circumstances because the early separation of a worker impacts not only the rights and responsibilities of the employer and worker but also implicates DOL's and DHS's enforcement responsibilities. Although any abscondment is a loss to the employer, the Government requires notification to be able to better track workers who are in the country on a temporary basis with limited work authorization.

The Department acknowledges the need for clarification in the provision to ensure that the 48-hour requirement begins to run only when the abandonment is actually discovered. The Department has therefore added language to the provision clarifying that the employer must notify DOL no later than 2 work days after such abandonment or termination is discovered by the employer. The Department has added further clarification to ensure that employers must meet the identical standards for notification to DOL as to DHS, so that an abscondment occurs when the worker has not reported for work for a period of 5 consecutive work days without the consent of the employer to that non-reporting. This is intended to clarify for the employer that the same standard of reporting applies across both agencies, making it easier on the employer to make the report. There is no requirement that the notification be made by certified mail, however. A file copy of a letter sent by normal U.S. mail, with notation of the posting date, will suffice. However, in addition, the Department revised the notification requirement to reflect a time period of no later than 2 work days after the employer discovers the employee has absconded, which, consistent with DHS, has been defined as 5 consecutive work days of not reporting for work. To make the standard further consistent across agencies, for purposes of this provision the Department will defer to DHS on the definition of the term "working day."

### 3. Section 655.22(g)—Deductions and Prohibition on Transfer of Costs

The NPRM prohibited deductions by the employer or any third party, including a recruiter, for any expenses including recruitment fees and any other deductions not expressly permitted by law. Both worker advocacy organizations and an employer of H-2B workers commented that the provision was confusing and ambiguous. Worker advocates objected that it was unclear whether employees could be required to pay recruiting costs directly, while an employer objected to the payment of recruiting costs that were not clearly defined in the proposal. We agree that the rule as proposed was confusing. The confusion resulted in part from the fact that employer cost shifting is addressed elsewhere in the regulations, in § 655.22(j). Further, cost shifting by third parties presents an identical problem under the H-2A program but was dealt with in a different manner in the NPRM. Accordingly we are revising the language concerning cost shifting by third parties to mirror § 655.105(p) of the H-2A Final Rule to read as follows: "The employer has contractually forbidden any foreign labor contractor or recruiter whom the employer engages in international recruitment of H-2A workers to seek or receive payments from prospective employees, except as provided for in DHS regulations at 8 CFR 214.2(h)(5)(xi)(A)."

The Final Rule makes clear that recruiters may not pass on expenses to H-2B workers. Examples of exploitation of foreign workers, who in some instances have been required to give recruiters thousands of dollars to secure a job, have been widely reported. The Department is concerned that workers who heavily indebt themselves to secure a place in the H-2B program may be subject to exploitation in ways that would adversely affect the wages and working conditions of U.S. workers by creating conditions akin to indentured servitude, driving down wages and working conditions for all workers, foreign and domestic. We believe that requiring employers to incur the costs of recruitment is reasonable, even when taking place in a foreign country. Employers may easily band together for purposes of recruitment to defray costs. The fact that a recruiter is essential to the securing of such worker does not dissuade the Department from requiring the employer to bear the expense; rather, it underscores the classification that payment as a cost allocable to the employer.

The Department recognizes that its power to enforce regulations across international borders is constrained. However, it can and should do as much as possible in the U.S. to protect workers from unscrupulous recruiters. Consequently, the Department is requiring that the employer make, as a condition of applying for labor certification, the commitment that the employer is contractually forbidding any foreign labor contractor or recruiter whom the employer engages in international recruitment of H-2B workers to seek or receive payments from prospective employees.

The Department has also revised this section in the Final Rule to omit restrictions on deductions that are already covered in § 655.22(j), and we are incorporating the following language which is identical to the language in 20 CFR 655.104(p) of the H-2A Final Rule: "The employer must make all deductions from the worker's paychecks that are required by law. The job offer must specify all deductions not required by law that the employer will make from the worker's paycheck. All deductions must be reasonable. However, an employer subject to the FLSA may not make deductions that would violate the FLSA."

### 4. Section 655.22(h) [(g) in Final Rule]—Basis for Offered Wage

This provision requires that the offered wage not be based on commission, bonuses, or other incentives unless the employer guarantees that the wage paid will equal or exceed the prevailing wage. The second sentence of the proposed provision further stated that "the offered wage shall be held to exclude any deductions for reimbursement of the employer or any third

party by the employee for expenses in connection with obtaining or maintaining the H-2B employment including but not limited to international recruitment, legal fees not otherwise prohibited by this section, visa fees, items such as tools of the trade, and other items not expressly permitted by law." This sentence received several comments. A worker's rights advocacy group claimed the Department will not achieve its objective of protecting foreign workers from paying fees that should be paid by the employer. This commenter provided an example of a practice by one employer who required workers to pay for tests to determine their welding and fitting skills in preparation for employment in the United States. This **\*78038** commenter further recommended that this section should clarify that costs paid directly by workers are de facto deductions for the purpose of calculating compliance with the offered wage, even if employers do not directly deduct them and also that DOL should clarify its position on which costs are considered to benefit employers and thus require reimbursement and include specific examples of such costs. This commenter also believed that similar language in the FLSA was confusing. The Department appreciates the detailed analysis provided by this commenter, but we believe the statutory requirements, which are based on decades of administration of the Federal wage and hour laws, are clear and that it is not necessary to make the recommended changes.

## 5. Section 655.22(i) [(h) in Final Rule]—Position Is Temporary and Full-Time

The Department proposed that an employer seeking to employ H-2B workers be required to attest that the job opportunity is for a full-time, temporary position. One commenter suggested the proposed regulation could harm U.S. workers by guaranteeing full-time work for the period to foreign workers, while there is no such guarantee provided to U.S. workers in any seasonal position. The commenter also stated that while employers can state their intention to hire temporary workers full-time, if the weather does not cooperate, the employer may have no choice but to reduce hours in a particular week and that under this provision, the employer would not be able to do this, causing significant harm to the business and the U.S. workers whose hours would need to be reduced even further in order to ensure that foreign workers were paid a full-time wage. The commenter recommended a revised attestation stating: "The job opportunity is a bona fide, temporary position and hours worked will be comparable to the full time hours worked by associates in the same position at the employment site." As stated in the preamble to the NPRM, the H-2B program has always required that the positions being offered be temporary and full-time in nature, and the Department recognizes that some industries, occupations and States have differing definitions of what constitutes full-time employment. For example, certain landscaping positions are often classified as full-time for a 35-hour work week. To provide additional clarity, the Department, in § 655.4 has provided a definition of full-time employment that reflects our experience in the administration of this program. We will continue to make determinations of whether work is full-time for foreign labor certification purposes based on the facts, program experience, customary practice in the industry, and any investigation of the attestation. The Department has therefore decided to retain the proposed language.

## 6. Section 655.22(k) [(i) in Final Rule]—Layoff Provisions

Under the NPRM, an employer seeking to employ H-2B workers would have been required to attest that it is not displacing any similarly employed U.S. worker(s) in the occupation in the area of intended employment within the period beginning 120 days before the date of need and throughout the entire employment of the H-2B worker. The Department received a number of comments from various groups on this provision.

A number of commenters favored the requirement, noting that it assisted efforts to ensure that employers cannot lay off U.S. workers after seeking to hire H-2B workers to perform the same services. Other commenters, however, had concerns regarding the implementation of the prohibition and the potential liability.

Several commenters were concerned that the requirement to contact former employees who had been laid off would be onerous, given the difficulties in reaching what is purportedly a transient population, making such contact unduly burdensome. The Department finds this argument unpersuasive. The commenter did not support the summary statements that all temporary or seasonal help is transient and rootless in the communities in which the work is performed. Even assuming that such workers do not have lasting ties to the employer, employers generally maintain continuing contact with former employees for many purposes—including, but not limited to, the provision of payroll tax information the following year and the transfer or disposition of benefits (including unemployment benefits). Moreover, by limiting the requirement for such contact to the 120 days or less before the employer's date of need for the H-2B workers, the employer's last contact information would likely be current, making such contact, generally speaking, relatively simple.

One commenter asserted that the layoff provision conflicts with the definition of seasonality, noting that by definition a seasonal employee will always be laid off within the period set forth in an annual cycle. An employer association also objected to the provision on the ground that requiring the consideration of U.S. workers would force employers who laid off U.S. workers at the end of one season to hire them again at the commencement of the next season because the timing would put the next season within the 120-day window.

In response to these comments, the Department has limited the applicability of the layoff provision to 120 days on either side of the date of need. This broad period of time, covering two thirds of the year, will protect U.S. workers near the time of recruiting for and hiring H-2B workers, which is when U.S. workers are most vulnerable, but avoids the complications of overlapping seasons noted by some commenters.

The Department notes that much of the concern of those commenters regarding the re-hiring of U.S. workers stems from a belief that such workers will not show up or be interested in being re-hired. But, by limiting the applicability of the provision to within 120 days of the date of need (as well as the actual occupation and the area of intended employment of the sought-after H-2B certification), this provision affords laid off workers a reasonable opportunity to apply for vacancies for which they qualify, striking an appropriate balance between worker protection and employer needs.

Some commenters noted the need for a strengthening of the layoff provision, calling for additional safeguards against massive layoffs of U.S. workers by strengthening requirements for how employers will demonstrate they have made efforts to contact former employees. The Department declines to do so at this time. Employers will be allowed to document their contact of former employees using any objective means at their disposal in a manner guaranteed to ensure a good faith contact effort has been made. The Department does not have evidence at this time that employers will engage in fraudulent behavior with respect to this requirement. The Department will monitor this attestation, and all other employer attestations, through post-certification audits and will note the need for program modifications through that process.

### 7. Section 655.22(l) [(j) in Final Rule]—Prohibition Against Payments

As in the proposal, the Final Rule requires that an employer attest that it has not and will not shift the costs of preparing or filing the H-2B temporary labor certification application to the temporary worker, including the costs of domestic recruitment or attorneys' and agent fees. The domestic recruitment, legal, and other costs associated with **78039** obtaining the labor certification are business expenses necessary for or, in the case of legal fees, desired by, the employer to complete the labor certification application and labor market test. The employer's responsibility to pay these costs exists separate and apart from any benefit that may accrue to the foreign worker. Prohibiting the employer from passing these costs on to foreign workers allows the Department to protect the integrity of the process and protect the wages of the foreign worker from deterioration by unwarranted deduction. The Department will continue to permit employers, consistent with the Fair Labor Standards Act (FLSA), to make deductions from a worker's pay for the reasonable cost of furnishing housing and transportation, as well as worker expenses such as passport and visa fees (see fuller discussion below concerning transportation costs under the FLSA).

This section, pertaining to the receipt of payments by the employer from the employee or a third party, received many comments. Some of the commenters opposed the provision in its entirety, arguing it will make the program prohibitively expensive for employers. Other commenters were concerned the requirement would eliminate the current practice of having the employee pay for part of the recruiting and visa costs as an incentive for the workers not to leave the employer. Others supported this provision in its entirety, while still others agreed with the intent of the provision but found the language ambiguous. One specialty bar association not only supported the prohibition on cost-shifting for recruitment, but asked the Department to strengthen the prohibition language. However, this commenter was adamantly opposed to the prohibition against foreign workers paying the attorney's fees. The Department disagrees with the comments opposing this provision. We believe that these expenses are the costs of doing business and should be borne by the employer. The Department took all comments into consideration and modified the provision to clarify and strengthen the prohibition. The Final Rule applies the prohibition to attorneys and agents, not simply to employers. As rewritten, the provision eliminates reference to payments from "any other party;" it applies only to payments from the employees.

This section in the NPRM also would have prohibited the employer from receiving payments "of any kind for any activity related to the labor certification" process. The Department received a comment arguing that the phrase "received payment * * * as an incentive or inducement to file" is ambiguous. The Department took this comment into consideration and removed reference to incentive or inducement.

In addition, and based upon the comments received, the Department has revised the provision on cost-shifting for greater clarity. As mentioned above, the Department has eliminated the qualifying language regarding the incentive and inducement to filing, again to simplify for all employers engaging in recruitment activities what is prohibited. By simplifying the provision to prohibit employers who submit applications from seeking or receiving payment for any activity related to the recruitment of H-2B workers, the Department hopes to achieve consistent and enforceable compliance.

With regard to the application of the FLSA to H-2B workers' inbound subsistence and transportation costs, we note that a number of district courts have issued decisions on this question. See De Leon-Granados v. Eller & Sons Trees Inc., 2008 WL 4531813 (N.D. Ga., Oct. 7, 2008); Rosales v. Hispanic Employee Leasing Program, 2008 WL 363479 (W.D. Mich. Feb. 11, 2008); Rivera v. Brickman Group, 2008 WL 81570 (E.D. Pa. Jan. 7, 2008); Castellanos-Contreras v. Decatur Hotels, LLC, 488 F. Supp. 2d 565 (E.D. La. 2007); Recinos-Recinos v. Express Forestry Inc., 2006 WL 197030 (E.D. La. Jan. 24, 2006). These district courts have referenced the appellate court's decision in Arriaga v. Florida Pacific Farms, L.L.C., 305 F.3d 1228 (11th Cir. 2002), which held that growers violated the minimum wage provisions of the FLSA by failing to reimburse farmworkers during their first workweek for travel expenses (and visa and immigration fees) paid by the workers employed by the growers under the H-2A program. Under the FLSA, pre-employment expenses incurred by workers that are properly business expenses of the employer and primarily for the benefit of the employer are considered "kick-backs" of wages to the employer and are treated as deductions from the employees' wages during the first workweek. 29 CFR 531.35. Such deductions must be reimbursed by the employer during the first workweek to the extent that they effectively result in workers' weekly wages being below the minimum wage. 29 CFR 531.36. Although the employer in the Arriaga case did not itself make direct deductions from the workers' wages, the Court held that the costs incurred by the workers amounted to "de facto deductions" that the workers absorbed, thereby driving the workers' wages below the statutory minimum. The Eleventh Circuit reasoned that the transportation and visa costs incurred by the workers were primarily for the benefit of the employer and necessary and incidental to the employment of the workers and stated that "[t]ransportation charges are an inevitable and inescapable consequence of having H-2A foreign workers employed in the United States; these are costs which arise out of the employment of H-2A workers." Finally, the court held that the growers' practices violated the FLSA minimum wage provisions, even though the H-2A regulations provide that the transportation costs need not be repaid until the workers complete 50 percent of the contract work period. The Eleventh Circuit noted that the H-2A regulations require employers to comply with applicable federal laws, and in accepting the contract orders in this case, the ETA Regional Administrator informed the growers in writing that their obligation to pay the full FLSA minimum wage is not overridden by the H-2A regulations.

The Department believes that the better reading of the FLSA and the Department's own regulations is that relocation costs under the H-2A program are not primarily for the benefit of the employer, that relocation costs paid for by H-2A workers do not constitute kickbacks within the meaning of 29 CFR 531.35, and that reimbursement of workers for such costs in the first paycheck is not required by the FLSA.

The FLSA requires employers to pay their employees set minimum hourly wages. 29 U.S.C. 206(a). The FLSA allows employers to count as wages (and thus count toward the satisfaction of the minimum wage obligation) the reasonable cost of "furnishing [an] employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees." 29 U.S.C. 203(m). The FLSA regulations provide that "[t]he cost of furnishing 'facilities' found by the Administrator to be primarily for the benefit or convenience of the employer will not be recognized as reasonable [costs within the meaning of the statute] and may not therefore be included in computing wages." 29 CFR 531.3(d)(1). The FLSA regulations further provide examples of various items that the Department has deemed generally to be qualifying facilities within the meaning of 29 U.S.C. 203(m) (see also 29 CFR 531.32(a)), as well as examples of **78040 various items that the Department has deemed generally not to be qualifying facilities (see 29 CFR 531.3(d)(2), 29 CFR 531.32(c)).

Separate from the question whether items or expenses furnished or paid for by the employer can be counted as wages paid to the employee, the FLSA regulations contain provisions governing the treatment under the FLSA of costs and expenses incurred by employees. The regulations specify that wages, whether paid in cash or in facilities, cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally, or "free and clear." 29 CFR 531.35. Thus, "[t]he wage requirements of the Act will not be met where the employee 'kicks-back' directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the

employee. This is true whether the 'kick-back' is made in cash or in other than cash. For example, if the employer requires that the employee must provide tools of the trade that will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act." Id. The regulations treat employer deductions from an employee's wages for costs incurred by the employer as though the deductions were a payment from the employee to the employer for the items furnished or services rendered by the employer, and applies the standards set forth in the "kick-back" provisions at 29 CFR 531.35 to those payments. Thus, "[d]eductions for articles such as tools, miners' lamps, dynamite caps, and other items which do not constitute 'board, lodging, or other facilities' " are illegal "to the extent that they reduce the wages of the employee in any such workweek below the minimum required by the Act." 29 CFR 531.36(b).

In sum, where an employer has paid for a particular item or service, under certain circumstances it may, pursuant to 29 U.S.C. 203(m), count that payment as wages paid to the employee. On the other hand, when an employee has paid for such an item or service, an analysis under 29 CFR 531.35 is required to determine whether the payment constitutes a "kick-back" of wages to the employer that should be treated as a deduction from the employee's wages.

The Arriaga court seems to have assumed that all expenses necessarily fall into one of these two categories—that either they qualify as wages under 29 U.S.C. 203(m) or they constitute a "kick-back" under 29 CFR 531.35. See Arriaga, 305 F.3d at 1241-42 (stating that if a payment "may not be counted as wages" under 29 U.S.C. 203(m), then "the employer therefore would be required to reimburse the expense up to the point the FLSA minimum wage provisions have been met" under 29 CFR 531.35 and 29 CFR 531.36). That is incorrect. For example, if an employer were to give an employee a valuable item that was not "customarily furnished" to his or her employees, the employer would not be able to count the value of that item as wages under 29 U.S.C. 203(m) unless the employer "customarily furnished" the item to his or her employees. Nevertheless, since the employee paid nothing for that item, it clearly would not constitute a "kick-back" of wages to the employer that would have to be deducted from the employee's wages for purposes of determining whether the employer met its minimum wage obligations under 29 U.S.C. 206(a). Similarly, if a grocery employee bought a loaf of bread off the shelf at the grocery store where he or she worked as part of an arms-length commercial transaction, the payment made by the employee to the employer would not constitute a "kick-back" of wages to the employer, nor would the loaf of bread sold by the employer to the employee be able to be counted toward the employee's wages under 29 U.S.C. 203(m). Both parties would presumably benefit equally from such a transaction—it would neither be primarily for the benefit of the employer, nor would it be primarily for the benefit of the employee.

Expenses paid by an employer that are primarily for the employer's benefit cannot be counted toward wages under 29 U.S.C. 203(m). See 29 CFR 531.3(d). Similarly, expenses paid by an employee cannot constitute a "kick-back" unless they are for the employer's benefit. See 29 CFR 531.35. An analysis conducted under 29 U.S.C. 203(m) determining that a particular kind of expense is primarily for the benefit of the employer will thus generally carry through to establish that the same kind of expense is primarily for the benefit of the employer under 29 CFR 531.35. Each expense, however, must be analyzed separately in its proper context.

The question at issue here is whether payments made by H-2B employees for the cost of relocating to the United States, whether paid to a third party transportation provider or paid directly to the employer, constitutes a "kick-back" of wages within the meaning of 29 CFR 531.35. If the payment does constitute a "kick-back," then the payment must, as the Arriaga court decided, be counted as a deduction from the employee's first week of wages under the FLSA for purposes of determining whether the employer's minimum wage obligations have been met.

The Department does not believe that an H-2B worker's payment of his or her own relocation expenses constitutes a "kick-back" to the H-2B employer within the meaning of 29 CFR 531.35. It is a necessary condition to be considered a "kick-back" that an employee-paid expense be primarily for the benefit of the employer. The Department need not decide for present purposes whether an employee-paid expense's status as primarily for the benefit of the employer is a sufficient condition for it to qualify as a "kick-back," because the Department does not consider an H-2B employee's payment of his or her own relocation expenses to be primarily for the benefit of the H-2B employer.

Both as a general matter and in the specific context of guest worker programs, employee relocation costs are not typically considered to be "primarily for the benefit" of the employer. Rather, in the Department's view, an H-2B worker's inbound

transportation costs either primarily benefit the employee, or equally benefit the employee and the employer. In either case, the FLSA and its implementing regulations do not require H-2B employers to pay the relocation costs of H-2B employees. Arriaga and the district courts that followed its reasoning in the H-2B context misconstrued the Department's regulations and are wrongly decided.

As an initial matter, any weighing of the relative balance of benefits derived by H-2B employers and employees from inbound transportation costs must take into account the fact that H-2B workers derive very substantial benefits from their relocation. Foreign workers seeking employment under the H-2B nonimmigrant visa program often travel great distances, far from family, friends, and home, to accept the offer of employment. Their travel not only allows them to earn money—typically far more money than they could have in their home country over a similar period of time—but also allows them to live and engage in non-work activities in the U.S. These twin benefits are so valuable to foreign workers that these workers have proven willing in many instances to pay recruiters thousands of dollars (a practice that the Department is now taking measures to curtail) just to gain access to the job opportunities, at times **\*78041** going to great lengths to raise the necessary funds. The fact that H-2B workers travel such great distances and make such substantial sacrifices to obtain work in the United States indicates that the travel greatly benefits those employees.

Most significantly, however, the Department's regulations explicitly state that "transportation furnished employees between their homes and work where the travel time does not constitute hours worked compensable under the Act and the transportation is not an incident of and necessary to the employment" are qualifying "facilities" under 29 U.S.C. 203(m). 29 CFR 531.32(a). As qualifying facilities, such expenses cannot by definition be primarily for the benefit of the employer. 29 CFR 531.32(c). The wording of the regulation does not distinguish between commuting and relocation costs, and in the context of the H-2B program, inbound relocation costs fit well within the definition as they are between the employee's home country and the place of work.

The Arriaga court ruled that H-2A relocation expenses are primarily for the benefit of the employer in part because it believed that under 29 CFR 531.32, "a consistent line" is drawn "between those costs arising from the employment itself and those that would arise in the ordinary course of life." 305 F.3d at 1242. The court held that relocation costs do not arise in the ordinary course of life, but rather arise from employment. Id. Commuting costs and relocation costs cannot be distinguished on those grounds, however. Both kinds of expenses are incurred by employees for the purpose of getting to a work site to work. Moreover, an employee would not rationally incur either kind of expense but for the existence of the job. Both the employer and the employee derive benefits from the employment relationship, and, absent unusual circumstances, an employee's relocation costs to start a new job cannot be said to be primarily for the benefit of the employer.

That is not to say that travel and relocation costs are never properly considered to be primarily for the benefit of an employer. The regulations state that travel costs will be considered to be primarily for the benefit of the employer when they are "an incident of and necessary to the employment." 29 CFR 531.32(c). This might include, for example, a business trip, or an employer-imposed requirement that an employee relocate in order to retain his or her job. Relocation costs to start a new job will rarely satisfy this test, however.

In a literal sense it may be necessary to travel to a new job opportunity in order to perform the work, but that fact, without more, does not render the travel an "incident" of the employment. Inbound relocation costs are not, absent unusual circumstances, any more an "incident of * * * employment" than is commuting to a job each day. Indeed, inbound relocation costs are quite similar to commuting costs in many respects, which generally are not considered compensable. Cf. DOL Opinion Letter WH-538 (Aug. 5, 1994) (stating that travel time from home to work is "ordinary home-to-work travel and is not compensable" under the FLSA); Vega ex rel. Trevino v. Gasper, 36 F.3d 417 (5th Cir. 1994) (finding travel to and from work and home not compensable activity under Portal-to-Portal Act). In fact, there is no reason to believe that the drafters of 29 U.S.C. 203(m) and 206(a) ever intended for those provisions to indirectly require employers to pay for their employees' relocation and commuting expenses. To qualify as an "incident of * * * employment" under the Department's regulations, transportation costs must have a more direct and palpable connection to the job in question than merely serving to bring the employee to the work site.

Taking the Arriaga court's logic to its ultimate conclusion would potentially subject employers across the U.S. to a requirement to pay relocation expenses for all newly hired employees—or at least to pay relocation expenses for all newly hired foreign employees, since international relocation is perhaps less "ordinary" than intranational relocation. That simply

cannot be correct. The language of 29 U.S.C. 203(m) and 206(a) and their implementing regulations provide a very thin reed on which to hang such a seismic shift in hiring practices, particularly so many years after those provisions have gone into effect. Nor does the fact that H-2B workers are temporary guest workers change the equation. Even assuming that H-2B workers derive somewhat less benefit from their jobs because they are only temporary, that fact alone would not render the worker's relocation expenses an "incident" of the temporary job. If it did, ski resorts, camp grounds, shore businesses, and hotels would all be legally required to pay relocation costs for their employees at the beginning of each season—again, a result that is very difficult to square with the language and purpose of 29 U.S.C. 203(m) and 29 CFR 531.35.

A stronger argument could be made, perhaps, that employers derive a greater-than-usual benefit from relocation costs when they hire foreign guest workers such as H-2B workers, because employers generally are not allowed to hire guest workers unless they have first attempted but failed to recruit U.S. workers. Thus, such employers have specifically stated a need to hire non-local workers. Given the substantially greater benefit that foreign guest workers generally derive from work opportunities in the United States than they do from employment opportunities in their home countries, however, the Department believes that this at most brings the balance of benefits between the employer and the worker into equipoise. Moreover, the employer's need for non-local workers does nothing to transform the relocation costs into an "incident" of the job opportunity in a way that would render the employer's payment of the relocation expenses a "kick-back" to the employer. If it did, courts would soon be called upon every time an employer hired an out-of-state worker to assess just how great the employer's need for the out-of-state employee was in light of local labor market conditions. Conversely, the courts would also have to inquire into the employee's circumstances, and whether the employee had reasonably comparable job prospects in the area from which the employee relocated. Again, the Department does not believe such a result is consistent with the text or the intent of the FLSA or the Department's implementing regulations.

It is true, of course, that H-2B employers derive some benefit from an H-2B worker's inbound travel. To be compensable under the FLSA, however, the question is not whether an employer receives some benefit from an item or paid-for cost, but rather whether they receive the primary benefit. Significantly, despite the fact that employers nearly always derive some benefit from the hiring of state-side workers as well, such workers' relocation costs generally have not been considered to be "primarily for the benefit of the employer." That is so because the worker benefits from the travel either more than or just as much as the employer.

In sum, the Department believes that the costs of relocation to the site of the job opportunity generally is not an "incident" of an H-2B worker's employment within the meaning of 29 CFR 531.32, and is not primarily for the benefit of the H-2B employer. The Department states this as a definitive interpretation of its own regulations and expects that courts will defer to that interpretation.

### *78042 8. Section 655.22(m) [(k) in Final Rule]—Bona Fide Inquiry

As proposed in the NPRM, the Final Rule at § 655.22(k) requires an employer that is a job contractor to attest that if it places its employees at the job sites of other employers, it has made a written bona fide inquiry into whether the other employer has displaced or intends to displace a similarly employed U.S. worker within the area of intended employment within the 120 days of the date of need. To comply with this attestation, the Department is requiring the employer to inquire in writing to and receive a written response from the employer where the relevant H-2B worker will be placed. This can be done by exchange of correspondence or attested to by the secondary employer in the contract for labor services with the employer petitioning to bring in H-2B workers. This proposed attestation at § 655.22(k) also requires the employer to attest that all worksites where the H-2B employee will work are listed on the Application for Temporary Employment Certification.

The Department received several comments on this secondary placement attestation provision. While some were in favor of the requirement, some employer associations expressed concern that making such an inquiry of their clients was unfair and unduly burdensome. The Department acknowledges that this attestation imposes an additional level of inquiry between job contractors and their clients where the contractor will be providing H-2B workers at a client site. The INA's mandate of the unavailability of persons capable of performing the job duties for which the H-2B workers are sought is at the heart of this requirement.

It is the H-2B worker's job activity, rather than the identity of the H-2B worker's employer, which is required to be measured against the availability of U.S. workers; the H-2B worker can be admitted only upon assurances of the unavailability of unemployed persons able to take the H-2B job opportunity. As a result, an H-2B worker performing duties at company X, for

which company Y has hired him and pays him, may have an adverse effect not only on employees at the petitioning job contractor company employing him but also the company benefiting from his or her services. The limitations imposed by the Department—area of intended employment, occupation, and timing—provide parameters to reassure employers while at the same time enabling them to ensure full compliance with the mandates of the H-2B program.

One commenter agreed with this provision but did not believe a labor contractor should be held liable for the statements provided by those entities. The Department believes this commenter misinterpreted this section. The job contractor should make a bona fide inquiry and document the inquiry and response. If it later turns out that the employer who received the H-2B worker from the job contractor displaced a U.S. worker during the stated timeframe, proof of the employer's negative response to the job contractor's bona fide inquiry will relieve the job contractor of liability for that violation.

Another commenter requested that we strike this provision in its entirety because it does not allow for change in circumstances that would warrant displacing U.S. workers. The Department sees no reason why the U.S. worker would have to be displaced over the foreign worker and therefore, declines to eliminate this provision.

Finally, an industry association commented that H-2B workers employed by carnivals and circuses are constantly being placed on job sites of other employers as they travel the circuit and that this requirement is too difficult to comply with. It is difficult for the Department to discern, from the manner in which this comment was written, whether the H-2B workers are being paid by one petitioning employer throughout the itinerary or whether these H-2B workers are placed on the payroll of the fixed-site employer at each location. The Department has not made any changes to this section, as no compliance challenge was clearly communicated.

**9. Section 655.22(o) [(m) in Final Rule]—Notice to Worker of Required Departure**
Under the Final Rule, employers have a responsibility to inform foreign workers of their duty to leave the United States at the end of the authorized period of stay, and to pay for the return transportation of the H-2B worker if that worker is dismissed early. As stated in the NPRM, DHS will establish a new land-border exit pilot program for certain H-2B and other foreign workers to help ensure that departure follows the end of work authorization, regardless of whether it flows from a premature end or from the end of the authorized labor certification.

The Department received one comment on the duty to inform the worker of the obligation to depart from the country. This commenter opined that it is not the responsibility of employers to become unpaid immigration officers. The Department is not suggesting that it is placing any burden on employers to act as immigration officers. The Department has retained the requirement, while clarifying it to be consistent with DHS's regulations on this issue.

**10. Section 655.22(p) [(n) in Final Rule]—Representation of Need**
The Final Rule requires the employer to attest that it truly and accurately stated the number of workers needed, the dates of need, and the reasons underlying the temporary need in its labor certification request. The Department received two comments on this provision. One requested that we change the words "truly and accurately" to "reasonable and good faith" based on estimates from information available at the time of filing the certification. The Department has considered this change but declines to amend the regulatory language. The concern of the commenter of the need for flexibility is found in the provision in both the NPRM and this Final Rule regarding amendments (§ 655.34(c)(2)) of the start date of the certification. Any need for additional flexibility on the part of the Department must be balanced against the Department's need to ensure integrity in an attestation-based program; giving freedom to change its dates of need allows unscrupulous employers to submit applications not based on an actual need, thus circumventing the entire process in an attempt to obtain limited visas.

The second commenter expressed concern with the date of need requirement and requested the Department change several sections on which this attestation is predicated. One of the major concerns of this commenter was the potential need to amend start dates after certification if an employer must wait for visa numbers to become available. The Department has, however, retained the underlying provision for this attestation. While the Department permits amendment of the start date of the certification by the employer both prior to certification (§ 655.34(c)(2)) and after certification to certify a late adjudication (§ 655.34(c)(4)), the reconciliation of the start date becomes an issue for DHS adjudication. The Department notes that a regulatory provision allowing movement of the date of need after certification would be inconsistent with the DHS proposed

rule, which would not permit the filing of a petition whose start date was inconsistent with the start date of the labor certification.

This commenter also proposed, in the alternative, that employers be allowed **\*78043** to submit their I-129 labor certification applications to DHS with a note that they have submitted their request for an amendment to the Department and that the Department be required to adjudicate the request for amendment within five days. The Department considered the comment and has decided not to establish a deadline for the processing of amendment requests. We defer to DHS to determine what is appropriate for its adjudication of I-129 petitions which falls exclusively under its jurisdiction.

### L. Retention of Supporting Documentation

The Final Rule contains a modified requirement that employers retain specified documentation outlined in the proposed regulations to demonstrate compliance with program requirements. The proposed retention period was for 5 years. This documentation must be provided in the event of an RFI, post-adjudication audit, WHD investigation or other similar activity. The Department received a few comments in response to this proposed requirement. One small business coalition expressed its support, while another organization expressed concern that a 5-year document retention requirement was too long, especially for small employers, or employers like circuses and carnivals that are mobile or have a mobile component. Another commenter requested the Department prepare and provide a list to H-2B employers in one place, in plain language—perhaps as part of broad stakeholder compliance assistance—the documentation that should be retained. In response to concerns about the length of time for records retention, the Department has reduced the requirement from 5 years to 3 years. The documentation required will support specific attestations by the employer under the program. We will provide additional guidance in the course of individual and broad-based technical assistance and educational outreach to the employer community, including on the OFLC Web site. We will consider the issuance of additional written guidance, as appropriate.

### M. Section 655.23(c)—Request for Further Information

The Department proposed to issue a Request for Further Information (RFI) within 14 days of receiving the application, if needed, for the purpose of adjudicating the application for labor certification. All of those who commented on this provision requested that the timeframes be changed, but most also recommended an additional provision that would obligate the Department to process and respond to the information received through the RFI within a certain period of time. The Department agrees and shortened both the issuance and response time to 7 days. The Department also has added a provision that obligates the CO to issue a Final Determination within 7 business days of receiving the employer's response, or by 60 days before the date of need, whichever is greater.

### N. Section 655.24—Post-Adjudication Audits

The Department proposed to use various selection criteria for identifying applications for audit review after the application has been adjudicated in an effort to maintain and enhance program integrity. The audits are meant to permit the Department to ensure compliance with the terms and conditions by an employer and to fulfill the Secretary's statutory mandate to certify applications only where unemployed U.S. workers capable of performing such services cannot be found. Failure by an employer to respond to the audit could lead to debarment from the program as could a finding by the Department that the employer has not been complying with the terms and conditions attested to in the application. The Department received many comments on this provision. They were equally divided between those that opposed post-adjudication audits and those that believed audits are an effective tool to enhance integrity. Those who opposed the post-adjudication audits did not make any alternative suggestions on how the Department could determine compliance with the program. Therefore, with no other alternatives available, the Department believes its initial analysis is correct and, therefore, has not made any substantive changes to this section, save for including the option for the CO to refer any findings that an employer violated the terms and conditions of the program with respect to eligible U.S. workers to the Department of Justice, Civil Rights Division, Office of Special Counsel for Unfair Immigration Related Employment Practices, as suggested by one commenter.

### O. Section 655.30—Supervised Recruitment

The Department proposed to require certain employers to engage in supervised pre-filing recruitment to ensure compliance with recruitment requirements. One comment was received on this provision. The commenter believes that the NPC will be unable to handle such a responsibility as effectively and as efficiently as did the local SWAs and that it will affect the

integrity of the program. The Department respectfully disagrees with this commenter and has retained the provision as proposed. We believe that centralizing the process will provide uniformity and expertise that will enhance program integrity. Further, in the permanent labor certification program, supervised recruitment is conducted under Federal guidance and not SWA supervision.

### P. Section 655.31—Debarment

The Department's NPRM proposed a mechanism allowing the Department to debar an employer/attorney/agent from the H-2B program for a period of up to 3 calendar years. Debarment from the program is a necessary and reasonable mechanism to enforce H-2B labor certification requirements and ensure compliance with the program's statutory requirements. Further, debarment and other enforcement mechanisms, e.g., audits, are necessary and reasonable program compliance checks to balance the transition to an attestation-based filing system. The proposed rule would permit the Department to debar an employer, attorney, and/or agent for a period of up to 3 calendar years for misrepresenting a material fact or for making a fraudulent statement on an H-2B application, for a material or substantial failure to comply with the terms of the attestations, for failure to cooperate with the audit process or ordered supervised recruitment, or if the employer/attorney/agent has been found by a court of law, WHD, DHS, or the DOS to have committed fraud or willful misrepresentation involving any OFLC employment-based immigration program.

Upon further consideration, based in part upon the Department's recent efforts to modernize its H-2A labor certification regulations, the Department has decided to modify the debarment provision so that it more closely parallels the debarment provision for the H-2A regulation at 20 CFR 655.118, given the similarity of the H-2A and H-2B labor certification programs. While many of the grounds for debarment are substantially similar in the Final Rule as in the NPRM, the Final Rule contains additional safeguards for both workers and employers, which are explained in greater detail below.

### 1. Debarment Authority

An advocacy organization questioned the Department's authority to debar attorneys, agents, or employers from the H-2B program and asserted that a determination of a violation should only be made after notice of violation and an **\*78044** opportunity for a hearing. The debarment of entities from participating in a government program is an inherent part of an agency's responsibility to maintain the integrity of that program. As the Second Circuit found in Janik Paving & Construction, Inc. v. Brock, 828 F.2d 84 (2d Cir. 1987), the Department possesses an inherent authority to refuse to provide a benefit or lift a restriction for an employer that has acted contrary to the welfare of U.S. workers. In assessing the Department's authority to debar violators, the court found that "[t]he Secretary may * * * make such rules and regulations allowing reasonable variations, tolerances, and exemptions to and from any or all provisions * * * as [s]he may find necessary and proper in the public interest to prevent injustice of undue hardship or to avoid serious impairment of the conduct of Government business." Id. at 89.

In addition, although the Administrative Procedure Act provides that parties are entitled to appear before the agency with legal counsel, see 5 U.S.C. 555(b), this provision "leaves intact the agencies' control over both lawyers and non-lawyers who practice before them," Attorney General's Manual on the APA (1947) at 65. The Department's debarment of attorneys and agents under the H-2B program is also consistent with the Department's longstanding practice of regulating attorneys and representatives who appear before the agency. See, e.g., In re judicial inquiry re Miroslaw Kusmirek, 2000-INA-116 (Sept. 18, 2002) (sanctioning a representative for providing forged documents to the Department of Labor).

In order to encourage compliance, the regulatory scheme for the H-2B program relies on attestations, audits, investigations and the remedial measure of debarment. Use of debarment as a mechanism to encourage compliance has been endorsed in the INA for a number of foreign labor certification and attestation programs. Ensuring the integrity of a statutory program enacted to protect U.S. workers is an important part of the Department's mission.

As part of the Department's inherent debarment authority, the Department may determine the particular procedures that may apply to the process. Accordingly, it is within the Department's authority to require the OFLC Administrator to issue a Notice of Intent to Debar no later than 2 years after the occurrence of the violation; offer the employer an opportunity to submit evidence in rebuttal; and if the rebuttal evidence is not timely filed or if the Administrator determines that the employer, attorney, or agent more likely than not meets one or more of the bases for debarment, issue a Notice of Debarment which may be subject to administrative appeal through the Department's Board of Alien Labor Certification Appeals

(BALCA). Like the NPRM, the Final Rule provides that the Notice of Debarment shall be in writing, state the reason for the debarment finding and duration of debarment, and identify the appeal rights. Additionally, the Final Rule provides that the debarment will take effect on the start date identified in the Notice of Debarment unless the administrative appeal is properly filed within 30 days of the date of the Notice, thereby, staying the debarment pending the outcome of the appeal.

**2. Grounds for Debarment**
While a union and a state agency expressed their support for the debarment provisions, a law firm asserted that the debarment was an unduly strict sanction for minor violations of new procedures, the details of which are still not clear. We disagree with the commenter's characterization of violations warranting debarment as "minor." The Department will not debar for "minor" violations. Rather most of the violations that will be the basis of potential debarment actions require a pattern or practice of acts that: (1) Are significantly injurious to the wages or benefits offered under the H-2B program or working conditions of a significant number of the employer's U.S. or H-2B workers; (2) reflect a significant failure to offer employment to each qualified domestic worker who applied for the job opportunity for which certification was being sought, except for lawful job-related reasons; (3) reflect a significant failure to comply with the employer's obligations to recruit U.S. workers; (4) reflect a significant failure to comply with the RFI or audit process; (5) reflect the employment of an H-2B worker outside the area of intended employment, or in an activity/activities not listed in the job order (other than an activity minor and incidental to the activity/activities listed in the job order), or after the period of employment specified in the job order and any approved extension; or (6) reflect a significant failure to comply with supervised recruitment. However, the Department recognizes that there are some acts which the Department would have no other available remedy to enforce would warrant debarment even without a pattern or practice. These acts are set forth separately under § 655.31(d)(2) through (5). These acts are: Fraud; the failure to cooperate with a DOL investigation or with a DOL official performing an investigation, inspection or law enforcement function; the failure to comply with one or more sanctions or remedies imposed by the ESA, or with one or more decisions of the Secretary or court; and a single heinous act showing such flagrant disregard for the law that future compliance with program requirements cannot reasonably be expected.

As to the details of the violation not being clear, we believe that the regulations are quite clear in setting forth the various grounds under which an employer, attorney or agent may be debarred. The Department understands the seriousness of debarment as a penalty and, in considering the comments received in response to the NPRM, believes that the resulting debarment provision upholds the integrity of the H-2B labor certification program and puts employers on notice of what violations are sufficiently serious that could result in potential debarment.

Additionally, the law firm requested a provision for training prior to being subject to sanctions such as debarment. While we do not think that it is necessary to address such training directly in the regulation, OFLC will issue further guidance, as appropriate, to orient stakeholders and staff to these new provisions.

**3. Debarment of Attorneys and Agents**
An international recruiting company requested that the Department apply a different standard for the debarment of attorneys and agents from the debarment of employers. In particular, the commenter asserted that the evidence to debar the agent or attorney would need to be legally significant since they do not share in the task of employment and stated that many agents accept information from the employer at face value and accept information as true. While attorneys and agents are not strictly liable for all actions of the employers they represent they do have responsibilities attendant to their participation in the program. Employers, agents, and attorneys each must remain aware of their particular responsibilities under the labor certification process and of the consequences of submitting false or misleading information to a Federal agency. Accordingly, the regulation provides that the Administrator may debar agents and attorneys not only for participating in, but also having knowledge of, or having reason to know of, the employer's substantial violation.

An advocacy organization objected to the omission of appeal rights for **\*78045** attorneys and agents with respect to a Notice of Debarment. The commenter stressed that since attorneys and agents may themselves be subject to a Notice of Debarment, they ought to have recourse to correct a conceivably incurred or unfair decision. The commenter also noted that there may be certain instances where the interests of an employer and attorney or agent may diverge with respect to pursuing an appeal and the latter would be harmed due to the lack of appeal rights. The commenter also noted that the Department's permanent labor certification regulations provide not only the employer but any debarred person or entity the right to appeal the debarment decision. We agree with commenter's concern and have included references to attorneys' and agents' rebuttal and appeal

rights, in additional to that of employers.

**4. Use of Labor Contractors**

An advocacy organization expressed a concern that employers would manipulate their legal identities resulting in abuses that would not be cured by debarment. In particular, the commenter set forth a scenario in which a company would retain a labor contractor or temporary agency to serve as the "employer" for a group of foreign workers at the company's work site. The commenter was concerned that the company would take advantage of a labor contractor's false claim that no domestic workers could be found, yet only the labor contractor would be debarred as the "employer," thus allowing the company to hire another labor contractor to repeat the same abuses.

The commenter seems to presume all labor contractors would commit violations of the program, which is a generalization that unfairly portrays law abiding labor contractors in a negative light. Nonetheless, this is a situation that would be of concern to the Department and, if appropriate, we would pursue administrative means to ascertain the veracity of applications and information submitted to the Department.

**5. Review of Debarment Determinations**

The Department did not receive comments about the procedures for the review of the Administrator, OFLC's debarment determinations. However, to ensure consistency across programs, the Department has included in the Final Rule procedures, identical to those set forth in the Department's H-2A Final Rule, for hearings before an administrative law judge and review of the administrative law judge's decision by the Administrative Review Board. Under the Final Rule, a debarred party may request a hearing which would be governed by the procedures in 29 CFR part 18, and administrative law judge decisions would not be required to be issued within a set period of time. We believe that this process provides a period of time that is both sufficient for thorough consideration of the grounds for debarment and expedient enough so as to allow the Department to debar bad actors before they can cause any additional harm while also minimizing the period of uncertainty for employers in the case of a successful appeal.

*Q. Section 655.32—Labor Certification Determinations*

The proposed language delineated the criteria by which the Administrator of OFLC will certify or deny applications. The commenters, though citing this particular section of the NPRM, actually commented on the attestation-based process in general. Their comments were incorporated into that discussion above.

*R. Section 655.33—Appeals to the BALCA*

The Department's and DHS's NPRMs proposed a new model for the adjudication of H-2B applications. Under current procedures, the Department does not provide for any administrative review of decisions either denying H-2B labor certification applications or rendering a non-determination. Currently, the Department's decisions are advisory to DHS and employers whose applications are denied or issued a non-determination by the Department may submit countervailing evidence to DHS and have access to administrative review under DHS procedures. Under the DHS NPRM, the countervailing evidence process is eliminated and employers seeking to file H-2B visa petitions will be required to present an approved labor certification from DOL. Since DOL decisions denying H-2B labor certification will no longer be subject to additional review outside of the Department, we concluded that it would be appropriate to provide an employer whose labor certification application is denied an opportunity to seek review in the Department. The Department's NPRM included such a procedure providing for administrative review before the BALCA.

The Department received a number of comments on this portion of the NPRM, the majority of which expressed dissatisfaction with the proposal. We have carefully reviewed these comments and made several changes in response. Several commenters expressed satisfaction with the current appeal process and requested that it not be changed. To the extent these comments related to concerns about the length of that process, that question is discussed below. To the extent the commenters expressed a preference for the retention of the current practice in which countervailing evidence can be submitted to DHS when an H-2B labor certification application is denied, similar comments were submitted to DHS in response to its NPRM and DHS made no change in its Final Rule. We defer to and adopt DHS's response on this issue. Likewise, the concern expressed by one commenter that the time spent utilizing the Department's appeals procedures will

delay employers getting into the queue at DHS for the limited number of available H-2B visas, is a matter that is addressed by DHS in their Final Rule.

With regard to matters directly related to the Department's proposal, a number of commenters objected to the provision that precluded the submission of new evidence to the BALCA. We believe these commenters do not recognize the totality of the proposal. The NPRM provides that before a CO can deny an H-2B application, the CO must issue an RFI that apprises the employer of the grounds for the proposed denial and provides an opportunity to submit additional information. The Department does not see any reason to provide another opportunity to submit necessary information. In addition, providing such an opportunity would inevitably delay issuance of final decisions from the BALCA. Concerns about delays at the BALCA were expressed by a number of commenters even in the absence of any authorization for the submission of new evidence.

Several commenters expressed concern that the appeal process before the BALCA would take too long. One noted specifically that no time limit was contained for the BALCA to issue its docketing statement and a briefing schedule. It was also pointed out that the NPRM provided merely that the BALCA "should" notify the employer of its decision within 20 days of the filing of the CO's brief. In response to comments reflecting concerns about the timeliness of the appeal process, the Final Rule reflects significantly shorter time frames, with the BALCA decision due no later than 15 business days after the request for review is filed.

One commenter suggested the possibility of allowing worker representatives to participate in the administrative appeal process. We have rejected that suggestion. Generally, the **\*78046** Department's labor certification procedures do not involve participation by third parties and we do not believe that their involvement would enhance the process given the nature of the labor certification determination.

### *S. Section 655.34(c)—Amendments*

The Department received several comments on the provision requiring the amendment of labor certifications if the start dates change and/or the number of workers change. All commenters opposed this change. One commenter admitted that employers set their start date based on the availability of visa numbers. Other commenters claimed that this provision makes it impracticable to adjust to market fluctuations during the season. The Department appreciates the candid comments about the difficulties this new requirement will create. However, the Department's experience is that many times dates of need or number of workers needed are changed to such a degree that the recruitment previously done is stale by the time USCIS receives the application. Changes to start dates, especially as the practice has become more common, also raise a concern that U.S. workers who might indeed be available for work on the new start date were not given the chance to apply originally. Therefore, this requirement represents a reasonable and logical solution. The only changes made to the section were for clarification purposes.

### *T. Section 655.35—Required Departure*

In consultation with DHS, the Department proposed to include, as part of the employer's obligations, the requirement that employers provide notice to the H-2B workers of their required departure at the end of their authorized stay or separation from employment, whichever occurs first. This section was designed in anticipation of DHS establishing a registration of departure program. The provision requires employers to inform their H-2B workers of their obligation to register their departure at the port of exit. The Department received one comment suggesting that we eliminate this provision because it is unworkable due to the requirement for specific entry and exit points, which is inevitably a guarantee for violations occurring. This commenter also suggested we work with DHS instead. The Department respectfully declines to eliminate this language. The entry-exit ports and requirements continue to be matters of immigration under DHS's jurisdiction; this language simply makes it an employer's obligation to inform foreign workers of the workers' responsibility. The Department did consult with DHS on this language to establish this employer obligation and lay the appropriate groundwork as DHS continues to build their next-generation entry-exit system.

### *U. Delegation of Enforcement Authority*

As previously discussed, the INA provides the Department no direct authority to enforce any conditions concerning the employment of H-2B workers, including the prevailing wage attestation. DHS possesses that authority pursuant to secs. 103

and 214(a) and (c) of the INA. 8 U.S.C. 1103 and 8 U.S.C. 1184(c)(14)(A). DHS may also delegate its authority to the Department under secs. 103(a)(6) and 214(c)(14)(B) of the INA. 8 U.S.C. 1103(a)(6) and 8 U.S.C. 1184(c)(14)(B). DHS has chosen to delegate its enforcement authority to DOL, which provides the basis for the new enforcement provisions of this subpart. The delegation will not take effect until this rule becomes effective.

*V. Section 655.50(c)—Availability of Records in the Enforcement Process*

Language has been added to § 655.50(c) to describe the employer's responsibility to make records available when those records are maintained in a central office.

*W. Section 655.60—Compliance With Application Attestations*

The NPRM proposed a WHD enforcement program addressing H-2B employers' compliance with attestations made as a condition of securing authorization to employ H-2B workers. The proposed enforcement program also covered statements made to DHS as part of the petition for an H-2B worker on the DHS Form I-129, Petition for a Nonimmigrant Worker. Compliance with attestations and the DHS petition are designed to protect U.S. workers and would be reviewed in WHD enforcement actions. This Final Rule adopts this proposal.

A trade union and U.S. Senator commented that the proposal did not include a mechanism for accepting complaints of potential violations. The Department intends to accept complaints, as it does under other statutes it administers such as the Fair Labor Standards Act (FLSA), 29 U.S.C. 201 et seq., which does not have a specific regulatory mechanism for the acceptance of complaints. Thus, the Department has not added a specific regulatory procedure here.

Another trade union commented that the Department should adopt the definition of "employ" found in the FLSA, which defines the term to include "suffer or permit to work." In fact, the proposed regulations included such a definition. However, the terms "employer" and "employee" were defined in terms of the common law test of employment which does not include "suffer or permit to work." Since the two concepts are different and the use of the "suffer or permit" test is precluded by the U.S. Supreme Court opinion in Nationwide Mutual Ins. v. Darden, 503 U.S. 318, 322-323 (1992), the reference to "suffer or permit to work" has been removed.

*X. Section 655.65—Remedies for Violations of H-2B Attestations*

**1. Section 655.65(a) and (b)—Assessment of Civil Money Penalties**

Under the proposed rule, the WHD would assess civil monetary penalties in an amount not to exceed $10,000 per violation for a substantial failure to meet conditions of the H-2B labor condition application or of the DHS Form I-129, Petition for a Nonimmigrant Worker for an H-2B worker; or for a willful misrepresentation of a material fact on the DOL application or DHS petition; or a failure to cooperate with a Department of Labor audit or investigation. No comment addressed this provision and it is adopted in the Final Rule, with one change—in accordance with the statutory provisions, the Final Rule clearly reflects that the WHD Administrator may access civil money penalties when appropriate.

**2. Section 655.65(i)—Reinstatement of Illegally Displaced U.S. Workers**

Under the NPRM the WHD would seek reinstatement of similarly employed U.S. workers who were illegally laid off by the employer in the area of intended employment. Such unlawful terminations are prohibited if they occur less than 120 days before the date of requested need for the H-2B workers or during the entire period of employment of the H-2B workers. No comments addressed this proposal and it is adopted in the Final Rule.

**3. Section 655.65(i)—Other Appropriate Remedies**

WHD may seek remedies under other laws that may be applicable to the work situation including, but not limited to, remedies available under the FLSA (29 U.S.C. 201 et seq.), the Migrant and Seasonal Agricultural Worker Protection Act (29 U.S.C. 1801 et seq.), and the McNamara-O'Hara Service Contract Act (41 U.S.C. 351 et seq.). WHD also may seek other administrative remedies for violations as it determines to be appropriate.

**\*78047** The Department sought public comments on whether back wages can be assessed under the H-2B program when an employer fails to pay the prevailing wage rate. The most extensive comments received were from a U.S. Senator asserting that the lack of back pay as a remedy is a "weakness of the Department's enforcement proposal" and that back pay is "an essential make-whole remedy for both H-2B program participants and American workers * * * [and] would provide a key incentive for otherwise vulnerable workers to come forward and protect their rights." The Senator also stated that "[t]here is ample authority establishing that similarly broad grants of remedial authority are sufficient to authorize an award of back [pay], even when this remedy is not specifically enumerated."

The Department has carefully considered whether Congress has provided authority to assess back wages under the H-2B provisions. The Department concludes that the H-2B statutory provisions provide the Secretary with the authority to seek back wages for failure to pay the required wage even though the statute does not specifically list this remedy. The INA broadly authorizes DHS to, "in addition to any other remedy authorized by law, impose such administrative remedies (including civil monetary penalties * * *) as the Secretary of Homeland Security determines to be appropriate[.]" 8 U.S.C. 1184(c)(14)(i). As noted above, that authority has been delegated to the Department of Labor. Awarding back pay is unquestionably the most appropriate remedy for failure to pay the required wage. It is also consistent with the statutory grant of authority and will further the purposes of the H-2B program because it will reduce employers' incentives to bypass U.S. workers in order to hire and exploit H-2B foreign workers, and guard against depressing U.S. workers' wage rates.

A number of courts have concluded that, under similarly broad grants of remedial authority, the Secretary may establish back pay as an appropriate sanction even in the absence of explicit statutory authority. See, e.g., Commonwealth of Kentucky Dept. of Human Resources v. Donovan, 704 F.2d 288, 294-96 (6th Cir. 1983) (ruling that the Secretary of Labor had authority to award back pay under Comprehensive Employment and Training Act (CETA) both prior to the 1978 statutory and regulatory amendments and pursuant to the 1978 amendments); City of Philadelphia v. U.S. Dept. of Labor, 723 F.2d 330, 332 (3d Cir. 1983); United States v. Duquesne Light Co., 423 F. Supp. 507, 509 (W.D. Pa. 1976) (in government contracting case, back pay appropriate under E.O. 11246).

The preamble to the NPRM, 73 FR 29946, noted that the H-1B provisions of the INA, unlike the H-2B provisions, contain a separate provision requiring that the Secretary assess back wages in cases where an employer has failed to pay the LCA-specified wages. 8 U.S.C. 1182(n)(2)(D) ("If the Secretary finds, after notice and opportunity for a hearing, that an employer has not paid wages at the wage level specified under the [LCA] * * * the Secretary shall order the employer to provide for payment of such amounts of back pay as may be required to comply with the [H-1B] requirements * * * whether or not [other penalties have] been imposed."). The H-1B back pay provision is, however, different from either programs' general, broad grant of remedial authority by being mandatory and by imposing no standard for the severity of wage violations (e.g., willfulness or "substantial violation") for the collection of back wages. Therefore, the failure to include the mandate in H-2B simply means that the Secretary is not required to seek back pay in cases where the employer has failed to pay the LCA-specified wages; it does not bear on the Secretary's discretion to seek back pay in such cases. The Department concludes that the statutory language of the H-2B program provides the Secretary with the discretionary authority to seek back pay, provided there is a finding of a "substantial violation" or willfulness, in cases where the employer has failed to pay the LCA-specified wages. See 8 U.S.C. 1184(c)(14)(A)(i). The Department has modified the Final Rule accordingly.

### Y. Comments Beyond the Scope

In addition to those discussed above, the Department received numerous comments that were beyond the scope of or not directly relevant to the proposed regulation. We did not respond to these comments, but find it appropriate to note them. They included: Calls for the Department to work with Congress to extend the Save Our Small and Seasonal Business Act returning workers provision; calls for the Congress to raise the H-2B 66,000 annual visa cap, or to allocate visa numbers more equitably across States; calls for the government to "recapture" H-2B visa numbers that expire the same year they are issued so they can be used for different workers; calls for the Congress to increase funding for all Federal agencies administering the H-2B visa program, and the SWAs, either through appropriations, or applications or fraud preventions fees; requests that DHS establish a special fraud investigative unit for certain visa related crimes and offenses; concerns about the requirement that workers use DHS's designated entry-exit system, and about the burdens and policies being built such a system; a request that foreign workers be given a two-month grace period between employers when the worker needs an extension but the workers' visas terminate before the beginning of their next employment; a request that employers have the authority to activate or deactivate the H-2B visa like a credit card to allow immediate action and loss of status if the worker fails to comply with the terms of the H-2B contract; calls for the government to require that H-2B workers (over whom the Department has no

jurisdiction save for the areas covered in this Final Rule) purchase travel insurance or prohibit H-2B workers from identifying themselves as "self-employed" on their federal tax forms, or to eliminate the requirement that H-2B workers pay Social Security or Medicare; opinions that the United States has sufficient foreign workers to meet the needs of U.S. employers, especially at a time when the economy is slowing down and many U.S. workers are unemployed; calls for U.S. employers to provide higher wages and better working conditions; and a call for H-2B workers to be permitted representation by Federally-funded legal services corporations, and that resources for such counsel be increased.

## III. Administrative Information

### A. *Executive Order 12866—Regulatory Planning and Review*

Under Executive Order (E.O.) 12866, the Department must determine whether a regulatory action is "significant" and therefore, subject to the requirements of the E.O. and subject to review by the Office of Management and Budget (OMB). Section 3(f) of the E.O. defines a "significant regulatory action" as an action that is likely to result in a rule that: (1) Has an annual effect on the economy of $100 million or more or adversely and materially affects a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or tribal governments or communities (also referred to as "economically significant"); (2) creates serious inconsistency or otherwise interferes with an action taken or planned by another agency; (3) materially alters the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raises novel legal or policy issues **\*78048** arising out of legal mandates, the President's priorities, or the principles set forth in the E.O.

The Department determined that this regulation is a "significant regulatory action" under sec. 3(f)(4). This Final Rule implements a significant policy related to the President's policies on immigration. However, the Department determined that this rule is not an "economically significant" rule under E.O. 12866 because it will not have an annual effect on the economy of $100 million or more.

### Analysis Considerations

The direct incremental costs employers will incur because of this Final Rule, above and beyond the current costs required by the program as it is currently implemented, are not economically significant. The total annual cost associated with this Final Rule is approximately $1,872,769 per year or $166 per employer. The only additional costs on employers resulting from this Final Rule are those involved in (1) the placement of a Sunday advertisement, which replaces one of the former daily advertisement and the additional paperwork costs; (2) the new paperwork and retention requirements; and (3) contacting laid-off workers to notify them of a job opportunity.[FN6]

### Cost of the Sunday Advertisement

The cost range for advertising and recruitment is taken from a recent (October 2008) sample of newspapers in various urban and rural U.S. cities, and reflects approximate costs for placing one 10-line advertisement in those newspapers. The cost of advertising in a Sunday paper instead of during the week is approximately $234, which represents an increase of approximately $31.16 over the weekday advertisement.[FN7] The additional total cost for the 11,267 employers utilizing the H-2B program of one Sunday ad would average approximately $351,080 assuming that such ads would not have been placed by the business as part of its normal practices to recruit U.S. workers.[FN8]

### Cost of Paperwork and Record Retention Requirements

The paperwork and record retention costs are minimal, as records will require a burden of approximately 1.35 hours per year per application. Based on the median hourly wage rate for a Human Resources Manager ($40.47), as published by the Department's Occupational Information Network, O\*Net OnLine, and increased by a factor of 1.42 to account for employee benefits and other compensation, a total cumulative burden of 15,210 hours will result in a total cost of $874,118, or $77.58 per employer.

### Cost To Notify Laid-Off Workers of Job Opportunity

A final cost to employers for implementing the requirements of this Final Rule is the cost associated with notifying laid-off

workers of a job opportunity. The Department estimates that the total cost to meet this requirement is $647,571 or $57.48 per employer. To make this cost determination, the Department estimated it would take an employer's Human Resources Manager approximately 3 minutes to notify each laid-off worker. The Department does not have data to determine how many laid-off workers an employer would be required to notify. Therefore, the Department projected this number based on the total number of employees requested on the applications. Based on PY 2006 data, employers requested visas for 247,287 foreign workers, for an average of 22 employees per employer. We then multiplied this number by 3 minutes (the time estimate to notify each laid-off worker) to determine that it will take each employer approximately one hour to meet this requirement. Thus, the cost per employer is the hourly salary for the Human Resource Manager to make the calls or $57.47.

**Benefits**

We also project that employers will experience significant time-savings as a result of the reengineered process. The Department estimates the average time-savings to employers will be at least 28 days from the current process, based on the current average H-2B application processing time of 73 days in the fiscal year (FY) 2007 (October 1, 2006-September 30, 2007). Although the Department cannot estimate the cost savings as a result of this time saved, it believes that employers will experience a variety of economic benefits, including benefits from predictability of workforce size and availability regardless of geographic area, as a result of reengineering the application process.

The Department received seven comments related to the cost of this rulemaking. One comment was directed at the cost to small businesses and has been addressed in Section B of this section of the preamble below. The remaining six comments were related to the costs to the SWAs, which is not a cost calculated in the total cost of this Final Rule because they are considered transfer costs under OMB Circular A-4. Therefore, the Department has addressed those comments in Section C of this section of the preamble. The Department notes, however, that based on the comments, it reduced the number of required advertisements from three in the preamble to two in this Final Rule, which is reflected in the cost analysis above.

*B. Regulatory Flexibility Analysis/SBREFA*

The Regulatory Flexibility Act (RFA) at 5 U.S.C. 603 requires agencies to prepare a regulatory flexibility analysis to determine whether a regulation will have a significant economic impact on a substantial number of small entities. Section 605 of the RFA allows an agency to certify a rule in lieu of preparing an analysis if the regulation is not expected to have a significant economic impact on a substantial number of small entities. A significant economic impact is defined as eliminating more than 10 percent of the businesses' profits; exceeding 1 percent of the gross revenue of the entities in a particular sector; or exceeding 5 percent of the labor costs of the entities in the sector. Further under the Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. 801 (SBREFA), an agency is required to produce compliance guidance for small entities if the rule has a significant economic impact. Although the RFA and the SBREFA analyses were included as separate preamble sections in the proposed rule, the Department has included them in one preamble section in this Final Rule to avoid unnecessary duplication. The Department has certified that this Final Rule does not have a significant economic impact on a substantial number of small entities.

**1. Definition of a Small Entity**

A small entity is one that is "independently owned and operated and which is not dominant in its field of operation." The definition of small business varies from industry to **\*78049** industry to the extent necessary to properly reflect industry size differences. An agency must either use the SBA definition for a small entity, or, establish an alternative definition. Given that this rulemaking crosses industry sectors, the Department has adopted the SBA size standards defined in 13 CFR 121.201. The SBA utilizes annual revenue in some industries, while utilizing number of employees in others to determine whether or not a business is considered a small business. Historically however, the Department has not collected information about an employer's industry classification, annual revenues, or number of employees currently on payroll in the H-2B program. Therefore, the Department cannot accurately and comprehensively categorize each applicant-employer for the purpose of conducting the RFA analysis by industry and size standard. In lieu of the industry and size standard analysis, the Department based the estimated costs of the reformed H-2B process assuming all employers-applicants were small entities.

**2. Factual Basis for Certification**

The factual basis for such a certification is that this Final Rule does not affect a substantial number of small entities and there

will not be a significant economic impact on them. The Department receives more than 10,000 applications a year under this program. In FY 2006 (October 1, 2005-September 30, 2006), ETA received from SWAs 11,267 applications from employers seeking temporary labor certification under the H-2B program. As mentioned earlier, the Department does not collect information regarding the numbers of small entities participating in the H-2B program. The Department believes that this rule may potentially affect as many as 11,267 employers participating in this program, assuming that each employer only has one application.

Although there may be a substantial number of small entities impacted by this Final Rule, the Department has determined that this rule will not have a significant economic impact on those small businesses that utilize the program. The RFA and the SBREFA, which amended the RFA, require that an agency promulgating regulations segment and analyze industrial sectors into several appropriate size categories for the industry being regulated. Even though the foreign labor certification programs are open to all industries, the Department does not have sufficient data to analyze the universe of H-2B applicants by industry sector. However, the Department was able to analyze the PY 2006 data to determine that landscape occupations [FN9] accounted for approximately 31 percent of all the applications filed. According to SBA guidelines for the landscape industry, all employers with annual receipts at or below $6.5 million are considered small businesses. The cost of this rule for those employers at this threshold would be approximately .003 percent of their annual revenues; even for employers with annual receipts of only $500,000, the cost would represent only .036 percent of revenues.[FN10] The Department also recognizes that there are potentially very small business that might be affected. Therefore, for purposes of comparing costs, this rule would cost small entities that had gross annual receipts of $120,000 and profits of $12,000 approximately .15 percent of their revenues, which would not be significant.

The Department believes that the costs incurred by employers under this Final Rule will not be substantially different from those incurred under the current application filing process. Employers seeking to hire foreign workers on a temporary basis under the H-2B program must continue to establish to the Secretary's satisfaction that their recruitment attempts have not yielded enough qualified and available U.S. workers. Similar to the current process, employers under this H-2B process will file a standardized application but will retain recruitment documentation, a recruitment report, and any supporting evidence or documentation justifying the temporary need for the services or labor to be performed. To estimate the cost of this reformed H-2B process on employers, the Department calculated each employer will pay an additional $31.16 to meet the advertising requirements for a job opportunity, and will spend an additional 1.35 hours staff time preparing the standardized application, narrative statement of temporary need, final recruitment report, and retaining all other required documentation (e.g., newspaper ads, business necessity) for audit purposes or $81.57 per employer. The Department also estimated that it will take an employer approximately one hour to notify laid-off workers of a job opportunity, or $66.46.

Using the RFA standard to determine whether a rule will have a substantial impact on a significant number of small businesses, the Department determined that this Final Rule will not eliminate more than 10 percent of the businesses' profits; exceed 1 percent of the gross revenue of the entities in a particular sector; or exceed 5 percent of the labor costs of the entities in the sector. The total cost per employer is approximately $179, which represents .15 percent of the gross receipts and profits of a small entity with $120,000 in revenues and $12,000 profits. Therefore, this rule will not have a significant impact on a substantial number of small businesses.

The Department received one comment on this section, which generally stated that the rule would increase the cost to employers, especially given the changes to advertising. Although this statement is partly true given that the cost of the rule increased by approximately $179, in light of the other non-quantifiable benefits, the Final Rule will likely represent a cost-savings to the employer. Therefore, for the reasons stated, the Department believes that total costs for any small entities affected by this program will be reduced or stay the same as the costs for participating in the current program. Even assuming that all entities who file H-2B labor certification applications qualify as small businesses, there will be no net negative economic effect.

### C. Unfunded Mandates Reform Act of 1995

Section 202 of the Unfunded Mandates Reform Act (UMRA) of 1995 (2 U.S.C. 1501 et seq.) directs agencies to assess the effects of a Federal regulatory action on State, local, and tribal governments, and the private sector to determine whether the regulatory action imposes a Federal mandate. A Federal mandate is defined in the Act at 2 U.S.C. 658(5)-(7) to include any provision in a regulation that imposes an enforceable duty upon State, local, or tribal governments, or imposes a duty upon the private sector which is not voluntary. A decision by a private entity to obtain an H-2B worker is purely voluntary and is,

therefore, **78050** excluded from any reporting requirement under the Act.

The Department received six comments on this section from SWAs related to the increase in cost and workload and/or the lack of funding to support the new H-2B processing requirements. One commenter generally noted that its jurisdiction was neither financially nor functionally prepared to take on this added workload. Three States specifically stated that the funds provided under the Wagner-Peyser Act were insufficient to carry out their H-2B responsibilities prior to the changes in this rule, and the new eligibility verification requirements increased their funding challenges. Three States specifically related the lack of resources to the additional cost of storing and processing the I-9 documents related to the eligibility verification requirements.

The Department disagrees that this Final Rule imposes an unfunded mandate. As noted in the proposed rule, the Department is not insensitive to the resource and time constraints facing SWAs in their administration of H-2B activities and the difficulties inherent in making informed referrals on a population of workers that may be itinerant and difficult to contact. 73 FR 29950, May 28, 2008. However, we do not believe that this requirement will result in a significant workload increase or administrative burden. The Department points out that although there may be some new requirements for SWAs, there are also many requirements for SWAs that have been eliminated in this Final Rule given the reengineered approach. The Department believes reduced burden from the old requirements more than offsets any additional burden finalized here. The SWAs will experience a direct impact on their foreign labor certification activities in the elimination of certain H-2B activities under this Final Rule. These eliminated activities are currently funded by the Department under grants provided under the Wagner-Peyser Act, 29 U.S.C. 49 et seq. In addition, other tools will be available to the SWAs to make this requirement relatively easy to implement, such as the E-Verify system. As a result, the net effect of this Final Rule will likely be to ensure the amounts of such grants available to each State correspond or even increase relative to its workload under the H-2B program in the receipt, processing and monitoring of each application.

One State commented that the new eligibility verification requirements could lead to discriminatory practices subject to legal challenge, which in this commenter's opinion, the legal costs associated with any defense also represented an unfunded mandate. The Department believes it is premature to presume that the States will have to bear a significant cost to defend against any potential litigation associated with the implementation of this Final Rule, and which is typically considered part of a grantee's programmatic responsibility, should it occur.

Therefore, for the reasons stated above, the Department finds that this Final Rule does not impose an unfunded mandate.

### D. *Executive Order 13132—Federalism*

Executive Order 13132 addresses the Federalism impact of an agency's regulations on the States' authority. Under E.O. 13132, Federal agencies are required to consult with States prior to and during the implementation of national policies that have a direct effect on the States, the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government. Further, an agency is permitted to limit a State's discretion when it has statutory authority and the regulation is a national activity that addresses a problem of national significance.

The Department received one comment on this section. This commenter stated that the Department's reversal of a long-standing position on U.S. worker self-attestation creates a Federalism impact. According to this commenter, TEGL 11-07, Change 1, mandates that SWAs perform pre-employment eligibility verifications on every U.S. worker that requests a referral to an H-2A job order. This commenter requests that the Department prepare a summary impact statement and acknowledge that many States currently have attestation-based systems for U.S. worker access to public labor exchange services.

The Department disagrees with this commenter's assessment of a Federalism impact and therefore, the need for a summary impact statement. In this case there is no direct effect on the States because the States are not in the best position to address the needs to re-engineer a Federal program to relieve the backlog that has occurred due to inadequate staffing, funding, or other issues of concern. The issues addressed by the regulations are of national concern to ensure an effective program that regulates temporary alien workers and protects U.S. workers.

As noted elsewhere in this preamble, the Department attempted to reform this program in 2005. To meet the demands of the

considerable workload increases for both the Department and the SWAs and limited appropriations, the Department determined that regulatory changes were still necessary. These changes are consistent with the Department's review, program experience, and years of stakeholder feedback on longstanding concerns about the integrity of the prior program. Therefore, as a program of national scope, the Department is implementing requirements that apply uniformly to all States.

Even if there were an argument that the Department should defer to the States on the eligibility verification requirements, the Department is authorized by the INA to implement Federal regulations to ensure consistency across States on immigration matters. Therefore, rather than having separate eligibility verification processes that vary from State to State, the Department is exercising its right under the INA to impose consistent requirements for all participants across the H-2B program. In addition, given that the H-2B program is an immigration-related program, it also is a program of national security and therefore, of national significance with Federal oversight and uniformity. The verification requirement is designed to strengthen the integrity of the temporary labor certification process, afford employers a legal pool of applicants, protect U.S. workers, and improve confidence in and use of the H-2B program.

Further, the relationship the States have with this program and the Federal Government is through grants from the Department to the States for the sole purpose of maintaining consistency across States. As a voluntary Federal program, the Department may change the direction from time to time as dictated by the changes to immigration-related concerns, but at the same time are consistent with the underlying legislation.

Therefore, for the reasons stated, the Department has determined that this rule does not have sufficient Federalism implications to warrant the preparation of a summary impact statement.

### E. *Executive Order 13175—Indian Tribal Governments*

Executive Order 13175 requires Federal agencies to develop policies in consultation with tribal officials when those policies have tribal implications. This Final Rule regulates the H-2B visa program and does not have tribal implications. Therefore, the Department has determined that this E.O. does not apply to this rulemaking. The Department did not receive any comments related to this section.

**\*78051** *F. Assessment of Federal Regulations and Policies on Families*
Section 654 of the Treasury and General Government Appropriations Act of 1999 (5 U.S.C. 601 note) requires agencies to assess the impact of Federal regulations and policies on families. The assessment must address whether the regulation strengthens or erodes the stability, integrity, autonomy, or safety of the family.

The Final Rule does not have an impact on the autonomy or integrity of the family as an institution, as it is described under this provision. The Department did not receive any comments related to this section.

### G. *Executive Order 12630—Protected Property Rights*

Executive Order 12630, Governmental Actions and the Interference with Constitutionality Protected Property Rights, prevents the Federal government from taking private property for public use without compensation. It further institutes an affirmative obligation that agencies evaluate all policies and regulations to ensure there is no impact on constitutionally protected property rights. Such policies include rules and regulations that propose or implement licensing, permitting, or other condition requirements or limitations on private property use, or that require dedications or exactions from owners of private property.

The Department did not receive any comments on this section. The Department certifies that this Final Rule does not infringe on protected property rights.

### H. *Executive Order 12988—Civil Justice Reform*

Section 3 of E.O. 12988, Civil Justice Reform, requires Federal agencies to draft regulations in a manner that will reduce needless litigation and will not unduly burden the Federal court system. Therefore, agencies are required to review regulations for drafting errors and ambiguity; to minimize litigation; ensure that it provides a clear legal standard for affected

conduct rather than a general standard; and promote simplification and burden reduction.

The rule has been drafted in clear language and with detailed provisions that aim to minimize litigation. The purpose of this Final Rule is to reengineer the H-2B program and simplify the application process. Therefore, the Department has determined that the regulation meets the applicable standards set forth in sec. 3 of E.O. 12988. The Department received no comments regarding this section.

### I. Plain Language

Every Federal agency is required to draft regulations that are written in plain language to better inform the public about policies. The Department has assessed this Final Rule under the plain language requirements and determined that it follows the Government's standards requiring documents to be accessible and understandable to the public. The Department did not receive any comments related to this section.

### J. Executive Order 13211—Energy Supply

This Final Rule is not subject to E.O. 13211, which assesses whether a regulation is likely to have a significant adverse effect on the supply, distribution, or use of energy. Accordingly, the Department has determined that this rule does not represent a significant energy action and does not warrant a Statement of Energy Effects. The Department did not receive any comments related to this section.

### K. Paperwork Reduction Act

#### 1. Summary

As part of its continuing effort to reduce paperwork and respondent burden, the Department of Labor conducts a preclearance consultation program to provide the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps to ensure that requested data can be provided in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the impact of collection requirements on respondents can be properly assessed.

In accordance with the Paperwork Reduction Act (44 U.S.C. 3501), information collection requirements, which must be implemented as a result of this regulation, a clearance package containing proposed forms was submitted to OMB on February 14, 2008, along with its proposed rule to reform the H-2A agricultural foreign labor certification program, and then again on May 22, 2008, in conjunction with the H-2B proposed rulemaking preceding this Final Rule. Therefore, the public was given 60 days to comment on this information collection with both submissions, for a total of 120 days. All comments received were taken into consideration and a final package was submitted to OMB. The collection of information for the current H-2B program under the regulations in effect prior to the effective date of this rule were approved under OMB control number 1205-0015 (Form ETA 750).

This Final Rule implements the use of the new information collection, which OMB approved on November 21, 2008 under OMB control number 1205-0466. The Expiration Date is November 30, 2011. The new forms, ETA 9141 and ETA 9142, have a public reporting burden estimated to average 55 minutes for Form ETA 9141 and 2.75 hours for Form ETA 9142 per response or application filed.

This paperwork package applies—as does this Final Rule—to the H-2B, H-1B, H-1B1, H-1C, E-3, and PERM programs. The burden hours associated with the additional programs are a result of the wage determination and retention of document requirements. Under this Final Rule, and the implementation schedule it establishes, employers applying to any of these programs must use the ETA Form 9141, a single, Federal form that replaces the State-specific forms previously used to obtain prevailing wage determinations. There are no additional costs to the employer associated with the implementation of this new form, as costs are defined by the Paperwork Reduction Act. As the Department notes elsewhere in this preamble, the H-1C program was inadvertently removed. Consistent with the proposed rule at 73 FR 29947, May 28, 2008, it was the Department's intention to standardize all forms for better program effectiveness and efficiency in its non-agricultural programs, which necessarily extends also to the H-1C program.

For an additional explanation of how the Department calculated the burden hours and related costs, the Paperwork Reduction Act package for this information collection may be obtained from the RegInfo.gov Web site at http://www.reginfo.gov/public/do/PRAMain or by contacting the Department at: Office of Policy Development and Research, Department of Labor, 200 Constitution Ave., NW., Washington, DC 20210 or by phone request to 202-693-3700 (this is not a toll-free number) or by e-mail at DOL—PRA—PUBLIC@dol.gov.

The Department received six comments on this section, all related to the H-2B program. One commenter stated that the form ETA 9141 was unnecessarily long and complex and should be simplified. The Department has attempted to shorten the form and make it easier to use. It has been reduced from seven pages to four pages.

**\*78052** Three of the comments related to the burden associated with the paperwork requirements. Two final commenters stated that they did not have the funding or staff time to manage the record retention requirements or to process and store the paperwork. None of the commenters specifically addressed the issue of our methodology or assumptions, or the other programs to which the ETA 9141 now applies.

The paperwork burden estimate for the form used for the H-2B program under the regulations in effect prior to the effective date of this Final Rule, (form ETA 750—OMB control number 1205-0015) was approximately 1.4 hours. Under this new collection of information, the Department estimates that the burden will be approximately 2.75 hours for Form ETA 9142. We based this calculation on a burden estimate of 1.4 hours for those program requirements that remained the same and allocated approximately 1.35 hours for the additional information requirements.

Although the Department did not receive any comments related to the remaining programs (H-1B, H-1B1, E-3, H-1C, and PERM), it notes that only the Form ETA 9141 applies to these programs. This Form will be used in lieu of the State form for submitting a prevailing wage request. Although the burden hours for each State application vary, the Department estimates the burden hours to complete the State forms to be approximately 1.0 hour. As a result, and for the reasons discussed elsewhere in this preamble, the Department does not expect the paperwork burden hours to increase for these programs.

In sum, without more persuasive analysis rebutting the analysis used by the Department, we assume our calculations are representative of the actual hourly burden for the new collection, which represents no increase for most programs and a minimal increase for the H-2B program.

### *L. Catalog of Federal Domestic Assistance Number*
This program is listed in the Catalog of Federal Domestic Assistance at Number 17-273, "Temporary Labor Certification for Foreign Workers."

### List of Subjects

#### *20 CFR Part 655*
Administrative practice and procedure, Foreign workers, Employment, Employment and training, enforcement, Forest and forest products, Fraud, Health professions, Immigration, Labor, Longshore and harbor work, Migrant labor, Passports and visas, Penalties, Reporting and recordkeeping requirements, Unemployment, Wages, Working conditions.

#### *20 CFR Part 656*
Administrative practice and procedure, Agriculture, Aliens, Employment, Employment and training, Enforcement, Forest and forest products, Fraud, Guam, Health professions, Immigration, Labor, Passports and visas, Penalties, Reporting and recordkeeping requirements, Students, Unemployment, Wages, Working conditions.

For the reasons stated in the preamble, the Department of Labor amends 20 CFR parts 655 and 656 as follows:

### PART 655—TEMPORARY EMPLOYMENT OF FOREIGN WORKERS IN THE UNITED STATES

1. The authority citation for part 655 is revised to read as follows:

Authority: Section 655.0 issued under 8 U.S.C. 1101(a)(15)(E)(iii), 1101(a)(15)(H)(i) and (ii), 1182(m), (n) and (t), 1184(c), (g), and (j), 1188, and 1288(c) and (d); sec. 3(c)(1), Public Law 101-238, 103 Stat. 2099, 2102 (8 U.S.C. 1182 note); sec. 221(a), Public Law 101-649, 104 Stat. 4978, 5027 (8 U.S.C. 1184 note); sec. 303(a)(8), Public Law 102-232, 105 Stat. 1733, 1748 (8 U.S.C. 1101 note); sec. 323(c), Public Law 103-206, 107 Stat. 2428; sec. 412(e), Public Law 105-277, 112 Stat. 2681 (8 U.S.C. 1182 note); sec. 2(d), Public Law 106-95, 113 Stat. 1312, 1316 (8 U.S.C. 1182 note); Public Law 109-423, 120 Stat. 2900; and 8 CFR 214.2(h).

Section 655.00 issued under 8 U.S.C. 1101(a)(15)(H)(ii), 1184(c), and 1188; and 8 CFR 214.2(h).

Subpart A issued under 8 U.S.C. 1101(a)(15)(H)(ii)(b), 1103(a), and 1184(a) and (c); and 8 CFR 214.2(h).

Subpart B issued under 8 U.S.C. 1101(a)(15)(H)(ii)(a), 1184(c), and 1188; and 8 CFR 214.2(h).

Subpart C issued under 8 CFR 214.2(h).

Subparts D and E authority repealed.

Subparts F and G issued under 8 U.S.C. 1288(c) and (d); and sec. 323(c), Public Law 103-206, 107 Stat. 2428.

Subparts H and I issued under 8 U.S.C. 1101(a)(15)(H)(i)(b) and (b)(1), 1182(n) and (t), and 1184(g) and (j); sec. 303(a)(8), Public Law 102-232, 105 Stat. 1733, 1748 (8 U.S.C. 1101 note); sec. 412(e), Public Law 105-277, 112 Stat. 2681; and 8 CFR 214.2(h).

Subparts J and K authority repealed.

Subparts L and M issued under 8 U.S.C. 1101(a)(15)(H)(i)(c) and 1182(m); sec. 2(d), Public Law 106-95, 113 Stat. 1312, 1316 (8 U.S.C. 1182 note); Public Law 109-423, 120 Stat. 2900; and 8 CFR 214.2(h).

2. Revise the heading of Part 655 to read as set forth above.

3. Revise subpart A to read as follows:

## Subpart A—Labor Certification Process and Enforcement of Attestations for Temporary Employment in Occupations Other Than Agriculture or Registered Nursing in the United States (H-2B Workers)

Sec.

655.1 Purpose and scope of subpart A.

655.2 Territory of Guam.

655.3 Special procedures.

655.4 Definitions of terms used in this subpart.

655.5 Application Filing Transition.

655.6 Temporary need.

655.7 [Reserved]

655.8 [Reserved]

655.9 [Reserved]

655.10 Determination of prevailing wage for temporary labor certification purposes.

655.11 Certifying officer review of prevailing wage determinations.

655.12 [Reserved]

655.13 [Reserved]

655.14 [Reserved]

655.15 Required pre-filing recruitment.

655.17 Advertising requirements.

655.18 [Reserved]

655.19 [Reserved]

655.20 Applications for temporary employment certification.

655.21 Supporting evidence for temporary need.

655.22 Obligations of H-2B employers.

655.23 Receipt and processing of applications.

655.24 Audits.

655.25 [Reserved]

655.26 [Reserved]

655.27 [Reserved]

655.28 [Reserved]

655.29 [Reserved]

655.30 Supervised recruitment.

655.31 Debarment.

655.32 Labor certification determinations.

655.33 Administrative review.

655.34 Validity of temporary labor certifications.

655.35 Required departure.

655.50 Enforcement process.

655.55 Complaints.

655.60 Violations.

655.65 Remedies for violations.

655.70 WHD Administrator's determination.

655.71 Request for hearing.

655.72 Hearing rules of practice.

655.73 Service of pleadings.

655.74 Conduct of proceedings.

655.75 Decision and order of administrative law judge.

655.76 Appeal of administrative law judge decision.

655.80 Notice to OFLC and DHS.

**Subpart A—Labor Certification Process and Enforcement of Attestations for Temporary Employment in Occupations Other Than Agriculture or Registered Nursing in the United States (H-2B Workers)**
20 CFR § 655.1

### § 655.1 Purpose and scope of subpart A.
(a) Before granting the petition of an employer to admit nonimmigrant workers on H-2B visas for temporary **\*78053** nonagricultural employment in the United States (U.S.), the Secretary of Homeland Security is required to consult with appropriate agencies regarding the availability of U.S. workers. Immigration and Nationality Act of 1952 (INA), as amended, secs. 101(a)(15)(H)(ii)(b) and 214(c)(1), 8 U.S.C. 1101(a)(15)(H)(ii)(b) and 1184(c)(1).

(b) Regulations of the Department of Homeland Security (DHS) for the U.S. Citizenship and Immigration Services (USCIS) at 8 CFR 214.2(h)(6)(iv) require that, except for Guam, the petitioning H-2B employer attach to its petition a determination from the Secretary of Labor (Secretary) that:

(1) There are not sufficient U.S. workers available who are capable of performing the temporary services or labor at the time of filing of the petition for H-2B classification and at the place where the foreign worker is to perform the work; and

(2) The employment of the foreign worker will not adversely affect the wages and working conditions of U.S. workers similarly employed.

(c) This subpart sets forth the procedures governing the labor certification process for the temporary employment of nonimmigrant foreign workers in the U.S. in occupations other than agriculture and registered nursing.

(1) This subpart sets forth the procedures through which employers may apply for H-2B labor certifications, as well as the procedures by which such applications are considered and how they are granted or denied.

(2) This subpart sets forth the procedures governing the Department's investigatory, inspection, and law enforcement functions to assure compliance with the terms and conditions of employment under the H-2B program. The authority for such functions has been delegated by the Secretary of Homeland Security to the Secretary of Labor and re-delegated within the Department to the Employment Standards Administration (ESA) Wage and Hour Division (WHD). This subpart sets forth the WHD's investigation and enforcement actions.
20 CFR § 655.2

### § 655.2 Territory of Guam.
Subpart A of this part does not apply to temporary employment in the Territory of Guam, and the Department of Labor (Department or DOL) does not certify to the USCIS of DHS the temporary employment of nonimmigrant foreign workers under H-2B visas, or enforce compliance with the provisions of the H-2B visa program provisions in the Territory of Guam. Pursuant to DHS regulations, 8 CFR 214.2(h)(6)(v) administration of the H-2B temporary labor certification program is

performed by the Governor of Guam, or the Governor's designated representative.

20 CFR § 655.3

**§ 655.3 Special procedures.**
(a) Systematic process. This subpart provides procedures for the processing of H-2B applications from employers for the certification of employment of nonimmigrant positions in nonagricultural employment.

(b) Establishment of special procedures. The Office of Foreign Labor Certification (OFLC) Administrator has the authority to establish or to devise, continue, revise, or revoke special procedures in the form of variances for the processing of certain H-2B applications when employers can demonstrate, upon written application to the OFLC Administrator, that special procedures are necessary. These include special procedures currently in effect for the handling of applications for tree planters and related reforestation workers, professional athletes, boilermakers coming to the U.S. on an emergency basis, and professional entertainers. Prior to making determinations under this paragraph (b), the OFLC Administrator may consult with employer and worker representatives.

20 CFR § 655.4

**§ 655.4 Definitions of terms used in this subpart.**
For the purposes of this subpart:

Act means the Immigration and Nationality Act or INA, as amended, 8 U.S.C. 1101 et seq.

Administrative Law Judge means a person within the Department's Office of Administrative Law Judges appointed pursuant to 5 U.S.C. 3105, or a panel of such persons designated by the Chief Administrative Law Judge from the Board of Alien Labor Certification Appeals established by part 656 of this chapter, which will hear and decide appeals as set forth in § 655.115.

Administrator, Office of Foreign Labor Certification (OFLC) means the primary official of the Office of Foreign Labor Certification, ETA, or the Administrator's designee.

Administrator, Wage and Hour Division (WHD), Employment Standards Administration means the primary official of the WHD, or the Administrator's designee.

Agent means a legal entity or person authorized to act on behalf of the employer for temporary non-agricultural labor certification purposes that is not itself an employer as defined in this subpart. The term "agent" specifically excludes associations or other organizations of employers.

Applicant means a lawful U.S. worker who is applying for a job opportunity for which an employer has filed an Application for Temporary Employment Certification (Form ETA 9142).

Application for Temporary Employment Certification means the Office of Management and Budget (OMB)-approved form submitted by an employer to secure a temporary nonagricultural labor certification determination from DOL. A complete submission of the Application for Temporary Employment Certification includes the form, all valid wage determinations as required by § 655.101(a)(1) and the U.S. worker recruitment report.

Area of Intended Employment means the geographic area within normal commuting distance of the place (worksite address) of intended employment of the job opportunity for which the certification is sought. There is no rigid measure of distance which constitutes a normal commuting distance or normal commuting area, because there may be widely varying factual circumstances among different areas (e.g., average commuting times, barriers to reaching the worksite, quality of regional transportation network, etc.). If the place of intended employment is within a Metropolitan Statistical Area (MSA), including a multistate MSA, any place within the MSA is deemed to be within normal commuting distance of the place of intended employment. The borders of MSAs are not controlling in the identification of the normal commuting area; a location outside of an MSA may be within normal commuting distance of a location that is inside (e.g., near the border of) the MSA.

Attorney means any person who is currently a member in good standing of the bar of the highest court of any State, possession, territory, or commonwealth of the United States, or the District of Columbia, and who is not under suspension,

debarment or disbarment from practice before any court or the Department, the Board of Immigration Appeals, the immigration judges, or DHS under 8 CFR 292.3, 1003.101. Such a person is permitted to act as an agent or attorney for an employer under this subpart.

Board of Alien Labor Certification Appeals (BALCA or Board) means the permanent Board established by part 656 of this chapter, chaired by the Chief Administrative Law Judge, and consisting of Administrative Law Judges assigned to the Department and designated by the Chief Administrative Law Judge to be members of BALCA. **78054** The Board is located in Washington, DC, and reviews and decides appeals in Washington, DC.

Center Director means the OFLC official to whom the OFLC Administrator has delegated his authority for purposes of National Processing Center (NPC) operations and functions.

Certifying Officer (CO) means the OFLC official designated by the Administrator, OFLC with making programmatic determinations on employer-filed applications under the H-2B program.

Chief Administrative Law Judge means the chief official of the Department's Office of Administrative Law Judges or the Chief Administrative Law Judge's designee.

Date of need means the first date the employer requires services of the H-2B workers as listed on the application.

Department of Homeland Security (DHS) means the Federal agency having jurisdiction over certain immigration-related functions, acting through its agencies, including the U.S. Citizenship and Immigration Services.

Eligible worker means an individual who is not an unauthorized alien (as defined in sec. 274A(h)(3) of the INA, 8 U.S.C. 1324a(h)(3), or in this paragraph (c)) with respect to the employment in which the worker is engaging.

Employee means employee as defined under the general common law of agency. Some of the factors relevant to the determination of employee status include: The hiring party's right to control the manner and means by which the work is accomplished; the skill required to perform the work; the source of the instrumentalities and tools for accomplishing the work; the location of the work; the hiring party's discretion over when and how long to work; and whether the work is part of the regular business of the hiring party. Other applicable factors should be considered and no one factor is dispositive.

Employer means:

(1) A person, firm, corporation or other association or organization:

(i) Has a place of business (physical location) in the U.S. and a means by which it may be contacted;

(ii) Has an employer relationship with respect to H-2B employees or related U.S. workers under this part; and

(iii) Possesses, for purposes of the filing of an application, a valid Federal Employer Identification Number (FEIN).

(2) Where two or more employers each have the definitional indicia of employment with respect to an employee, those employers may be considered to jointly employ that employee.

Employment and Training Administration or ETA means the agency within the Department, which includes the OFLC and has been delegated authority by the Secretary to fulfill the Secretary's mandate under the Act.

ETA National Processing Center (NPC) means a National Processing Center established by the OFLC for the processing of applications submitted in connection with the Department's mandate pursuant to the INA.

Full-time, for purposes of temporary labor certification employment, means 30 or more hours per week, except that where a State or an established practice in an industry has developed a definition of full-time employment for any occupation that is less than 30 hours per week, that definition shall have precedence.

H-2B Petition means the form and accompanying documentation required by DHS for employers seeking to employ foreign persons as H-2B nonimmigrant workers.

INA means the Immigration and Nationality Act, as amended, 8 U.S.C. 1101 et seq.

Job contractor means a person, association, firm, or a corporation that meets the definition of an employer and who contracts services or labor on a temporary basis to one or more employers, which is not an affiliate, branch or subsidiary of the job contractor, and where the job contractor will not exercise any supervision or control in the performance of the services or labor to be performed other than hiring, paying, and firing the workers.

Job opportunity means one or more job openings with the petitioning employer for temporary employment at a place in the U.S. to which U.S. workers can be referred. Job opportunities consisting solely of job duties that will be performed totally outside the United States, its territories, possessions, or commonwealths cannot be the subject of an Application for Temporary Employment Certification.

Joint employment means that where two or more employers each have sufficient definitional indicia of employment to be considered the employer of an employee, those employers may be considered to jointly employ that employee. An employer in a joint employment relationship to an employee may be considered a "joint employer" of that employee.

Layoff means any involuntary separation of one or more U.S. employees without cause or prejudice.

Metropolitan Statistical Area (MSA) means those geographic entities defined by the U.S. Office of Management and Budget (OMB) for use by Federal statistical agencies in collecting, tabulating, and publishing Federal statistics. A metro area contains a core urban area of 50,000 or more population, and a micro area contains an urban core of at least 10,000 (but less than 50,000) population. Each metro or micro area consists of one or more counties and includes the counties containing the core urban area, as well as any adjacent counties that have a high degree of social and economic integration (as measured by commuting to work) with the urban core.

Offered Wage means the highest of the prevailing wage, Federal minimum wage, the State minimum wage, or local minimum wage.

Office of Foreign Labor Certification (OFLC) means the organizational component within ETA that provides national leadership and policy guidance and develops regulations and procedures by which it carries out the responsibilities of the Secretary under the INA, as amended, concerning foreign workers seeking admission to the U.S. in order to work under sec. 101(a)(15)(H)(ii)(b) of the INA, as amended.

Occupational Employment Statistics Survey (OES) means that program under the jurisdiction of the Bureau of Labor Statistics (BLS) that provides annual wage estimates for occupations at the State and MSA levels.

Prevailing Wage Determination (PWD) means the prevailing wage for the position, as described in § 655.10(b), that is the subject of the Application for Temporary Employment Certification.

Professional Athlete shall have the meaning ascribed to it in INA sec. 212(a)(5)(A)(iii)(II), which defines "professional athlete" as an individual who is employed as an athlete by:

(1) A team that is a member of an association of six or more professional sports teams whose total combined revenues exceed $10,000,000 per year, if the association governs the conduct of its members and regulates the contests and exhibitions in which its member teams regularly engage; or

(2) Any minor league team that is affiliated with such an association.

Representative means an individual employed by or authorized to act on behalf of the employer with respect to the recruitment activities entered into for and attestations made with respect to the Application for Temporary Employment

Certification. A representative who interviews and/or considers U.S. workers for the job that is subject of the Application must be the person who normally interviews or **78055** considers, on behalf of the employer, applicants for job opportunities such as that offered in the application, but which do not involve labor certifications.

Secretary means the Secretary of Labor, the chief official of the U.S. Department of Labor, or the Secretary's designee.

Secretary of Homeland Security means the chief official of the Department of Homeland Security or the Secretary of Homeland Security's designee.

Secretary of State means the chief official of the U.S. Department of State or the Secretary of State's designee.

State Workforce Agency (SWA), formerly known as State Employment Security Agency, means the State government agency that receives funds pursuant to the Wagner-Peyser Act to administer public labor exchange delivered through the State's one-stop delivery system in accordance with the Wagner-Peyser Act. (29 U.S.C. 49 et seq.).

Strike means a labor dispute wherein employees engage in a concerted stoppage of work (including stoppage by reason of the expiration of a collective-bargaining agreement) or engage in any concerted slowdown or other concerted interruption of operations. Whether a job opportunity is vacant by reason of a strike or lock out will be determined by evaluating for each position identified as vacant in the Application for Temporary Employment Certification whether the specific vacancy has been caused by the strike or lock out.

Successor in Interest means that, in determining whether an employer is a successor in interest, the factors used under Title VII of the Civil Rights Act and the Vietnam Era Veterans' Readjustment Assistance Act will be considered. When considering whether an employer is a successor, the primary consideration will be the personal involvement of the firm's ownership, management, supervisors, and others associated with the firm in the violations resulting in debarment. Normally, wholly new management or ownership of the same business operation, one in which the former management or owner does not retain a direct or indirect interest, will not be deemed to be a successor in interest for purposes of debarment. A determination of whether or not a successor in interest exists is based on the entire circumstances viewed in their totality. The factors to be considered include:

(1) Substantial continuity of the same business operations;

(2) Use of the same facilities;

(3) Continuity of the work force;

(4) Similarity of jobs and working conditions;

(5) Similarity of supervisory personnel;

(6) Similarity in machinery, equipment, and production methods;

(7) Similarity of products and services; and

(8) The ability of the predecessor to provide relief.

United States (U.S.), when used in a geographic sense, means the continental United States, Alaska, Hawaii, the Commonwealth of Puerto Rico, and the territories of Guam, the Virgin Islands, and, as of the transition program effective date, as defined in the Consolidated Natural Resources Act of 2008, Public Law 110-229, Title VII, the Commonwealth of the Northern Mariana Islands.

United States Citizenship and Immigration Services (USCIS) means the Federal agency within DHS making the determination under the INA whether to grant petitions filed by employers seeking H-2B workers to perform temporary nonagricultural work in the U.S.

United States Worker (U.S. Worker) means a worker who is either

(1) A citizen or national of the U.S.; or

(2) An alien who is lawfully admitted for permanent residence in the U.S., is admitted as a refugee under sec. 207 of the INA, is granted asylum under sec. 208 of the INA, or is an immigrant otherwise authorized (by the INA or by DHS) to be employed in the U.S.

Within [number and type] days will, for purposes of determining an employer's compliance with timing requirements with respect to appeals and requests for review, begin to run on the first business day after the Department sends a notice to the employer by means normally assuring next-day delivery, and will end on the day that the employer sends whatever communication is required by these rules back to the Department, as evidenced by a postal mark or other similar receipt.
 20 CFR § 655.5

### § 655.5 Application Filing Transition.
(a) Compliance with these regulations. Except as provided in paragraphs (b) and (c) of this section, employers filing applications for H-2B workers on or after the effective date of these regulations where the date of need for the services or labor to be performed is on or after October 1, 2009, must comply with all of the obligations and assurances in this subpart. SWAs will no longer accept for processing applications filed by employers for H-2B workers for temporary or seasonal nonagricultural services on or after January 18, 2009.

(b) Applications filed under former regulations. (1) For applications filed with the SWAs serving the area of intended employment prior to the effective date of these regulations, the SWAs shall continue to process all active applications under the former regulations and transmit all completed applications to the appropriate NPC for review and issuance of a labor certification determination.

(2) For applications filed with the SWAs serving the area of intended employment prior to the effective date of these regulations that were completed and transmitted to the NPC, the NPC shall continue to process all active applications under the former regulations and issue a labor certification determination.

(c) Applications filed with the NPC under these regulations. Employers filing applications on or after the effective date of these regulations where their date of need for H-2B workers is prior to October 1, 2009, must receive a prevailing wage determination from the SWA serving the area of intended employment. The SWA shall process such requests in accordance with the provisions of § 655.10. Once the employer receives its prevailing wage determination from the SWA, it must conduct all of the pre-filing recruitment steps set forth under this subpart prior to filing an Application for Temporary Employment Certification with the NPC.
 20 CFR § 655.6

### § 655.6 Temporary need.
(a) To use the H-2B program, the employer must establish that its need for nonagricultural services or labor is temporary, regardless of whether the underlying job is permanent or temporary. 8 CFR 214.2(h)(6)(ii).

(b) The employer's need is considered temporary if justified to the Secretary as either a one-time occurrence, a seasonal need, a peakload need, or an intermittent need, as defined by the Department of Homeland Security. 8 CFR 214.2(h)(6)(ii)(B).

(c) Except where the employer's need is based on a one-time occurrence, the Secretary will, absent unusual circumstances, deny an Application for Temporary Employment Certification where the employer has a recurring, seasonal or peakload need lasting more than 10 months.

(d) The temporary nature of the work or services to be performed in applications filed by job contractors will be determined by examining the job contractor's own need for the services or labor to be performed in addition to the needs of each individual employer with **\*78056** whom the job contractor has agreed to provide workers as part of a signed work contract or labor services agreement.

(e) The employer filing the application must maintain documentation evidencing the temporary need and be prepared to submit this documentation in response to a Request for Further Information (RFI) from the CO prior to rendering a Final Determination or in the event of an audit examination. The documentation required in this section must be retained by the employer for a period of no less than 3 years from the date of the labor certification.

 20 CFR § 655.7-655.9

**§§ 655.7-655.9 [Reserved]**
20 CFR § 655.10

**§ 655.10 Determination of prevailing wage for temporary labor certification purposes.**
(a) Application process. (1) The employer must request a prevailing wage determination from the NPC in accordance with the procedures established by this regulation.

(2) The employer must obtain a prevailing wage determination that is valid either on the date recruitment begins or the date of filing a complete Application for Temporary Employment Certification with the Department.

(3) The employer must offer and advertise the position to all potential workers at a wage at least equal to the prevailing wage obtained from the NPC.

(b) Determinations. Prevailing wages shall be determined as follows:

(1) Except as provided in paragraph (e) of this section, if the job opportunity is covered by a collective bargaining agreement (CBA) that was negotiated at arms' length between the union and the employer, the wage rate set forth in the CBA is considered as not adversely affecting the wages of U.S. workers, that is, it is considered the "prevailing wage" for labor certification purposes.

(2) If the job opportunity is not covered by a CBA, the prevailing wage for labor certification purposes shall be the arithmetic mean, except as provided in paragraph (b)(4) of this section, of the wages of workers similarly employed at the skill level in the area of intended employment. The wage component of the BLS Occupational Employment Statistics Survey (OES) shall be used to determine the arithmetic mean, unless the employer provides a survey acceptable to OFLC under paragraph (f) of this section.

(3) If the job opportunity involves multiple worksites within an area of intended employment and different prevailing wage rates exist for the same opportunity and staff level within the area of intended employment, the prevailing wage shall be based on the highest applicable wage among all relevant worksites.

(4) If the employer provides a survey acceptable under paragraph (f) of this section that provides a median but does not provide an arithmetic mean, the prevailing wage applicable to the employer's job opportunity shall be the median of the wages of U.S. workers similarly employed in the area of intended employment.

(5) The employer may use a current wage determination in the area determined under the Davis-Bacon Act, 40 U.S.C. 276a et seq., 29 CFR part 1, or the McNamara-O'Hara Service Contract Act, 41 U.S.C. 351 et seq.

(6) The NPC will enter its wage determination on the form it uses for these purposes, indicate the source, and return the form with its endorsement to the employer within 30 days of receipt of the request for a prevailing wage determination. The employer must offer this wage (or higher) to both its H-2B workers and any similarly employed U.S. worker hired in response to the recruitment required as part of the application.

(c) Similarly Employed. For purposes of this section, "similarly employed" means having substantially comparable jobs in the occupational category in the area of intended employment, except that, if a representative sample of workers in the occupational category cannot be obtained in the area of intended employment, similarly employed means:

(1) Having jobs requiring a substantially similar level of comparable skills within the area of intended employment; or

(2) If there are no substantially comparable jobs in the area of intended employment, having substantially comparable jobs

with employers outside of the area of intended employment.

(d) Validity period. The NPC must specify the validity period of the prevailing wage, which in no event may be more than 1 year or less than 3 months from the determination date. For employment that is less than one year in duration, the prevailing wage determination shall apply and shall be paid the prevailing wage by the employer, at a minimum, for the duration of the employment.

(e) Professional athletes. In computing the prevailing wage for a professional athlete when the job opportunity is covered by professional sports league rules or regulations, the wage set forth in those rules or regulations is considered the prevailing wage (see sec. 212(p)(2) of the INA).

(f) Employer-provided wage information. (1) If the job opportunity is not covered by a CBA, or by a professional sports league's rules or regulations, the NPC will consider wage information provided by the employer in making a Prevailing Wage Determination. An employer survey can be submitted either initially or after NPC issuance of a PWD derived from the OES survey.

(2) In each case where the employer submits a survey or other wage data for which it seeks acceptance, the employer must provide specific information about the survey methodology, including such items as sample size and source, sample selection procedures, and survey job descriptions, to allow a determination of the adequacy of the data provided and validity of the statistical methodology used in conducting the survey in accordance with guidance issued by the OFLC national office.

(3) The survey must be based upon recently collected data:

(i) Any published survey must have been published within 24 months of the date of submission, must be the most current edition of the survey, and must be based on data collected not more than 24 months before the publication date.

(ii) A survey conducted by the employer must be based on data collected within 24 months of the date it is submitted for consideration.

(4) If the employer-provided survey is found not to be acceptable, the NPC shall inform the employer in writing of the reasons the survey was not accepted.

(5) The employer, after receiving notification that the survey it provided for consideration is not acceptable, may file supplemental information as provided in paragraph (g) of this section, file a new request for a PWD, appeal under § 655.11, or, if the initial PWD was requested prior to submission of the employer survey, acquiesce to the initial PWD.

(g) Submission of supplemental information by employer. (1) If the employer disagrees with the wage level assigned to its job opportunity, or if the NPC informs the employer its survey is not acceptable, or if there is another legitimate basis for such a review, the employer may submit supplemental information to the NPC.

(2) The NPC must consider one supplemental submission relating to the employer's survey, the skill level assigned to the job opportunity, or any other legitimate basis for the employer to request such a review. If the NPC does not accept the employer's survey after considering the supplemental information, or affirms its determination concerning the skill level, the NPC must **78057** inform the employer, in writing, of the reasons for its decision.

(3) The employer may then apply for a new wage determination, appeal under § 655.11, or acquiesce to the initial PWD.

(h) The prevailing wage cannot be lower than required by any other law. No PWD for labor certification purposes made under this section permits an employer to pay a wage lower than the highest wage required by any applicable Federal, State, or local law.

(i) Retention of Documentation. The employer must retain the PWD for 3 years and submitted to a CO in the event it is requested in an RFI or an audit or to a Wage and Hour representative in the event of a Wage and Hour investigation.
 20 CFR § 655.11

**§ 655.11 Certifying officer review of prevailing wage determinations.**

(a) Request for review of prevailing wage determinations. Any employer desiring review of a PWD must make a written request for such review within 10 days of the date from when the final PWD was issued. The request for review must be sent to the NPC postmarked no later than 10 days after the determination; clearly identify the PWD for which review is sought; set forth the particular grounds for the request; and include all materials submitted to the NPC for purposes of securing the PWD.

(b) NPC Review. Upon the receipt of a written request for review, the NPC shall review the employer's request and accompanying documentation, including any supplementary material submitted by the employer.

(c) Designations. The Director of the NPC will determine which CO will review the employer's request for review.

(d) Review on the record. The CO shall review the PWD solely on the basis upon which the PWD was made and after review may:

(1) Affirm the PWD issued by the NPC; or

(2) Modify the PWD.

(e) Request for review by BALCA. Any employer desiring review of a CO's decision on a PWD must make a written request for review of the determination by BALCA within 30 calendar days of the date of the decision of the CO. The CO must receive the written request for BALCA review no later than the 30th day after the date of its final determination including the date of the final determination.

(1) The request for review, statements, briefs, and other submissions of the parties and amicus curiae must contain only legal arguments and only such evidence that was within the record upon which the decision on the PWD by the NPC was based.

(2) The request for review must be in writing and addressed to the CO who made the determination. Upon receipt of a request for a review, the CO must immediately assemble an indexed appeal file in reverse chronological order, with the index on top followed by the most recent document.

(3) The CO must send the Appeal File to the Office of Administrative Law Judges, Board of Alien Labor Certification Appeals, 800 K Street, NW., Suite 400-N, Washington, DC 20001-8002.

(4) The BALCA shall handle appeals in accordance with § 655.33.
 20 CFR § 655.12-655.14

**§§ 655.12-655.14 [Reserved]**
20 CFR § 655.15

**§ 655.15 Required pre-filing recruitment.**

(a) Time of Filing of Application. An employer may not file an Application for Temporary Employment Certification before all of the pre-filing recruitment steps set forth in this section have been fully satisfied, except where specifically exempted from some or all of those requirements by these regulations or special procedures. Applications submitted not meeting this requirement shall not be accepted for processing.

(b) General Attestation Obligation. An employer must attest on the Application for Temporary Employment Certification to having performed all required steps of the recruitment process as specified in this section.

(c) Retention of documentation. The employer filing the Application for Temporary Employment Certification must maintain documentation of its advertising and recruitment efforts, including prevailing wage determinations, as required in this subpart and be prepared, upon written request, to submit this documentation in response to an RFI from the CO prior to the CO rendering a Final Determination or in the event of a CO-directed audit examination. The documentation required in this section must be retained by the employer for a period of no less than 3 years from the date of the certification.

(d) Recruitment Steps. An employer filing an application must:

(1) Obtain a prevailing wage determination from the NPC in accordance with procedures in § 655.10;

(2) Submit a job order to the SWA serving the area of intended employment;

(3) Publish two print advertisements (one of which must be on a Sunday, except as provided in paragraph (f)(4) of this section); and

(4) Where the employer is a party to a collective bargaining agreement governing the job classification that is the subject of the H-2B labor certification application, the employer must formally contact the local union that is party to the collective bargaining agreement as a recruitment source for able, willing, qualified, and available U.S. workers.

(e) Job Order. (1) The employer must place an active job order with the SWA serving the area of intended employment no more than 120 calendar days before the employer's date of need for H-2B workers, identifying it as a job order to be placed in connection with a future application for H-2B workers. Unless otherwise directed by the CO, the SWA must keep the job order open for a period of not less than 10 calendar days. Documentation of this step shall be satisfied by maintaining a copy of the SWA job order downloaded from the SWA Internet job listing site, a copy of the job order provided by the SWA, or other proof of publication from the SWA containing the text of the job order and the start and end dates of posting. If the job opportunity contains multiple work locations within the same area of intended employment and the area of intended employment is found in more than one State, the employer shall place a job order with the SWA having jurisdiction over the place where the work has been identified to begin. Upon placing a job order, the SWA receiving the job order under this paragraph shall promptly transmit, on behalf of the employer, a copy of the active job order to all States listed in the application as anticipated worksites.

(2) The job order submitted by the employer to the SWA must satisfy all the requirements for newspaper advertisements contained in § 655.17.

(f) Newspaper Advertisements. (1) During the period of time that the job order is being circulated for intrastate clearance by the SWA under paragraph (e) of this section, the employer must publish an advertisement on 2 separate days, which may be consecutive, one of which must be a Sunday advertisement (except as provided in paragraph (f)(2) of this section), in a newspaper of general circulation serving the area of intended employment that has a reasonable distribution and is appropriate to the occupation and the workers likely to apply for the job opportunity. Both newspaper advertisements must be published only after the job order is placed for active recruitment by the SWA.

(2) If the job opportunity is located in a rural area that does not have a newspaper with a Sunday edition, the **\*78058** employer must, in place of a Sunday edition advertisement, advertise in the regularly published daily edition with the widest circulation in the area of intended employment.

(3) The newspaper advertisements must satisfy the requirements contained in § 655.17. The employer must maintain copies of newspaper pages (with date of publication and full copy of advertisement), or tear sheets of the pages of the publication in which the advertisements appeared, or other proof of publication containing the text of the printed advertisements and the dates of publication furnished by the newspaper.

(4) If a professional, trade or ethnic publication is more appropriate for the occupation and the workers likely to apply for the job opportunity than a general circulation newspaper, and is the most likely source to bring responses from able, willing, qualified, and available U.S. workers, then the employer may use a professional, trade or ethnic publication in place of one of the newspaper advertisements, but may not replace the Sunday advertisement (or the substitute permitted by paragraph (f)(2) of this section).

(g) Labor Organizations. During the period of time that the job order is being circulated for intrastate clearance by the SWA under paragraph (e) of this section, an employer that is already a party to a collective bargaining agreement governing the job classification that is the subject of the H-2B labor certification application must formally contact by U.S. Mail or other effective means the local union that is party to the collective bargaining agreement. An employer governed by this paragraph

must maintain dated logs demonstrating that such organizations were contacted and notified of the position openings and whether they referred qualified U.S. worker(s), including number of referrals, or were non-responsive to the employer's request.

(h) Layoff. If there has been a layoff of U.S. workers by the applicant employer in the occupation in the area of intended employment within 120 days of the first date on which an H-2B worker is needed as indicated on the submitted Application for Temporary Employment Certification, the employer must document it has notified or will notify each laid-off worker of the job opportunity involved in the application and has considered or will consider each laid-off worker who expresses interest in the opportunity, and the result of the notification and consideration.

(i) Referral of U.S. workers. SWAs may only refer for employment individuals for whom they have verified identity and employment authorization through the process for employment verification of all workers that is established by INA sec. 274A(b). SWAs must provide documentation certifying the employment verification that satisfies the standards of INA sec. 274A(a)(5) and its implementing regulations at 8 CFR 274a.6.

(j) Recruitment Report. (1) No fewer than 2 calendar days after the last date on which the job order was posted and no fewer than 5 calendar days after the date on which the last newspaper or journal advertisement appeared, the employer must prepare, sign, and date a written recruitment report. The employer may not submit the H-2B application until the recruitment report is completed. The recruitment report must be submitted to the NPC with the application. The employer must retain a copy of the recruitment report for a period of 3 years.

(2) The recruitment report must:

(i) Identify each recruitment source by name;

(ii) State the name and contact information of each U.S. worker who applied or was referred to the job opportunity up to the date of the preparation of the recruitment report, and the disposition of each worker, including any applicable laid-off workers;

(iii) If applicable, explain the lawful job-related reason(s) for not hiring any U.S. workers who applied or were referred to the position.

(3) The employer must retain rÉsumÉs (if available) of, and evidence of contact with (which may be in the form of an attestation), each U.S. worker who applied or was referred to the job opportunity. Such rÉsumÉs and evidence of contact must be retained along with the recruitment report for a period of no less than 3 years, and must be provided in response to an RFI or in the event of an audit or an investigation.

 20 CFR § 655.17

## § 655.17 Advertising requirements.

All advertising conducted to satisfy the required recruitment steps under § 655.15 before filing the Application for Temporary Employment Certification must meet the requirements set forth in this section and must contain terms and conditions of employment which are not less favorable than those to be offered to the H-2B workers. All advertising must contain the following information:

(a) The employer's name and appropriate contact information for applicants to send rÉsumÉs directly to the employer;

(b) The geographic area of employment with enough specificity to apprise applicants of any travel requirements and where applicants will likely have to reside to perform the services or labor;

(c) If transportation to the worksite(s) will be provided by the employer, the advertising must say so;

(d) A description of the job opportunity (including the job duties) for which labor certification is sought with sufficient detail to apprise applicants of services or labor to be performed and the duration of the job opportunity;

(e) The job opportunity's minimum education and experience requirements and whether or not on-the-job training will be

available;

(f) The work hours and days, expected start and end dates of employment, and whether or not overtime will be available;

(g) The wage offer, or in the event that there are multiple wage offers, the range of applicable wage offers, each of which must not be less than the highest of the prevailing wage, the Federal minimum wage, State minimum wage, or local minimum wage applicable throughout the duration of the certified H-2B employment; and

(h) That the position is temporary and the total number of job openings the employer intends to fill.
 20 CFR § 655.18-655.19

**§§ 655.18-655.19 [Reserved]**
20 CFR § 655.20

**§ 655.20 Applications for temporary employment certification.**
(a) Application Filing Requirements. An employer who desires to apply for labor certification of temporary employment for one or more nonimmigrant foreign positions must file a completed Application for Temporary Employment Certification form, and a copy of the recruitment report completed in accordance with § 655.15(j).

(b) Filing. An employer must complete the Application for Temporary Employment Certification and send it by U.S. Mail or private mail courier to the NPC. Employers are strongly encouraged to keep receipts of any mailings. The Department will publish a Notice in the Federal Register identifying the address or addresses to which applications must be mailed, and will also post these addresses on the Department's Internet Web site at http:// www.foreignlaborcert.doleta.gov/. The form must bear the original signature of the employer (and that of the employer's authorized attorney or agent if the employer is represented by an attorney or agent). The Department **\*78059** may, at a future date, require applications to be filed electronically in addition to or instead of by U.S. Mail or private mail courier.

(c) Except where otherwise permitted under § 655.3, an association or other organization of employers is not permitted to file master applications on behalf of its employer-members under the H-2B program.

(d) Certification of more than one position may be requested on the application as long as all H-2B workers will perform the same services or labor on the same terms and conditions, in the same occupation, in the same area of intended employment, and during the same period of employment.

(e) Except where otherwise permitted under § 655.3, only one Application for Temporary Employment Certification may be filed for worksite(s) within one area of intended employment for each job opportunity with an employer.

(f) Where a one-time occurrence lasts longer than one year, but less than 18 months, the employer will be issued a labor certification for the entire period of need. Where a one-time occurrence lasts 18 months or longer, the employer will be required to conduct another labor market for the portion of time beyond 12 months.
 20 CFR § 655.21

**§ 655.21 Supporting evidence for temporary need.**
(a) Statement of Temporary Need. Each Application for Temporary Employment Certification must include attestations regarding temporary need in the appropriate sections. The employer must include a detailed statement of temporary need containing the following:

(1) A description of the employer's business history and activities (i.e., primary products or services) and schedule of operations throughout the year;

(2) An explanation regarding why the nature of the employer's job opportunity and number of foreign workers being requested for certification reflect a temporary need;

(3) An explanation regarding how the request for temporary labor certification meets one of the regulatory standards of a one-time occurrence, seasonal, peakload, or intermittent need under § 655.6(b) as defined by DHS under

214.2(h)(6)(ii)(B); and

(4) If applicable, a statement justifying any increase or decrease in the number of H-2B positions being requested for certification from the previous year.

(b) Request for Supporting Evidence. In circumstances where the CO requests evidence or documentation substantiating the employer's temporary need through a RFI under § 655.23(c) to support a Final Determination, or notifies the employer that its application is being audited under § 655.24, the employer must timely furnish the requested supplemental information or evidence or documentation. Failure to provide the information requested or late submissions may be grounds for the denial of the application. All such documentation or evidence becomes part of the record of the application.

(c) Retention of documentation. The documentation required in this section and any other supporting evidence justifying the temporary need by the employer filing the Application for Temporary Employment Certification must be retained for a period of no less than 3 years from the date of the certification.
 20 CFR § 655.22

## § 655.22 Obligations of H-2B employers.

An employer seeking H-2B labor certification must attest as part of the Application for Temporary Employment Certification that it will abide by the following conditions of this subpart:

(a) The employer is offering terms and working conditions normal to U.S. workers similarly employed in the area of intended employment, meaning that they may not be unusual for workers performing the same activity in the area of intended employment, and which are not less favorable than those offered to the H-2B worker(s) and are not less than the minimum terms and conditions required by this subpart.

(b) The specific job opportunity for which the employer is requesting H-2B certification is not vacant because the former occupant(s) is (are) on strike or locked out in the course of a labor dispute involving a work stoppage.

(c) The job opportunity is open to any qualified U.S. worker regardless of race, color, national origin, age, sex, religion, handicap, or citizenship, and the employer has conducted the required recruitment, in accordance with the regulations, and has been unsuccessful in locating sufficient numbers of qualified U.S. applicants for the job opportunity for which labor certification is sought. Any U.S. worker applicants were rejected only for lawful, job-related reasons, and the employer must retain records of all rejections.

(d) During the period of employment that is the subject of the labor certification application, the employer will comply with applicable Federal, State and local employment-related laws and regulations, including employment-related health and safety laws;

(e) The offered wage equals or exceeds the highest of the prevailing wage, the applicable Federal minimum wage, the State minimum wage, and local minimum wage, and the employer will pay the offered wage during the entire period of the approved H-2B labor certification.

(f) Upon the separation from employment of H-2B worker(s) employed under the labor certification application, if such separation occurs prior to the end date of the employment specified in the application, the employer will notify the Department and DHS in writing (or any other method specified by the Department or DHS in the Federal Register or the Code of Federal Regulations) of the separation from employment not later than 2 work days after such separation is discovered by the employer. An abandonment or abscondment shall be deemed to begin after a worker fails to report for work at the regularly scheduled time for 5 consecutive working days without the consent of the employer. Employees may be terminated for cause.

(g)(1) The offered wage is not based on commissions, bonuses, or other incentives, unless the employer guarantees a wage paid on a weekly, bi-weekly, or monthly basis that equals or exceeds the prevailing wage, or the legal Federal, State, or local minimum wage, whichever is highest. The employer must make all deductions from the worker's paychecks that are required by law. The job offer must specify all deductions not required by law that the employer will make from the worker's paycheck. All deductions must be reasonable. However, an employer subject to the FLSA may not make deductions that

would violate the FLSA.

(2) The employer has contractually forbidden any foreign labor contractor or recruiter whom the employer engages in international recruitment of H-2B workers to seek or receive payments from prospective employees, except as provided for in DHS regulations at 8 CFR 214.2(h)(5)(xi)(A). This provision does not prohibit employers or their agents from receiving reimbursement for costs that are the responsibility of the worker, such as government required passport or visa fees.

(h) The job opportunity is a bona fide, full-time temporary position, the qualifications for which are consistent with the normal and accepted qualifications required by non-H-2B employers in the same or comparable occupations.

(i) The employer has not laid off and will not lay off any similarly employed U.S. worker in the occupation that is the subject of the Application for **78060** Temporary Employment Certification in the area of intended employment within the period beginning 120 calendar days before the date of need through 120 calendar days after the date of need, except where the employer also attests that it offered the job opportunity that is the subject of the application to those laid off U.S. worker(s) and the U.S. worker(s) either refused the job opportunity or was rejected for the job opportunity only for lawful, job-related reasons.

(j) The employer and its attorney or agents have not sought or received payment of any kind from the employee for any activity related to obtaining the labor certification, including payment of the employer's attorneys' or agent fees, Application for Temporary Employment Certification, or recruitment costs. For purposes of this paragraph, payment includes, but is not limited to, monetary payments, wage concessions (including deductions from wages, salary, or benefits), kickbacks, bribes, tributes, in kind payments, and free labor.

(k) If the employer is a job contractor, it will not place any H-2B workers employed pursuant to the labor certification application with any other employer or at another employer's worksite unless:

(1) The employer applicant first makes a written bona fide inquiry as to whether the other employer has displaced or intends to displace any similarly employed U.S. workers within the area of intended employment within the period beginning 120 days before through 120 calendar days after the date of need, and the other employer provides written confirmation that it has not so displaced and does not intend to displace such U.S. workers, and

(2) All worksites are listed on the certified Application for Temporary Employment Certification, including amendments or modifications.

(l) The employer will not place any H-2B workers employed pursuant to this application outside the area of intended employment listed on the Application for Temporary Employment Certification unless the employer has obtained a new temporary labor certification from the Department.

(m) Unless the H-2B worker will be sponsored by another subsequent employer, the employer will inform H-2B workers of the requirement that they leave the U.S. at the end of the authorized period of stay provided by DHS or separation from the employer, whichever is earlier, as required in § 655.35 of this part (absent any extension or change of such worker's status or grace period pursuant to DHS regulations), and that if dismissed by the employer prior to the end of the period, the employer is liable for return transportation.

(n) The dates of temporary need, reason for temporary need, and number of positions being requested for labor certification have been truly and accurately stated on the application.
 20 CFR § 655.23

### § 655.23 Receipt and processing of applications.
(a) Filing Date. Applications received by U.S. Mail or private courier shall be considered filed when determined by the NPC to be complete. Incomplete applications shall not be accepted for processing or assigned a receipt date, but shall be returned by U.S. Mail to the employer or the employer's representative as incomplete.

(b) Processing. The CO will review complete applications for an absence of errors that would prevent certification and for compliance with the criteria for certification. The CO will make a determination to certify, deny, or issue a Request for

Further Information prior to making a Final Determination on the application. Criteria for certification, as used in this subpart, are whether the employer has: established the need for the nonagricultural services or labor to be performed is temporary in nature; established that the number of worker positions being requested for certification is justified and represent bona fide job opportunities; made all the assurances and met all the obligations required by § 655.22; and complied with all requirements of the program.

(c) Request for Further Information. (1) If the CO determines that the employer has made all necessary attestations and assurances, but the application fails to comply with one or more of the criteria for certification in paragraph (b) of this section, the CO must issue a RFI to the employer. The CO will issue the written RFI within 7 calendar days of the receipt of the application, and send it by means normally assuring next-day delivery.

(2) The RFI must:

(i) Specify the reason(s) why the application is not sufficient to grant temporary labor certification, citing the relevant regulatory standard(s) and/or special procedure(s);

(ii) Specify a date, no later than 7 calendar days from the date of the written RFI, by which the supplemental information and documentation must be received by the CO to be considered; and

(iii) State that, upon receipt of a response to the written RFI, or expiration of the stated deadline for receipt of the response, the CO will review the existing application as well as any supplemental materials submitted by the employer and issue a Final Determination. If unusual circumstances warrant, the CO may issue one or more additional RFIs prior to issuing a Final Determination.

(3) The CO will issue the Final Determination or the additional RFI within 7 business days of receipt of the employer's response, or within 60 days of the employer's date of need, whichever is later.

(4) Compliance with an RFI does not guarantee that the employer's application will be certified after submitting the information. The employer's documentation must justify its chosen standard of temporary need or otherwise overcome the stated deficiency in the application.

(d) Failure to comply with an RFI, including not providing all documentation within the specified time period, may result in a denial of the application. Such failure to comply with an RFI may also result in a finding by the CO requiring supervised recruitment under § 655.30 in future filings of H-2B temporary labor certification applications.
 20 CFR § 655.24

**§ 655.24 Audits.**
(a) Discretion. OFLC will conduct audits of H-2B temporary labor certification applications. The applications selected for audit will be chosen within the sole discretion of OFLC.

(b) Audit Letter. When an application is selected for audit, the CO shall issue an audit letter to the employer. The audit letter will:

(1) State the application has been selected for audit and note documentation that must be submitted by the employer;

(2) Specify a date, no fewer than 14 days and no more than 30 days from the date of the audit letter's issuance, by which the required documentation must be received by the CO; and

(3) Advise that failure to comply with the audit process may result in a finding by the CO to:

(i) Require the employer to conduct supervised recruitment under § 655.30 in future filings of H-2B temporary labor certification applications for a period of up to 2 years, or

(ii) Debar the employer from future filings of H-2B temporary labor certification applications as provided in § 655.31.

(c) Supplemental information. During the course of the audit examination, the CO may request supplemental information and/or documentation from the employer to complete the audit.

**\*78061** (d) Audit violations. If, as a result of the audit, the CO determines the employer failed to produce all required documentation, or determines that the employer made a material misrepresentation with respect to the application, the employer may be required to conduct supervised recruitment under § 655.30 in future filings of H-2B temporary labor certification applications for up to 2 years, or may be subject to debarment pursuant to § 655.31 or other sanctions. The CO may provide the audit findings and underlying documentation to DHS, WHD, or another appropriate enforcement agency. The CO may refer any findings that an employer discouraged an eligible U.S. worker from applying, or failed to hire, discharged, or otherwise discriminated against an eligible U.S. worker, to the Department of Justice, Civil Rights Division, Office of Special Counsel for Unfair Immigration Related Employment Practices.
 20 CFR § 655.25-655.29

**§§ 655.25-655.29 [Reserved]**
20 CFR § 655.30

**§ 655.30 Supervised recruitment.**
(a) Supervised recruitment. Where an employer is found to have violated program requirements, to have made a material misrepresentation to the Department, or to have failed to adequately conduct recruitment activities or failed in any obligation of this part, the CO may require pre-filing supervised recruitment.

(b) Requirements. Supervised recruitment shall consist of advertising for the job opportunity or opportunities in accordance with the required recruitment steps outlined under § 655.15, except as otherwise provided below.

(1) The CO will direct where the advertisements are to be placed.

(2) The employer must supply a draft advertisement and job order to the CO for review and approval no fewer than 150 days before the date on which the foreign worker(s) will commence work unless notified by the CO of the need for Supervised Recruitment less than 150 days before the date of need, in which case the employer must supply the drafts within 30 days of receipt of such notification.

(3) Each advertisement must comply with the requirements of § 655.17(a).

(4) The advertisement shall be placed in accordance with guidance provided by the CO.

(5) The employer will notify the CO when the advertisements are placed.

(c) Recruitment report. No fewer than 2 days after the last day of the posting of the job order and no fewer than 5 calendar days after the date on which the last newspaper or journal advertisement appeared, the employer must prepare a detailed written report of the employer's supervised recruitment, signed by the employer as outlined in § 655.15(i). The employer must submit the recruitment report to the CO within 30 days of the date of the first advertisement and must retain a copy for a period of no less than 3 years. The recruitment report must contain a copy of all advertisements and a copy of the SWA job order, including the dates so placed.

(d) The CO may refer any findings that an employer or its representative discouraged an eligible U.S. worker from applying, or failed to hire, discharged, or otherwise discriminated against an eligible U.S. worker, to the Department of Justice, Civil Rights Division, Office of Special Counsel for Unfair Immigration Related Employment Practices.
 20 CFR § 655.31

**§ 655.31 Debarment.**
(a) The Administrator, OFLC may not issue future labor certifications under this subpart to an employer and any successor in interest to the debarred employer, subject to the time limits set forth in paragraph (c) of this section, if:

(1) The Administrator, OFLC finds that the employer substantially violated a material term or condition of its temporary labor certification with respect to the employment of domestic or nonimmigrant workers; and

(2) The Administrator, OFLC issues a Notice of Intent to Debar no later than 2 years after the occurrence of the violation.

(b) The Administrator, OFLC may not issue future labor certifications under this subpart to an employer represented by an agent or attorney, subject to the time limits set forth in paragraph (c) of this section, if:

(1) The agent or attorney participated in, had knowledge of, or had reason to know of, the employer's substantial violation; and

(2) The Administrator issues the agent or attorney a Notice of Intent to Debar no later than 2 years after the occurrence of the violation.

(c) No employer, attorney, or agent may be debarred under this subpart for more than 3 years.

(d) For the purposes of this section, a substantial violation includes:

(1) A pattern or practice of acts of commission or omission on the part of the employer or the employer's agent that:

(i) Are significantly injurious to the wages or benefits offered under the H-2B program or working conditions of a significant number of the employer's U.S. or H-2B workers;

(ii) Reflect a significant failure to offer employment to each qualified domestic worker who applied for the job opportunity for which certification was being sought, except for lawful job-related reasons;

(iii) Reflect a significant failure to comply with the employer's obligations to recruit U.S. workers as set forth in this subpart;

(iv) Reflect a significant failure to comply with the RFI or audit process pursuant to §§ 655.23 or 655.24;

(v) Reflect the employment of an H-2B worker outside the area of intended employment, or in an activity/activities, not listed in the job order (other than an activity minor and incidental to the activity/activities listed in the job order), or after the period of employment specified in the job order and any approved extension; or

(vi) Reflect a significant failure to comply with the supervised recruitment process pursuant to § 655.30.

(2) Fraud involving the Application for Temporary Employment Certification or a response to an audit;

(3) A significant failure to cooperate with a DOL investigation or with a DOL official performing an investigation, inspection, or law enforcement function under this subpart;

(4) A significant failure to comply with one or more sanctions or remedies imposed by the ESA for violation(s) of obligations under this subpart found by that agency (if applicable), or with one or more decisions or orders of the Secretary or a court order secured by the Secretary; or

(5) A single heinous act showing such flagrant disregard for the law that future compliance with program requirements cannot reasonably be expected.

(e) DOL procedures for debarment under this section will be as follows:

(1) The Administrator, OFLC will send to the employer, attorney, or agent a Notice of Intent to Debar by means normally ensuring next-day delivery, which will contain a detailed statement of the grounds for the proposed debarment. The employer, attorney, or agent may submit evidence in rebuttal within 14 calendar days of the date the notice is issued. The Administrator, OFLC must consider all relevant evidence presented in deciding whether to debar the employer, attorney, or agent.

(2) If rebuttal evidence is not timely filed by the employer, attorney, or agent, the Notice of Intent to Debar will become the final decision of the Secretary and take effect immediately at the end of the 14-day period.

**\*78062** (3) If, after reviewing the employer's timely filed rebuttal evidence, the Administrator, OFLC determines that the employer, attorney, or agent more likely than not meets one or more of the bases for debarment under § 655.31(d), the Administrator, OFLC will notify the employer, by means normally ensuring next-day delivery, within 14 calendar days after receiving such timely filed rebuttal evidence, of his/her final determination of debarment and of the employer, attorney, or agent's right to appeal.

(4) The Notice of Debarment must be in writing, must state the reason for the debarment finding, including a detailed explanation of the grounds for and the duration of the debarment, and must offer the employer, attorney, or agent an opportunity to request a hearing. The notice must state that to obtain such a review or hearing, the debarred party must, within 30 calendar days of the date of the notice file a written request to the Chief Administrative Law Judge, United States Department of Labor, 800 K Street, NW., Suite 400-N, Washington, DC 20001-8002, and simultaneously serve a copy to the Administrator, OFLC. The debarment will take effect 30 days from the date the Notice of Debarment is issued, unless a request for a hearing is properly filed within 30 days from the date the Notice of Debarment is issued. The timely filing of a request for a hearing stays the debarment pending the outcome of the appeal.

(5)(i) Hearing. Within 10 days of receipt of the request for a hearing, the Administrator, OFLC will send a certified copy of the ETA case file to the Chief Administrative Law Judge by means normally assuring next-day delivery. The Chief Administrative Law Judge will immediately assign an ALJ to conduct the hearing. The procedures in 29 CFR part 18 apply to such hearings, except that the request for a hearing will not be considered to be a complaint to which an answer is required.

(ii) Decision. After the hearing, the ALJ must affirm, reverse, or modify the Administrator, OFLC 's determination. The ALJ's decision must be provided immediately to the employer, Administrator, OFLC, DHS, and DOS by means normally assuring next-day delivery. The ALJ's decision is the final decision of the Secretary, unless either party, within 30 calendar days of the ALJ's decision, seeks review of the decision with the Administrative Review Board (ARB).

(iii) Review by the ARB.

(A) Any party wishing review of the decision of an ALJ must, within 30 days of the decision of the ALJ, petition the ARB to review the decision. Copies of the petition must be served on all parties and on the ALJ. The ARB must decide whether to accept the petition within 30 days of receipt. If the ARB declines to accept the petition or if the ARB does not issue a notice accepting a petition within 30 days after the receipt of a timely filing of the petition, the decision of the ALJ shall be deemed the final agency action. If a petition for review is accepted, the decision of the ALJ shall be stayed unless and until the ARB issues an order affirming the decision. The ARB must serve notice of its decision to accept or not to accept the petition upon the ALJ and upon all parties to the proceeding in person or by certified mail.

(B) Upon receipt of the ARB's notice to accept the petition, the Office of Administrative Law Judges shall promptly forward a copy of the complete hearing record to the ARB.

(C) Where the ARB has determined to review such decision and order, the ARB shall notify each party of:

(1) The issue or issues raised;

(2) The form in which submissions shall be made (i.e., briefs, oral argument, etc.); and

(3) The time within which such presentation shall be submitted.

(D) The ARB's final decision must be issued within 90 days from the notice granting the petition and served upon all parties and the ALJ, in person or by certified mail. If the ARB fails to provide a decision within 90 days from the notice granting the petition, the ALJ's decision will be the final decision of the Secretary.

(f) Inter-Agency Reporting. After completion of the appeal process, DOL will inform DHS and other appropriate

enforcement agencies of the findings and provide a copy of the Notice of Debarment.
 20 CFR § 655.32

**§ 655.32 Labor certification determinations.**
(a) COs. The Administrator, OFLC, is the Department's National CO. The Administrator, and the CO(s) in the NPC (by virtue of delegation from the Administrator), have the authority to certify or deny applications for temporary employment certification under the H-2B nonimmigrant classification. If the Administrator directs that certain types of temporary labor certification applications or specific applications under the H-2B nonimmigrant classification be handled by the National OFLC, the Director of the Chicago NPC will refer such applications to the Administrator.

(b) Determination. The CO will make a determination either to grant or deny the Application for Temporary Employment Certification. The CO will grant the application if and only if the employer has met all the requirements of this subpart, including the criteria for certification defined in § 655.23(b), thus demonstrating that an insufficient number of qualified U.S. workers are available for the job opportunity for which certification is sought and the employment of the H-2B workers will not adversely affect the benefits, wages, and working conditions of similarly employed U.S. workers.

(c) Notice. The CO will notify the employer in writing (either electronically or by U.S. Mail) of the labor certification determination.

(d) Approved certification. If temporary labor certification is granted, the CO must send the certified Application for Temporary Employment Certification and a Final Determination letter to the employer, or, if appropriate, to the employer's agent or attorney with a copy to the employer. The Final Determination letter will notify the employer to file the certified application and any other documentation required by USCIS with the appropriate USCIS office.

(e) Denied certification. If temporary labor certification is denied, the Final Determination letter will:

(1) State the reason(s) certification is denied, citing the relevant regulatory standards and/or special procedures;

(2) If applicable, address the availability of U.S. workers in the occupation as well as the prevailing benefits, wages, and working conditions of similarly employed U.S. workers in the occupation and/or any applicable special procedures;

(3) Offer the employer an opportunity to request administrative review of the denial available under § 655.33, or to file a new application in accordance with specific instructions provided by the CO; and

(4) State that if the employer does not request administrative review in accordance with § 655.33, the denial is final and the Department will not further consider that application for temporary alien nonagricultural labor certification.

(f) Partial Certification. The CO may, in his/her discretion, and to ensure compliance with all statutory and regulatory requirements, issue a partial certification, reducing either the period of need, the number of H-2B positions being requested, or both, based upon information the CO receives in the course of processing the temporary labor certification application, an RFI, or otherwise. If a partial labor certification **\*78063** is issued, the Final Determination letter will:

(1) State the reason(s) for which either the period of need and/or the number of H-2B positions requested has been reduced, citing the relevant regulatory standards and/or special procedures;

(2) If applicable, address the availability of U.S. workers in the occupation;

(3) Offer the employer an opportunity to request administrative review of the partial labor certification available under § 655.33; and

(4) State that if the employer does not request administrative review in accordance with § 655.33, the partial labor certification is final and the Department will not further consider that application for temporary nonagricultural labor certification.
 20 CFR § 655.33

**§ 655.33 Administrative review.**

(a) Request for review. If a temporary labor certification is denied, in whole or in part, under § 655.32, the employer may request review of the denial by the BALCA. The request for review:

(1) Must be sent to the BALCA, with a copy simultaneously sent to the CO who denied the application, within 10 calendar days of the date of determination;

(2) Must clearly identify the particular temporary labor certification determination for which review is sought;

(3) Must set forth the particular grounds for the request;

(4) Must include a copy of the Final Determination; and

(5) May contain only legal argument and such evidence as was actually submitted to the CO in support of the application.

(b) Upon the receipt of a request for review, the CO shall, within 5 business days assemble and submit the Appeal File using means to ensure same day or overnight delivery, to the BALCA, the employer, and the Associate Solicitor for Employment and Training Legal Services, Office of the Solicitor, U.S. Department of Labor.

(c) Within 5 business days of receipt of the Appeal File, the counsel for the CO may submit, using means to ensure same day or overnight delivery, a brief in support of the CO's decision.

(d) The Chief Administrative Law Judge may designate a single member or a three member panel of the BALCA to consider a particular case.

(e) The BALCA must review a denial of temporary labor certification only on the basis of the Appeal File, the request for review, and any legal briefs submitted and must:

(1) Affirm the denial of the temporary labor certification; or

(2) Direct the CO to grant the certification; or

(3) Remand to the CO for further action.

(f) The BALCA should notify the employer, the CO, and counsel for the CO of its decision within 5 business days of the submission of the CO's brief or 10 days after receipt of the Appeal File, whichever is earlier, using means to ensure same day or overnight delivery.

 20 CFR § 655.34

**§ 655.34 Validity of temporary labor certifications.**

(a) Validity Period. A temporary labor certification is valid only for the period of time between the beginning and ending dates of employment, as certified by the OFLC Administrator on the Application for Temporary Employment Certification. The certification expires on the last day of authorized employment.

(b) Scope of Validity. A temporary labor certification is valid only for the number of H-2B positions, the area of intended employment, the specific services or labor to be performed, and the employer specified on the certified Application for Temporary Employment Certification and may not be transferred from one employer to another.

(c) Amendments to Applications. (1) Applications may be amended at any time, before the CO's certification determination, to increase the number of positions requested in the initial application by not more than 20 percent (50 percent for employers requesting less than 10 positions) without requiring an additional recruitment period for U.S. workers. Requests for increases above the percent prescribed, without additional recruitment, may be approved by the CO only when the request is submitted in writing, the need for additional workers could not have been reasonably foreseen, and the employer's services or products will be in jeopardy prior to the time that new H-2B workers could be secured.

(2) Applications may be amended to make minor changes in the period of employment, only when a written request is submitted to the CO and written approval obtained in advance. In considering whether to approve the request, the CO will review the reason(s) for the request, determine whether the reason(s) are on the whole justified, and take into account the effect(s) of a decision to approve on the adequacy of the underlying test of the domestic labor market for the job opportunity.

(3) Other amendments to the application, including elements of the job offer and the place of work, may be requested, in writing, and will be granted if the CO determines the proposed amendment(s) are justified and will have no significant effect upon the CO's ability to make the labor certification determination required under § 655.32.

(4) The CO may change the date of need to reflect an amended date when delays occur in the adjudication of the Application for Temporary Employment Certification, through no fault of the employer, and the certification would otherwise become valid after the initial date of need.
 20 CFR § 655.35

**§ 655.35 Required departure.**
(a) Limit to worker's stay. As defined further in DHS regulations, a temporary labor certification shall limit the authorized period of stay for any H-2B worker whose admission is based upon it. 8 CFR 214.2(h)(13). A foreign worker may not remain in the U.S. beyond the validity period of admission by DHS in H-2B status nor beyond separation from employment, whichever occurs first, absent any extension or change of such worker's status or grace period pursuant to DHS regulations.

(b) Notice to worker. Upon establishment of a pilot program by DHS for registration of departure, the employer must notify any H-2B worker starting work at a job opportunity for which the employer has obtained labor certification that the H-2B worker, when departing the U.S. by land at the conclusion of employment as described in paragraph (a) of this section, must register such departure at the place and in the manner prescribed by DHS. This requirement will apply only to H-2B foreign workers entering from ports of entry participating in the DHS pilot program.
 20 CFR § 655.50

**§ 655.50 Enforcement process.**
(a) Authority of the WHD Administrator. The WHD Administrator shall perform all the Secretary's investigative and enforcement functions under secs. 1101(a)(15)(H)(ii)(b), 103(a)(6), and 214(c) of the INA, pursuant to the delegation of authority from the Secretary of Homeland Security to the Secretary of Labor.

(b) Conduct of investigations. The Administrator, WHD, shall, either pursuant to a complaint or otherwise, conduct such investigations as may, in the judgment of the Administrator, be appropriate, and in connection therewith, may enter and inspect such places and such records (and make transcriptions or copies thereof), question such persons, and gather such information as deemed necessary by the Administrator to determine compliance **\*78064** regarding the matters which are the subject of investigation.

(c) Employer cooperation/availability of records. An employer shall at all times cooperate in administrative and enforcement proceedings. An employer being investigated shall make available to the WHD Administrator such records, information, persons, and places as the Administrator deems appropriate to copy, transcribe, question, or inspect. Where the records are maintained at a central recordkeeping office, other than in the place or places of employment, such records must be made available for inspection and copying within 72 hours following notice from the Secretary, or a duly authorized and designated representative. No employer or representative or agent of an employer subject to the provisions of secs. 1101(a)(15)(H)(ii)(b) and 214(c) of the INA and/or of this subpart shall interfere with any official of the Department who is performing an investigation, inspection, or law enforcement function pursuant to 8 U.S.C. 1101(a)(15)(H)(ii)(b) or 1184(c). Any such interference shall be a violation of the labor certification application and of this subpart, and the Administrator may take such further actions as the Administrator considers appropriate. (Federal criminal statutes prohibit certain interference with a Federal officer in the performance of official duties. 18 U.S.C. 111 and 18 U.S.C. 1114.)

(d) Confidentiality. The WHD Administrator shall, to the extent possible under existing law, protect the confidentiality of any person who provides information to the Department in confidence in the course of an investigation or otherwise under this subpart.
 20 CFR § 655.60

**§ 655.60 Violations.**

The WHD Administrator, through investigation, shall determine whether an employer has—

(a) Filed a petition with ETA that willfully misrepresents a material fact.

(b) Substantially failed to meet any of the conditions of the labor certification application attested to, as listed in § 655.22, or any of the conditions of the DHS Form I-129, Petition for a Nonimmigrant Worker for an H-2B worker in 8 CFR 214.2(h).

(c) Misrepresented a material fact to the State Department during the visa application process.
 20 CFR § 655.65

**§ 655.65 Remedies for violations.**

(a) Upon determining that an employer has willfully failed to pay wages, in violation of the attestation required by § 655.22(e) or willfully required employees to pay for fees or expenses prohibited by § 655.22(j), or willfully made impermissible deductions from pay as provided in § 655.22(g), the WHD Administrator may assess civil money penalties that are equal to the difference between the amount that should have been paid and the amount that actually was paid to such nonimmigrant(s), not to exceed $10,000.

(b) Upon determining that an employer has terminated by layoff or otherwise any employee described in § 622.55(k) of this part, within the period described in that section, the Administrator may assess civil money penalties that are equal to the wages that would have been earned but for the layoff at the H-2B rate for that period, not to exceed $10,000. No civil money penalty shall be assessed, however, if the employee refused the job opportunity, or was terminated for lawful, job-related reasons.

(c) The Administrator may assess civil money penalties in an amount not to exceed $10,000 per violation for any substantial failure to meet the conditions provided in the H-2B Application for Temporary Employment Certification or the DHS Form I-129, Petition for a Nonimmigrant Worker for an H-2B worker or successor form, or any willful misrepresentation in the application or petition, or a failure to cooperate with a Department audit or investigation.

(d) Substantial failure in paragraph (b) of this section shall mean a willful failure that constitutes a significant deviation from the terms and conditions of the labor condition application or the DHS Form I-129, Petition for a Nonimmigrant Worker for an H-2B worker or successor form.

(e) For purposes of this subpart, "willful failure" means a knowing failure or a reckless disregard with respect to whether the conduct was contrary to sec. 214(c) of the INA, or this subpart. See McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988); see also Trans World Airlines v. Thurston, 469 U.S. 111 (1985).

(f) The provisions of this subpart become applicable upon the date that the employer's labor condition application is certified and/or upon the date employment commences, whichever is earlier. The employer's submission and signature on the labor certification application and DHS Form I-129, Petition for a Nonimmigrant Worker for an H-2B worker or successor form constitutes the employer's representation that the statements on the application are accurate and its acknowledgement and acceptance of the obligations of the program. The employer's acceptance of these obligations is re-affirmed by the employer's submission of the petition (Form I-129), supported by the labor certification.

(g) In determining the amount of the civil money penalty to be assessed pursuant to paragraphs (b) and (c) of this section, the WHD Administrator shall consider the type of violation committed and other relevant factors. In determining the level of penalties to be assessed, the highest penalties shall be reserved for willful failures to meet any of the conditions of the application that involve harm to U.S. workers. Other factors which may be considered include, but are not limited to, the following:

(1) Previous history of violation, or violations, by the employer under the INA and this subpart, and 8 CFR 214.2;

(2) The number of U.S. or H-2B workers employed by the employer and affected by the violation or violations;

(3) The gravity of the violation or violations;

(4) Efforts made by the employer in good faith to comply with the INA and regulatory provisions of this subpart and at 8 CFR 214.2(h);

(5) The employer's explanation of the violation or violations;

(6) The employer's commitment to future compliance; and

(7) The extent to which the employer achieved a financial gain due to the violation, or the potential financial loss to the employer's workers.

(h) Disqualification from approval of petitions. Where the WHD Administrator finds a substantial failure to meet any conditions of the application or in a DHS Form I-129, or a willful misrepresentation of a material fact in an application or in a DHS Form I-129, as those terms are defined in § 655.31, the Administrator may recommend that ETA debar the employer for a period of no less than 1 year, and no more than 3 years.

(i) If the WHD Administrator finds a violation of the provisions specified in this subpart, the Administrator may impose such other administrative remedies as the Administrator determines to be appropriate, including reinstatement of displaced U.S. workers, or other appropriate legal or equitable remedies. If the WHD Administrator finds that an employer has not paid wages at the wage level specified under the application and required by § 655.22(e), the Administrator may require the employer to provide for payment of such amounts of back pay as may be required to comply with the requirements of § 655.22(e).

**\*78065** (j) The civil money penalties determined by the WHD Administrator to be appropriate are due for payment within 30 days of the assessment by the Administrator, or upon the decision by an administrative law judge where a hearing is timely requested, or upon the decision by the Secretary where review is granted. The employer shall remit the amount of the civil money penalty by certified check or money order made payable to the order of "Wage and Hour Division, Labor." The remittance shall be delivered or mailed to the Wage and Hour Division office in the manner directed in the Administrator's notice of determination. The payment or performance of any other remedy prescribed by the Administrator shall follow procedures established by the Administrator.

(k) The Federal Civil Penalties Inflation Adjustment Act of 1990, as amended (28 U.S.C. 2461 note), requires that inflationary adjustments to civil money penalties in accordance with a specified cost-of-living formula be made, by regulation, at least every 4 years. The adjustments are to be based on changes in the Consumer Price Index for all Urban Consumers (CPI-U) for the U.S. City Average for All Items. The adjusted amounts will be published in the Federal Register. The amount of the penalty in a particular case will be based on the amount of the penalty in effect at the time the violation occurs.

 20 CFR § 655.70

**§ 655.70 WHD Administrator's determination.**
(a) The WHD Administrator's determination shall be served on the employer by personal service or by certified mail at the employer's last known address. Where service by certified mail is not accepted by the employer, the Administrator may exercise discretion to serve the determination by regular mail.

(b) The WHD Administrator shall file with the Chief Administrative Law Judge, U.S. Department of Labor, a copy of the Administrator's determination.

(c) The WHD Administrator's written determination shall:

(1) Set forth the determination of the Administrator and the reason or reasons therefore, and in the case of a finding of violation(s) by an employer, prescribe the amount of any back wages and civil money penalties assessed and the reason therefor.

(2) Inform the employer that a hearing may be requested pursuant to § 655.71.

(3) Inform the employer that in the absence of a timely request for a hearing, received by the Chief Administrative Law Judge within 15 calendar days of the date of the determination, the determination of the Administrator shall become final and not appealable.

(4) Set forth the procedure for requesting a hearing, give the addresses of the Chief Administrative Law Judge (with whom the request must be filed) and the representative(s) of the Solicitor of Labor (upon whom copies of the request must be served).

(5) Where appropriate, inform the employer that the Administrator will notify ETA and DHS of the occurrence of a violation by the employer.
 20 CFR § 655.71

### § 655.71 Request for hearing.

(a) An employer desiring review of a determination issued under § 655.70, including judicial review, shall make a request for such an administrative hearing in writing to the Chief Administrative Law Judge at the address stated in the notice of determination. In such a proceeding, the Administrator shall be the prosecuting party, and the employer shall be the respondent. If such a request for an administrative hearing is timely filed, the WHD Administrator's determination shall be inoperative unless and until the case is dismissed or the Administrative Law Judge issues an order affirming the decision.

(b) No particular form is prescribed for any request for hearing permitted by this section. However, any such request shall:

(1) Be dated;

(2) Be typewritten or legibly written;

(3) Specify the issue or issues stated in the notice of determination giving rise to such request;

(4) State the specific reason or reasons why the employer believes such determination is in error;

(5) Be signed by the employer making the request or by an authorized representative of such employer; and

(6) Include the address at which such employer or authorized representative desires to receive further communications relating thereto.

(c) The request for such hearing must be received by the Chief Administrative Law Judge, at the address stated in the WHD Administrator's notice of determination, no later than 15 calendar days after the date of the determination. An employer which fails to meet this 15-day deadline for requesting a hearing may thereafter participate in the proceedings only by consent of the administrative law judge.

(d) The request may be filed in person, by facsimile transmission, by certified or regular mail, or by courier service. For the requesting employer's protection, if the request is by mail, it should be by certified mail. If the request is by facsimile transmission, the original of the request, signed by the employer or authorized representative, shall be filed within 10 days.

(e) Copies of the request for a hearing shall be sent by the employer or authorized representative to the WHD official who issued the WHD Administrator's notice of determination, and to the representative(s) of the Solicitor of Labor identified in the notice of determination.
 20 CFR § 655.72

### § 655.72 Hearing rules of practice.

(a) Except as specifically provided in this subpart, and to the extent they do not conflict with the provisions of this subpart, the "Rules of Practice and Procedure for Administrative Hearings Before the Office of Administrative Law Judges" established by the Secretary at 29 CFR part 18 shall apply to administrative proceedings under this subpart.

(b) As provided in the Administrative Procedure Act, 5 U.S.C. 556, any oral or documentary evidence may be received in proceedings under this part. The Federal Rules of Evidence and subpart B of the Rules of Practice and Procedure for

Administrative Hearings Before the Office of Administrative Law Judges (29 CFR part 18, subpart B) shall not apply, but principles designed to ensure production of relevant and probative evidence shall guide the admission of evidence. The administrative law judge may exclude evidence which is immaterial, irrelevant, or unduly repetitive.
 20 CFR § 655.73

### § 655.73 Service of pleadings.

(a) Under this subpart, a party may serve any pleading or document by regular mail. Service on a party is complete upon mailing to the last known address. No additional time for filing or response is authorized where service is by mail. In the interest of expeditious proceedings, the administrative law judge may direct the parties to serve pleadings or documents by a method other than regular mail.

(b) Two copies of all pleadings and other documents in any administrative law judge proceeding shall be served on the attorneys for the WHD Administrator. One copy shall be served on the Associate Solicitor, Division of Fair Labor Standards, Office of the Solicitor, U.S. Department of Labor, 200 Constitution Avenue, NW., Room N-2716, Washington, DC 20210, and one copy shall be served on the attorney representing the Administrator in the proceeding.

(c) Time will be computed beginning with the day following service and includes the last day of the period **78066** unless it is a Saturday, Sunday, or Federally-observed holiday, in which case the time period includes the next business day.
 20 CFR § 655.74

### § 655.74 Conduct of proceedings.

(a) Upon receipt of a timely request for a hearing filed pursuant to and in accordance with § 655.71, the Chief Administrative Law Judge shall promptly appoint an administrative law judge to hear the case.

(b) The administrative law judge shall notify all parties of the date, time and place of the hearing. All parties shall be given at least 14 calendar days notice of such hearing.

(c) The administrative law judge may prescribe a schedule by which the parties are permitted to file a prehearing brief or other written statement of fact or law. Any such brief or statement shall be served upon each other party. Post-hearing briefs will not be permitted except at the request of the administrative law judge. When permitted, any such brief shall be limited to the issue or issues specified by the administrative law judge, shall be due within the time prescribed by the administrative law judge, and shall be served on each other party.
 20 CFR § 655.75

### § 655.75 Decision and order of administrative law judge.

(a) The administrative law judge shall issue a decision. If any party desires review of the decision, including judicial review, a petition for Administrative Review Board (Board) review thereof shall be filed as provided in § 655.76. If a petition for review is filed, the decision of the administrative law judge shall be inoperative unless and until the Board issues an order affirming the decision, or unless and until 30 calendar days have passed after the Board's receipt of the petition for review and the Board has not issued notice to the parties that the Board will review the administrative law judge's decision.

(b) The decision of the administrative law judge shall include a statement of findings and conclusions, with reasons and basis therefore, upon each material issue presented on the record. The decision shall also include an appropriate order which may affirm, deny, reverse, or modify, in whole or in part, the determination of the Administrator, WHD; the reason or reasons for such order shall be stated in the decision.

(c) In the event that the WHD Administrator assesses back wages for wage violation(s) of § 655.22(e), (g), or (j) based upon a PWD obtained by the Administrator from OFLC during the investigation and the administrative law judge determines that the Administrator's request was not warranted, the administrative law judge shall remand the matter to the Administrator for further proceedings on the Administrator's determination. If there is no such determination and remand by the administrative law judge, the administrative law judge shall accept as final and accurate the wage determination obtained from OFLC or, in the event the employer filed a timely appeal under § 655.11, the final wage determination resulting from that process. Under no circumstances shall the administrative law judge determine the validity of the wage determination or require submission into evidence or disclosure of source data or the names of establishments contacted in developing the survey which is the basis for the PWD.

(d) The administrative law judge shall not render determinations as to the legality of a regulatory provision or the constitutionality of a statutory provision.

(e) The decision shall be served on all parties in person or by certified or regular mail.
 20 CFR § 655.76

### § 655.76 Appeal of administrative law judge decision.
(a) The WHD Administrator or an employer desiring review of the decision and order of an administrative law judge, including judicial review, shall petition the Department's Administrative Review Board (Board) to review the decision and order. To be effective, such petition shall be received by the Board within 30 calendar days of the date of the decision and order. Copies of the petition shall be served on all parties and on the administrative law judge.

(b) No particular form is prescribed for any petition for the Board's review permitted by this subpart. However, any such petition shall:

(1) Be dated;

(2) Be typewritten or legibly written;

(3) Specify the issue or issues stated in the administrative law judge decision and order giving rise to such petition;

(4) State the specific reason or reasons why the party petitioning for review believes such decision and order are in error;

(5) Be signed by the party filing the petition or by an authorized representative of such party;

(6) Include the address at which such party or authorized representative desires to receive further communications relating thereto; and

(7) Attach copies of the administrative law judge's decision and order, and any other record documents which would assist the Board in determining whether review is warranted.

(c) Whenever the Board determines to review the decision and order of an administrative law judge, a notice of the Board's determination shall be served upon the administrative law judge, upon the Office of Administrative Law Judges, and upon all parties to the proceeding within 30 calendar days after the Board's receipt of the petition for review. If the Board determines that it will review the decision and order, the order shall be inoperative unless and until the Board issues an order affirming the decision and order.

(d) Upon receipt of the Board's notice, the Office of Administrative Law Judges shall within 15 calendar days forward the complete hearing record to the Board.

(e) The Board's notice shall specify:

(1) The issue or issues to be reviewed;

(2) The form in which submissions shall be made by the parties (e.g., briefs); and

(3) The time within which such submissions shall be made.

(f) All documents submitted to the Board shall be filed with the Administrative Review Board, U.S. Department of Labor, 200 Constitution Avenue, NW., Room S-5220, Washington, DC 20210. An original and two copies of all documents shall be filed. Documents are not deemed filed with the Board until actually received by the Board. All documents, including documents filed by mail, shall be received by the Board either on or before the due date.

(g) Copies of all documents filed with the Board shall be served upon all other parties involved in the proceeding.

(h) The Board's final decision shall be served upon all parties and the administrative law judge.
 20 CFR § 655.80

**§ 655.80 Notice to OFLC and DHS.**
(a) The WHD Administrator shall, as appropriate, notify DHS and OFLC of the final determination of a violation and recommend that DHS not approve petitions filed by an employer. The Administrator's notification will address the type of violation committed by the employer and the appropriate statutory period for disqualification of the employer from approval of petitions.

(b) The Administrator shall notify DHS and OFLC upon the earliest of the following events:

(1) Where the Administrator determines that there is a basis for a finding of violation by an employer, and no timely request for hearing is made; or

(2) Where, after a hearing, the administrative law judge issues a **\*78067** decision and order finding a violation by an employer, and no timely petition for review is filed with the Department's Administrative Review Board (Board); or

(3) Where a timely petition for review is filed from an administrative law judge's decision finding a violation and the Board either declines within 30 days to entertain the appeal, or reviews and affirms the administrative law judge's determination; or

(4) Where the administrative law judge finds that there was no violation by an employer, and the Board, upon review, issues a decision holding that a violation was committed by an employer.
 20 CFR § 655.715
4. Amend § 655.715 by adding a definition for the "Center Director" to read as follows:
 20 CFR § 655.715

**§ 655.715 Definitions.**
* * * * *
Center Director means the Department official to whom the Administrator has delegated his authority for purposes of NPC operations and functions.
 * * * * *20 CFR § 655.731
5. Amend § 655.731 by revising paragraphs (a)(2) introductory text, (a)(2)(ii), (b)(3)(iii)(A), and (d)(2) and (3) to read as follows:
 20 CFR § 655.731

**§ 655.731 What is the first LCA requirement regarding wages?**
* * * * *
(a) * * *

(2) The prevailing wage for the occupational classification in the area of intended employment must be determined as of the time of filing the application. The employer shall base the prevailing wage on the best information available as of the time of filing the application. Except as provided in this section, the employer is not required to use any specific methodology to determine the prevailing wage and may utilize a wage obtained from an OFLC NPC (OES), an independent authoritative source, or other legitimate sources of wage data. One of the following sources shall be used to establish the prevailing wage:
 * * * * *
(ii) If the job opportunity is in an occupation which is not covered by paragraph (a)(2)(i) of this section, the prevailing wage shall be the arithmetic mean of the wages of workers similarly employed, except that the prevailing wage shall be the median when provided by paragraphs (a)(2)(ii)(A), (b)(3)(iii)(B)(2), and (b)(3)(iii)(C)(2) of this section. The prevailing wage rate shall be based on the best information available. The following prevailing wage sources may be used:

(A) OFLC National Processing Center (NPC) determination. Prior to January 1, 2010, the SWA having jurisdiction over the area of intended employment shall continue to receive and process prevailing wage determination requests, but shall do so in accordance with these regulatory provisions and Department guidance. On or after January 1, 2010, the NPC shall receive and process prevailing wage determination requests in accordance with these regulations and with Department guidance.

Upon receipt of a written request for a PWD on or after January 1, 2010, the NPC will determine whether the occupation is covered by a collective bargaining agreement which was negotiated at arms length, and, if not, determine the arithmetic mean of wages of workers similarly employed in the area of intended employment. The wage component of the Bureau of Labor Statistics Occupational Employment Statistics survey shall be used to determine the arithmetic mean, unless the employer provides an acceptable survey. The NPC shall determine the wage in accordance with secs. 212(n) and 212(t) of the INA. If an acceptable employer-provided wage survey provides a median and does not provide an arithmetic mean, the median shall be the prevailing wage applicable to the employer's job opportunity. In making a PWD, the Chicago NPC will follow 20 CFR 656.40 and other administrative guidelines or regulations issued by ETA. The Chicago NPC shall specify the validity period of the PWD, which in no event shall be for less than 90 days or more than 1 year from the date of the determination.

(1) An employer who chooses to utilize an NPC PWD shall file the labor condition application within the validity period of the prevailing wage as specified in the PWD. Any employer desiring review of an NPC PWD, including judicial review, shall follow the appeal procedures at 20 CFR 656.41. Employers which challenge an NPC PWD under 20 CFR 656.41 must obtain a ruling prior to filing an LCA. In any challenge, the Department and the NPC shall not divulge any employer wage data collected under the promise of confidentiality. Once an employer obtains a PWD from the NPC and files an LCA supported by that PWD, the employer is deemed to have accepted the PWD (as to the amount of the wage) and thereafter may not contest the legitimacy of the PWD by filing an appeal with the CO (see 20 CFR 656.41) or in an investigation or enforcement action.

(2) If the employer is unable to wait for the NPC to produce the requested prevailing wage for the occupation in question, or for the CO and/or the BALCA to issue a decision, the employer may rely on other legitimate sources of available wage information as set forth in paragraphs (a)(2)(ii)(B) and (C) of this section. If the employer later discovers, upon receipt of the PWD from the NPC, that the information relied upon produced a wage below the final PWD and the employer was paying the NPC-determined wage, no wage violation will be found if the employer retroactively compensates the H-2B nonimmigrant(s) for the difference between wage paid and the prevailing wage, within 30 days of the employer's receipt of the PWD.

(3) In all situations where the employer obtains the PWD from the NPC, the Department will deem that PWD as correct as to the amount of the wage. Nevertheless, the employer must maintain a copy of the NPC PWD. A complaint alleging inaccuracy of an NPC PWD, in such cases, will not be investigated.

(B) An independent authoritative source. The employer may use an independent authoritative wage source in lieu of an NPC PWD. The independent authoritative source survey must meet all the criteria set forth in paragraph (b)(3)(iii)(B) of this section.
 * * * * *
(b) * * *

(3) * * *

(iii) * * *

(A) A copy of the prevailing wage finding from the NPC for the occupation within the area of intended employment.
 * * * * * * * * * *
(d) * * *

(2) In the event the Administrator obtains a prevailing wage from ETA pursuant to paragraph (d)(1) of this section, and the employer desires review, including judicial review, the employer shall challenge the ETA prevailing wage only by filing a request for review under § 656.41 of this chapter within 30 days of the employer's receipt of the PWD from the Administrator. If the request is timely filed, the decision of OFLC is suspended until the Center Director issues a determination on the employer's appeal. If the employer desires review, including judicial review, of the decision of the NPC Center Director, the employer shall make a request for review of the determination by the Board of Alien Labor Certification Appeals (BALCA) under § 656.41(e) of this chapter within 30 days of the receipt of the decision of *78068 the Center Director. If a request for review is timely filed with the BALCA, the determination by the Center Director is suspended until the BALCA issues a determination on the employer's appeal. In any challenge to the wage determination, neither ETA nor

the NPC shall divulge any employer wage data collected under the promise of confidentiality.

(i) Where an employer timely challenges an OFLC PWD obtained by the Administrator, the 30-day investigative period shall be suspended until the employer obtains a final ruling. Upon such a final ruling, the investigation and any subsequent enforcement proceeding shall continue, with the PWD as determined by the BALCA serving as the conclusive determination for all purposes.

(ii) [Reserved]

(3) For purposes of this paragraph (d), OFLC may consult with the NPC to ascertain the prevailing wage applicable under the circumstances of the particular complaint.

20 CFR § 655.1102

6. Amend § 655.1102 to add the definition of "Office of Foreign Labor Certification (OFLC)" to read as follows:

20 CFR § 655.1102

### § 655.1102 What are the definitions of terms that are used in these regulations?

* * * * *

Office of Foreign Labor Certification (OFLC) means the organizational component within the ETA that provides national leadership and policy guidance and develops regulations and procedures to carry out the responsibilities of the Secretary of Labor under the INA concerning foreign workers seeking admission to the United States.

* * * * *20 CFR § 655.1112

7. Amend § 655.1112 by revising paragraph (c)(2) to read as follows:

20 CFR § 655.1112

### § 655.1112 Element II—What does "no adverse effect on wages and working conditions" mean?

* * * * *

(c) * * *

(2) Determination of prevailing wage for H-1C purposes. In the absence of collectively bargained wage rates, the National Processing Center (NPC) having jurisdiction as determined by OFLC shall determine the prevailing wage for similarly employed nurses in the geographic area in accordance with administrative guidelines issued by ETA for prevailing wage determination requests submitted on or after the effective date of these regulations.

(i) Prior to the effective date of these regulations, the SWA having jurisdiction over the area of intended employment shall continue to receive and process prevailing wage determination requests in accordance with the regulatory provisions and Department guidance in effect prior to January 1, 2009. On or after the effective date of these regulations, the NPC shall receive and process prevailing wage determination requests in accordance with these regulations and with Department guidance. A facility seeking to determine the prevailing wage must request a prevailing wage determination from the NPC having jurisdiction for providing the prevailing wage over the proposed area of intended employment not more than 90 days prior to the date the attestation is submitted to the Department. The NPC must enter its wage determination on the form it uses and return the form with its endorsement to the employer. Once a facility obtains a prevailing wage determination from the NPC and files an attestation supported by that prevailing wage determination, the facility shall be deemed to have accepted the prevailing wage determination as accurate and appropriate (as to both the occupational classification and the wage rate) and thereafter shall not contest the legitimacy of that prevailing wage determination in an investigation or enforcement action pursuant to subpart M of this part.

(ii) A facility may challenge the prevailing wage determination with the NPC having provided such determination according to administrative guidelines issued by ETA, but must obtain a final ruling prior to filing an attestation.

* * * * *

### PART 656—LABOR CERTIFICATION PROCESS FOR PERMANENT EMPLOYMENT OF ALIENS IN THE UNITED STATES

8. The authority citation for part 656 is revised to read as follows:

Authority: 8 U.S.C. 1182(a)(5)(A), 1182(p)(1); sec.122, Public Law 101-649, 109 Stat. 4978; and Title IV, Public Law

105-277, 112 Stat. 2681.
 20 CFR § 656.3
9. Amend § 656.3 by revising the definitions of "Prevailing wage determination (PWD)" and "State Workforce Agency (SWA)" to read as follows:
 20 CFR § 656.3

## § 656.3 Definitions, for purposes of this part, of terms used in this part.
* * * * *
Prevailing wage determination (PWD) means the prevailing wage provided or approved by an OFLC National Processing Center (NPC), in accordance with OFLC guidance governing foreign labor certification programs. This includes PWD requests processed for purposes of employer petitions filed with DHS under Schedule A or for sheepherders.
* * * * *
State Workforce Agency (SWA), formerly known as State Employment Security Agency (SESA), means the state agency that receives funds under the Wagner-Peyser Act to provide employment-related services to U.S. workers and employers and/or administers the public labor exchange delivered through the state's one-stop delivery system in accordance with the Wagner-Peyser Act.
 * * * * *20 CFR § 656.15

## § 656.15 [Amended]
20 CFR § 656.15
10. Amend § 656.15:

a. By removing the words "in duplicate;" from paragraph (a); and

b. By removing paragraph (f) and redesignating paragraph (g) as paragraph (f).
 20 CFR § 656.40
11. Amend § 656.40 by revising paragraphs (a), (b) introductory text, (c), (g), (h) and (i) to read as follows:
 20 CFR § 656.40

## § 656.40 Determination of prevailing wage for labor certification purposes.
(a) Application process. The employer must request a PWD from the NPC, on a form or in a manner prescribed by OFLC. Prior to January 1, 2010, the SWA having jurisdiction over the area of intended employment shall continue to receive and process prevailing wage determination requests in accordance with the regulatory provisions and Department guidance in effect prior to January 1, 2009. On or after January 1, 2010, the NPC shall receive and process prevailing wage determination requests in accordance with these regulations and with Department guidance. The NPC will provide the employer with an appropriate prevailing wage rate. The NPC shall determine the wage in accordance with sec. 212(t) of the INA. Unless the employer chooses to appeal the center's PWD under § 656.41(a) of this part, it files the Application for Permanent Employment Certification either electronically or by mail with the processing center of jurisdiction and maintains the PWD in its files. The determination shall be submitted to the CO, if requested.

(b) Determinations. The National Processing Center will determine the appropriate prevailing wage as follows: * * *

(c) Validity Period. The National Processing Center must specify the validity period of the prevailing wage, which in no event may be less than 90 days or more than 1 year from the **78069** determination date. To use a prevailing wage rate provided by the NPC, employers must file their applications or begin the recruitment period required by §§ 656.17(e) or 656.21 of this part within the validity period specified by the NPC.
 * * * * *
(g) Employer-provided wage information. (1) If the job opportunity is not covered by a CBA, or by a professional sports league's rules or regulations, the NPC will consider wage information provided by the employer in making a PWD. An employer survey can be submitted either initially or after NPC issuance of a PWD derived from the OES survey. In the latter situation, the new employer survey submission will be deemed a new PWD request.

(2) In each case where the employer submits a survey or other wage data for which it seeks acceptance, the employer must provide the NPC with enough information about the survey methodology, including such items as sample size and source, sample selection procedures, and survey job descriptions, to allow the NPC to make a determination about the adequacy of

the data provided and validity of the statistical methodology used in conducting the survey in accordance with guidance issued by the OFLC national office.

(3) The survey submitted to the NPC must be based upon recently collected data.

(i) A published survey must have been published within 24 months of the date of submission to the NPC, must be the most current edition of the survey, and the data upon which the survey is based must have been collected within 24 months of the publication date of the survey.

(ii) A survey conducted by the employer must be based on data collected within 24 months of the date it is submitted to the NPC.

(4) If the employer-provided survey is found not to be acceptable, the NPC will inform the employer in writing of the reasons the survey was not accepted.

(5) The employer, after receiving notification that the survey it provided for NPC consideration is not acceptable, may file supplemental information as provided by paragraph (h) of this section, file a new request for a PWD, or appeal under § 656.41.

(h) Submittal of supplemental information by employer. (1) If the employer disagrees with the skill level assigned to its job opportunity, or if the NPC informs the employer its survey is not acceptable, or if there are other legitimate bases for such a review, the employer may submit supplemental information to the NPC.

(2) The NPC will consider one supplemental submission about the employer's survey or the skill level the NPC assigned to the job opportunity or any other legitimate basis for the employer to request such a review. If the NPC does not accept the employer's survey after considering the supplemental information, or affirms its determination concerning the skill level, it will inform the employer of the reasons for its decision.

(3) The employer may then apply for a new wage determination or appeal under § 656.41 of this part.

(i) Frequent users. The Secretary will issue guidance regarding the process by which employers may obtain a wage determination to apply to a subsequent application, when the wage is for the same occupation, skill level, and area of intended employment. In no case may the wage rate the employer provides the NPC be lower than the highest wage required by any applicable Federal, State, or local law.

(ii) [Reserved]
 * * * * *20 CFR § 656.41
12. Revise § 656.41 to read as follows:
 20 CFR § 656.41

## § 656.41 Review of prevailing wage determinations.

(a) Review of NPC PWD. Any employer desiring review of a PWD made by a CO must make a request for such review within 30 days of the date from when the PWD was issued. The request for review must be sent to the director of the NPC that issued the PWD within 30 days of the date of the PWD; clearly identify the PWD from which review is sought; set forth the particular grounds for the request; and include all the materials pertaining to the PWD submitted to the NPC up to the date of the PWD received from the NPC.

(b) Processing of request by NPC. Upon the receipt of a request for review, the NPC will review the employer's request and accompanying documentation, and add any material that may have been omitted by the employer, including any material the NPC sent the employer up to the date of the PWD.

(c) Review on the record. The director will review the PWD solely on the basis upon which the PWD was made and, upon the request for review, may either affirm or modify the PWD.

(d) Request for review by BALCA. Any employer desiring review of the director's determination must make a request for

review by the BALCA within 30 days of the date of the Director's decision.

(1) The request for review, statements, briefs, and other submissions of the parties and amicus curiae must contain only legal arguments and only such evidence that was within the record upon which the director made his/her affirmation of the PWD.

(2) The request for review must be in writing and addressed to the director of the NPC making the determination. Upon receipt of a request for a review, the director will assemble an indexed appeal file in reverse chronological order, with the index on top followed by the most recent document.

(3) The director will send the Appeal File to the Office of Administrative Law Judges, BALCA. The BALCA handles the appeals in accordance with §§ 656.26 and 656.27.

Signed in Washington, DC, this 12th day of December, 2008.

Brent R. Orrell,

Deputy Assistant Secretary, Employment and Training Administration.

Alexander J. Passantino,

Acting Administrator, Wage and Hour Division, Employment Standards Administration.


[FR Doc. E8-29995 Filed 12-18-08; 8:45 am]

BILLING CODE 4510-FP-P


Footnotes

| 1 | The SWAs are agencies of State Government that receive Federal Workforce Investment Act (WIA), Wagner-Peyser Act, and other funds to administer our nation's state-based employment services system and perform certain activities on behalf of the Federal Government. |
|---|---|
| 2 | On June 17, 2008, the Department transmitted draft legislation to the Congress that would amend the INA to provide the Department with authority to charge and retain a fee to recoup the costs of administering the H-2B labor certification program. FN3 The growth in the number of applications is explained in part by the increasing desire of employers for a legal temporary workforce and by legislation that permitted greater numbers of H-2B workers into the U.S. by exempting from the 66,000 annual cap any H-2B worker who had been counted against the numerical cap in previous years. See Save Our Small and Seasonal Businesses Act of 2005, Public Law 109-13, Div. B, Title IV, 119 Stat. 318 (effective May 11, 2005) (exempting from numerical cap for FY 2005 and FY 2006 returning H-2B workers who had counted against the cap in one of the three fiscal years preceding the fiscal year in which the visa petition was filed), and Save Our Small and Seasonal Businesses Act of 2006, included in the Defense Authorization Act for FY 2007, Sec. 1074, Public Law 109-364 (making amendment retroactive to October 1, 2006, and extending the exemption through FY 2007). These returning worker provisions expired September 30, 2007. 8 U.S.C. 1184(g)(9) (2007); INA sec. 214(g)(9); see also Sec. 14006, Public Law 108-287, 118 Stat. 951, 1014 (August 6, 2004) (exempting some fish roe occupations from the cap). |
| 4 | Further sanctions may be imposed by DHS. See 8 U.S.C. 1184(c)(14). |
| 5 | The Nursing Relief for Disadvantaged Areas Reauthorization Act of 2005, Public Law 109-423, took effect December 20, 2006. The Act reauthorized the H-1C nonimmigrant nurses program, a program originally created by the Nursing Relief for Disadvantaged Areas Act of 1999. |
| 6 | The Department notes that this cost is not new to the H-2B program because it has been required in program guidance. However, because it is new to the regulation, we have included it in this analysis. |
| 7 | The Department based this average on 10 locations with the highest number of H-2B applications, including the following: |

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Houston, Texas; Orlando, Florida; Vail, Colorado; Orange County, California; Cape Cod, Massachusetts; Detroit, Michigan; Baton Rouge, Louisiana; Houma, Louisiana; Columbus, Ohio; and Washington, DC.

FN8 The Department notes that this cost is based on the highest costs in each location. Fees are likely to be lower given that many newspapers offer lower rates for consecutive ads, for placing two ads in the same week, or for purchasing a Sunday and weekday ad.

9       The Department notes that this was the only occupation that could be paralleled with the industry classifications required by the SBA and described in 13 CFR 121.201. The landscape industry includes grounds keeping, lawn services, landscaping, tree planting, tree trimming, and tree surgeons. However, the Department does not require employers to list a North American Industry Classification System (NAICS) code for each employment position under the H-2B program, and therefore, the data calculated for this example is not as accurate as it would be with NAICS coding. For instance, some landscaping duties require bricklaying, which we note has been used as a separate employment category on some of the applications. Without the coding it is not possible to categorize occupations accurately. Therefore, the Department notes that we used this industry merely to provide an example of how this rule could affect a category of employers.

FN10 The cost of the rule ($166) divided by the projected annual receipts of the business.

---

**End of Document**                                                                © 2017 Thomson Reuters. No claim to original U.S. Government Works.