FILED
2017 Nov-30  AM 11:40
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

JAMES SULLIVAN, et al.,                )
                                       )
       Plaintiffs,              )
    v.                              )          Case No. 7:13-cv-01275-LSC
                                       )
PJ UNITED, INC., et al.,               )
                                       )
       Defendants.             )

## PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT FOR
## <u>PARTIAL SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

Statement of Undisputed Relevant Facts ............................................................1

   I.    Rule 30(b)(6) Depositions ...........................................................1

   II.   Corporate Representative Testimony Regarding Affirmative Defense 2: "Defendants assert the defense afforded by Section 10 of the Portal to Portal Act as to liability." ........................................................2

   III.  Corporate Representative Testimony Regarding Affirmative Defense 3: "Defendants assert the defense afforded by Section 11 of the Portal to Portal Act as to liquidated damages." ...............................................6

   IV.  Defendants' Contemporaneous Use of the Attorney-Client Privilege as Both a Shield and a Sword ........................................................8

   V.   Corporate Representative Testimony Regarding Affirmative Defense 4: "Defendants assert the FLSA's de minimis defense with regard to each workweek worked by each Plaintiff during the statutory recovery period." ..............................................................................10

   VI.  Defendants' Corporate Structure ..............................................11

   VII. Defendants' Policies with Regard to Driver Insurance ...........................13

   VIII. Defendants' Reimbursement Rate Policy .................................15

   IX.  Defendants' Failure to Keep Accurate Records ....................................18

   X.    Defendants Are a Single, or Alternatively Joint, Employer .....................19

   XI.  Defendants Are Not Entitled to Offset Damages with a Tip Credit...........23

Standard for Summary Judgment ...................................................25

Argument ..................................................................................26

   I.    Defendants Admit No Facts Support Their Second, Third, and Fourth Affirmative Defenses ..........................................................26

      A. Defendants Have the Burden of Proof to Establish Affirmative Defense......................................................................27

      B. Summary Judgment Should Be Granted on Defendants' Second Affirmative Defense ("Section 10 of the Portal to Portal Act," 29 U.S.C. § 259).....................................................27

    C. Summary Judgment Should Be Granted on Defendants' Third Affirmative Defense ("Section 11 of the Portal to Portal Act," 29 U.S.C. § 260)............................................................................32

    D. Summary Judgment Should Be Granted on Defendants' 4th Affirmative Defense ("The De Minimis Exception"). ...........................36

II.    Defendant Douglas Stephens Is Individually Liable ................................39

    A. Applicable Substantive Law..................................................................39

    B. There is No Genuine Issue of Material Fact Regarding Mr. Stephens' Status as an "Employer" Under the FLSA............................................41

III.   Defendants Must Reimburse a Portion of the Fixed Costs of Driving ......42

    A. Employee-Paid Costs Required by Employers to Perform the Job Must Be Reimbursed. ...........................................................................43

    B. The DOL Demands Reimbursement for Vehicle Insurance...................45

    C. Payments Shift Part of an Employer's Business Expense to Employees Must Be Reimbursed. ...........................................................................47

    D. All Transportation Costs Needed to Perform the Job of Delivery Driver Must Be Reimbursed.................................................................48

    E. Defendants' Argument about Delivery Drivers' Purchase of Vehicle Insurance Regardless of Their Employment Are Contrary to Law. ........49

IV. Defendants Used an Unlawful Reimbursement Rate ................................51

    A. Employers Must Reimburse at the IRS Standard Business Mileage Rate if They Do Not Track or Reimburse Actual Vehicle Costs............52

    B. Partial Summary Judgment Will Materially Simplify the Case.............57

V.    The Mt. Clemens Burden Shifting Applies and Plaintiffs' Claims May Be Proven by Representative Evidence ...................................................57

    A. The Mt. Clemens Burden of Proof and Representative Testimony. .......58

    B. The Regulations Provide the Duty to Keep Records of Actual Costs.....59

    C. Defendants Fail to Qualify for the DOL's Exception to Keeping Records of Actual Vehicle Costs. ......................................................62

VI. Defendants Are a Single, or Alternatively Joint, Employer ......................63

    A. Standard for Determining Single and Joint Employer. .........................64

B. There Is No Genuine Issue of Material Fact Regarding the Defendant Entities' Status as a "Single Integrated Enterprise."..............................66

1. Defendant entities have interrelated operations.................................66

2. Defendant entities have centralized control of labor relations...........66

3. Defendant entities share common management. ............................68

4. Defendant entities have common ownership and financial control.....70

C. There Is No Genuine Issue of Material Fact Regarding the Defendant Entities' Status as "Joint Employers."...................................................71

1. All Defendant entities benefit from the delivery drivers' labor..........71

2. All Defendant entities are not completely disassociated with respect to the delivery drivers' employment.................................................71

3. All Defendant entities share control of the delivery drivers because they are under common control........................................................73

VII. Tips in Excess of the Amount of the Tip Credit Are Not Considered in Determining Net Wages ........................................................................74

A. Tips in Excess of the Amount of a Tip Credit Cannot Offset Minimum Wage Deficits...................................................................................75

B. The Undisputed Facts Show No Genuine Issue of Material Fact Precluding Summary Judgment in Plaintiffs' Favor.............................82

# TABLE OF AUTHORITIES

## Cases

*Addison v. Huron Stevedoring Corp.*, 204 F.2d 88 (2nd Cir. 1953) ...................... 37

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................... 25

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) .......................... 36, 58

*Arnold v. Schreiber Foods, Inc.*, 690 F. Supp. 2d 672 (M.D. Tenn. 2010) ........... 37

*Arriaga v. Florida Pac. Farms, L.L.C.*,
305 F.3d 1228 (11th Cir. 2002) .................................................... 48, 49, 50, 61

*Auer v. Robbins*, 519 U.S. 452 (1997) ......................................................... 46, 47

*Bass v. PJCOMN Acq. Corp.*,
2011 U.S. Dist. LEXIS 58359 (D. Colo. June 1) ........................................... 79

*Bernal v. Vankar Enterprises, Inc.*, 579 F. Supp. 2d 804 (W.D. Tex. 2008) ......... 80

*Bonham v. The Cooper Cellar Corp.*, 476 F. Supp. 98 (E.D. Tenn. 1979) ........... 80

*Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981) ............................... 47

*Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500 (11th Cir. 1993) ........... 61

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................... 25

*Chan v. Sung Yue Tung Corp.*, 2007 WL 313483 (S.D.N.Y. Feb. 1) ................... 80

*Chan v. Triple 8 Palace, Inc.*, 2006 WL 851749 (S.D. N.Y. March 30) .............. 81

*Chao v. Tyson Foods, Inc.*, 568 F. Supp. 2d 1300 (N.D. Ala. 2008) .................... 37

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ................................................................................... 60

*Chisolm v. Gravitas Rest. Ltd.*, 2008 WL 838760 (S.D. Tex. March 25) ............. 80

*Cole v. Farm Fresh Poultry, Inc.*,
  824 F.2d 923 (11th Cir. 1987)........................................................28, 29, 30

*Cornish v. Deli Mgmt., Inc.*, 2016 WL 5934077 (D. Md. Oct. 12) .......................55

*Darrow v. WKRP Mgmt., LLC*, 2011 WL 2174496 (D. Colo. June 3).................55

*Dean v. 1715 Northside Dr., Inc.*,
  224 F. Supp. 3d 1302 (N.D. Ga. 2016) ........................................................28

*De Leon-Granados v. Eller & Sons Trees, Inc.*, 581 F. Supp. 2d 1295 ................39

*Dellsperger v. HPA Subway, Inc.*, 2012 WL 6728049 (S.D. Ala. Dec. 28)...........65

*Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113 (4th Cir. 1985) .........................59

*Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468 (11th Cir. 1982)................61

*EEOC v. Home Ins. Co.*, 672 F.2d 252 (2d Cir. 1982)........................................29

*Falk v. Brennan*, 414 U.S. 190 (1973)................................................................40

*Fast v. Applebee's Int'l., Inc.*, 638 F.3d 872 (8th Cir. 2011) .........................55, 76

*Fike v. Gold Kist, Inc.*, 514 F. Supp. 722 (N.D. Ala. 1981) ................................66

*Fuentes v. CAI Int'l., Inc.*, 728 F. Supp. 2d 1347 (S.D. Fla. 2010) ................35, 36

*Garay v. Hosp. Housekeeping Sys., LLC*,
  2013 WL 121526373 (M.D. Fla. Mar. 12) ....................................................40

*Garcia v. Frog Island Seafood, Inc.*,
  644 F. Supp. 2d 696 (E.D.N.C. 2009).................................................43, 44, 52

*Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 566 (Cal. 2007) ............55, 56

*Glenn L. Martin Nebraska Co. v. Culkin*,
  197 F.2d 981 (8th Cir. 1952)........................................................................36

*Harrell v. Diamond A Entm't., Inc.*, 992 F. Supp. 1343 (M.D. Fla 1997) ............. 80

*Harrison v. Ocean Bank*, 614 Fed. App'x. 429 (11th Cir. 2015) .................... 46, 47

*Hawkins v. E.I. du Pont de Nemours & Co.*,
12 W.H. Cases 448 (E.D. Va. 1955) ............................................. 37

*In re EchoStar Commc'ns. Corp.*, 448 F.3d 1294 (D.C. Cir. 2006) ..................... 35

*In the Matter of an Arbitration*, 2015 WL 8682313 (AAA) ................................ 56

*In the Matter of an Arbitration*, 2015 WL 8682319 (AAA) ................................ 56

*Joiner v. City of Macon*, 814 F.2d 1537 (11th Cir. 1987) ..................................... 33

*Jones v. Ward*, 2011 WL 1187807 (M.D. Ala. March 30) .................................. 64

*Jory v. U.S.*, 562 Fed. App'x. 926 (11th Cir. 2014) ........................................... 47

*Josendis v. Wall to Wall Resident Repairs, Inc.*,
662 F.3d 1292 (11th Cir. 2011) ..................................................... 60

*Klein v. L-3 Commc'ns. Corp.*, 2013 WL 5913776 (M.D. Ala. Nov. 1) ............... 65

*Klinedinst v. Swift Invs., Inc.*, 260 F.3d 1251 (11th Cir. 2001) ................. 45, 46, 55

*Lamonica v. Safe Hurricane Shutters, Inc.*,
711 F.3d 1299 (11th Cir. 2013) ......................................... 39, 40, 41

*Lamonica v. Safe Hurricane Shutters, Inc.*,
2011 WL 13173035 (S.D. Fla. Jan. 18) ......................................... 40

*Lanzetta v. Florio's Enters.*, 763 F. Supp. 2d 615 (S.D.N.Y. 2011) .................... 80

*Leal v. Delta Drivers Serv.*, 2010 WL 326051 (S.D. Fla. Jan. 21) ........................ 41

*Martin v. Tango's Rest., Inc.*, 969 F.2d 1319 (1st Cir. 1992) .............................. 79

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................. 26

*Mayheu's Super Liquor Store v. Hodgson*,
464 F.2d 1196 (5th Cir. 1972) ..................................................................... 47, 52

*McKenzie v. Davenport-Harris Funeral Home*,
834 F.2d 930 (11th Cir. 1987 ........................................................................ 65

*McLaughlin v. Ho Fat Seto*, 850 F.2d 586 (9th Cir. 1988) ................................... 59

*Meetz v. Wisconsin Hospitality Grp. LLC*,
2017 WL 3736776 (E.D. Wis. Aug. 29) .................................................. 78, 79

*Melgar v. CSK Auto, Inc.,* 2015 WL 9303977 (N.D. Cal. Dec. 22) ...................... 62

*Moreno v. Palmetto Printing, Inc.,*
2017 WL 2505962 (S.D. Fla. June 9) ........................................................... 40

*Morgan v. Family Dollar Stores,*
551 F.3d 1233 (11th Cir. 2008) ...............................................45, 46, 55, 58, 59

*Murphy v. Miller Brewing Co.*, 307 F. Supp. 829 (E.D. Wis. 1969) .................... 28

*Nealey v. University Health Servs.*, 114 F. Supp. 2d 1358 (S.D. Ga. 2000) .......... 66

*Outside the Box Innovations, LLC v. Travel Caddy, Inc.*,
455 F. Supp. 2d 1374 (N.D. Ga. 2006) ...................................................... 9, 35

*Partridge v. Mosley Motel of St. Petersburg Inc.*,
2016 WL 70705 (M.D. Fla. Jan. 6) ............................................................. 40

*Patel v. Wargo*, 803 F.2d 632 (11th Cir. 1986) ............................................. 40, 65

*Pena v. Handy Wash, Inc.,*
114 F. Supp. 3d 1239 (S.D. Fla. 2013) ................................................... 34, 35

*Perez v. Lorraine Enterpr., Inc.*, 769 F.3d 23 (1st Cir. 2014) ............................. 77

*Perrin v. Papa John's Int'l., Inc.*,
2013 WL 6885334 (E.D. Mo. Dec. 31)....................................... 34, 44, 52, 53

*Perrin v. Papa John's Int'l., Inc.,*
2014 WL 4749547 (E.D. Mo. Sept. 24).........................................................34

*Perrin v. Papa John's Int'l., Inc.,*
114 F. Supp. 3d 707 (E.D. Mo. 2015).......................... 50, 51, 75, 76, 77, 78, 79

*Rakip v. Paradise Awnings Corp.,*
2010 WL 4553675 (S.D. Fla. Nov. 3)...........................................................35

*Reich v. Chez Robert*, 28 F.3d 401 (3rd Cir. 1994).............................................81

*Reich v. Southern Md. Hosp.*, 43 F.3d 949 (4th Cir. 1995) ..................................59

*Reyes v. Aqua Life Corp.*, 632 Fed. App'x. 552 (11th Cir. 2015) ........................33

*Rezendes v. Domenick's Blinds & Décor, Inc.,*
2015 WL 3484835 (M.D. Fla. June 2)...........................................................40

*Rikard v. U.S. Auto Prot., LLC,*
2013 WL 5671342 (E.D. Mo. Oct. 17) ................................................... 37, 38

*Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892 (9th Cir. 2013).........................50

*Rodriguez v. Nike Retail Servs.,*
2017 WL 4005591 (N.D. Cal. Sept. 12) ........................................................37

*Sanchez v. Bland Farms, LLC,*
2011 WL 2457519 (S.D. Ga. June 16)...........................................................37

*Schultz v. Hinojosa,* 432 F.2d 259 (5th Cir. 1970)...............................................47

*Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761 (5th Cir. 1997) ........66

*SEC v. BankAtlantic Bancorp, Inc.,*
661 Fed. App'x. 629 (11th Cir. 2016) ..........................................................25

*SEC v. Wall St. Capital Funding, LLC,*
2011 U.S. Dist. LEXIS 63186 (S.D. Fla. June 10).............................................9

*Sec. of Labor v. DeSisto*, 929 F.2d 789 (1st Cir. 1991).........................................59

*Sierra Club v. Johnson*, 436 F.3d 1269 (11th Cir. 2006) ............................... 46, 47

*Solano v. A Navas Party Prod.,* 728 F. Supp. 2d 1334 (S.D. Fla. 2010) .............. 40

*Stuart v. Resurgens Risk Mgmt.,*
    2013 WL 2903571 (N.D. Ga. June 12) .......................................... 40

*Torres v. Rock & River Food, Inc.,* 244 F. Supp. 2d 1320 (S.D. Fla. 2016) ......... 40

*U.S. v. Vernon*, 723 F.3d 1234 (11th Cir. 2013) .................................... 27

*U.S. Dept. of Labor v. Cole Enters., Inc.*, 62 F.3d 775 (6th Cir. 1995) ................ 78

*Varner v. Video Indus. Servs.,*
    2012 U.S. Dist. LEXIS 196855 (N.D. Ala. April 2) ....................... 65

*Villalpando v. Exel Direct, Inc.*, 2016 WL 1598663 (N.D. Cal. April 21) ............ 62

*WASS v. NPC Int'l, Inc.*, 688 F. Supp. 2d 1282 (D. Kan. 2010) .......................... 53

*Williams v. Jacksonville Terminal Co.*, 315 U.S. 386 (1942) ............................... 74

*Zellagui v. MCD Pizza, Inc.*, 59 F. Supp. 3d 712 (E.D. Pa. 2014) .................. 53, 55

**Statutes and Regulations**

29 U.S.C. § 203 .................................................................. 39, 76, 79

29 U.S.C. § 206 ............................................................. 16, 43, 52, 76

29 U.S.C. § 211 ...................................................................... 60, 61

29 U.S.C. § 259 ...................................................................... 27, 28

29 U.S.C. § 260 ............................................................................ 32

29 C.F.R. § 516 ........................................................ 53, 59, 60, 61, 62

29 C.F.R. § 531 ........................................... 43, 44, 45, 46, 47, 48, 52, 77, 79

x

29 C.F.R. § 778.......................................................................................44, 52, 53

29 C.F.R. § 785.......................................................................................36, 37, 38

29 C.F.R. § 790.............................................................................................. 33

29 C.F.R. § 791.............................................................................. 39, 64, 66, 71

Plaintiffs, by and through counsel, move this Court to grant them partial summary judgment against Defendants pursuant to Fed. R. Civ. P. 56 and find that:

1. Defendants' affirmative defenses 2, 3, and 4 fail;

2. Defendant Douglas Stephens is individually liable for any minimum wage violations and resulting damages that are sustained against the Defendant entities;

3. insurance paid by delivery drivers is a recoverable expense when it is required in order to perform the job;

4. Defendants failed to comply with the legal requirements for employee vehicle reimbursements and failed to use reasonable vehicle reimbursement rates;

5. Defendants' failures to keep accurate records and failure to reimburse at the IRS rate entitle Plaintiffs to rely on representative evidence;

6. Defendants constitute a single employer or, alternatively joint employers;

7. Defendants are prohibited from relying on tip credits to achieve minimum wage.

In support thereof, Plaintiffs state as follows.

## STATEMENT OF UNDISPUTED RELEVANT FACTS[1]

## I. Rule 30(b)(6) Depositions

1. On March 26, 2017, Plaintiffs served their Rule 30(b)(6) deposition notice on Defendants. (Ex. 1). The deposition was noticed for May 10, 2017. (*Id*. at p.1). Included in the topics for inquiry was "Defendants' affirmative defenses." (*Id*. at p.3, topic 16).

2. However, at the time of the deposition Defendants had not yet filed their

---

[1] Hereinafter "SOF."

Answer. (Doc. 121 (Answer filed June 8, 2017)).

3.  On June 8, 2017, approximately a month after the Rule 30(b)(6) deposition occurred, Defendants finally filed their Answer, albeit untimely, and identified four affirmative defenses. (*Id.*).

4.  Plaintiffs then noticed a second Rule 30(b)(6) deposition for August 29, 2017. (Ex. 2). The topics for inquiry again included "Defendants' affirmative defenses." (*Id.* at p.2, topic 1).

5.  At both the first and second Rule 30(b)(6) depositions, Defendants produced Stephen Saunders, Vice President of Operations, as their corporate designee to respond to questions regarding all listed topics. (Ex. 3 (May 10, 2017 Saunders Dep.) at 11:11-12, 15:8-13; Ex. 4 (Aug. 29, 2017 Saunders Dep.) at 6:19-7:7).

## II. Corporate Representative Testimony Regarding Affirmative Defense 2: "Defendants assert the defense afforded by Section 10 of the Portal to Portal Act as to liability."

6.  In his deposition, Mr. Saunders denied that Defendants relied on any specific U.S. Department of Labor regulation in determining its vehicle reimbursement rate:

> Q.   In determining their vehicle reimbursement rate, did the team PJ United companies rely on any regulation issued by the U.S. Department of Labor?
>
> A.   Our intent with our reimbursement rates was to reimburse any additional out-of-pocket expenses that the drivers incurred while delivering pizzas.
>
> Q.   When I say "team PJ United companies," we used it in the first deposition in May to refer to all the operating companies and PJ United itself. If I use it in that sense during this deposition, will you understand what I mean?

2

A. Yes.

Q. I understand your answer, but I don't think it's responsive to the question I asked. Did the team PJ United companies rely on any administrative regulation issued by the U.S. Department of Labor in determining their reimbursement rate?

MR. HANCOCK: Object to the form.

A. I'm sorry. I'm trying to think back on anything specific that I read, that I can recall when going through this. But the intent of our reimbursement program was to reimburse for any direct cost that the employee had, reimburse expenses out of pocket.

Q. In preparing for today's deposition, did you look into what administrative regulations, if any, team PJ United relied on in determining their reimbursement rates for vehicle costs?

MR. HANCOCK: Object to the form.

A. No. I can tell you specific to the reimbursement rates, dealing specifically with reimbursement rates for vehicle use, it was very difficult to find specific guidance in any of the regulations. **So no, I would say that we did not rely on anything specific because it's all up to interpretation**.

(Ex. 4 at 13:19-15:7 (emphasis added)).

7. Mr. Saunders could not identify any order by the U.S. Department of Labor

that Defendants relied on in determining their vehicle reimbursement rate:

Q. In determining their vehicle reimbursement rate, did the team PJ United companies rely on any order of the U.S. Department of Labor?

MR. HANCOCK: What do you mean by "order"?

Q. Your answer, please.

A. What do you mean by "order"?

Q. Any time anyone from the U.S. Department of Labor ordered somebody to do something.

A. Specific to our company, or generally?

Q. Generally.

A. I'm sure that DOL regs were reviewed and considered in the development of our reimbursement program. Specifically, I don't remember.

(*Id.* at 16:20-17:8).

3

8. Mr. Saunders could not identify any ruling or opinion by the U.S. Department of Labor on which Defendants relied in determining their vehicle reimbursement rate:

> Q.    Did the team PJ United companies rely on any ruling by the U.S. Department of Labor in coming up with their vehicle reimbursement rate?
>
> A.    That, I could say --
>
> MR. HANCOCK: I'm going to object to the form and the use of these legal words. If you want to know what the basis of the defense is is one thing.
>
> Q.    Your answer, please.
>
> MR. HANCOCK: If you're going to --
>
> MR. POTASHNICK: This isn't a proper legal objection for a deposition.
>
> Q.    Your answer, please.
>
> A.    Any legal rulings, no. I researched legal rulings. I couldn't find any that would help with guidance. And I also researched any DOL opinion letters specific to vehicle reimbursements.
>
> Q.    And did you find any DOL --
>
> A.    I did not find any, no.
>
> Q.    Let me finish the question so the record comes out clear. Did you find any DOL opinion letters regarding vehicle reimbursements when you were determining the reimbursement rate?
>
> A.    No.

(*Id.* at 17:9-18:8).

9. Mr. Saunders admitted that Defendants did not rely on any approval by the U.S. Department of Labor in determining their vehicle reimbursement rate:

> Q.    Did the team PJ United companies rely on any approval by the U.S. Department of Labor in determining their vehicle reimbursement rate?
>
> A.    No.

(*Id.* at 18:9-12).

10. Mr. Saunders admitted that Defendants did not rely on any interpretation by the U.S. Department of Labor in determining their vehicle reimbursement rate:

> Q.      Yes. Did the team PJ United companies rely on any interpretation by the U.S. Department of Labor in determining their vehicle reimbursement rate?
> A.      An interpretation by the DOL?
> Q.      Yes.
> A.      No.

(*Id*. at 19:6-12).

11. Mr. Saunders admitted that Defendants did not rely on any administrative practice by the U.S. Department of Labor in determining their vehicle reimbursement rate:

> Q.      Did the team PJ United companies rely on any administrative practice of the U.S. Department of Labor in determining their vehicle reimbursement rate?
> A.      Not that I'm aware of, no.

(*Id*. at 19:13-17).

12. Mr. Saunders could not identify any enforcement policy of the U.S. Department of Labor that Defendants relied on in determining their vehicle reimbursement rate:

> Q.      Can you identify any specific enforcement policy of the U.S. Department of Labor which team PJ United companies relied on in determining their vehicle reimbursement rate?
> A.      No.

(*Id*. at 20:20-24).

13. Mr. Saunders admitted that Defendants were unaware of any specific administrative guidance on vehicle reimbursement rates:

Q.    Do you recall looking at any administrative regulation issued by the U.S. Department of Labor in determining the reimbursement rate for vehicle costs? When I say "you," I'm referring to you and team PJ United companies.

MR. HANCOCK: Object to the form.

A.    **There's no specific guidance on reimbursements other than for anything the employees come out of pocket for primary benefit of the employer that should be reimbursed.**

(*Id.* at 15:25-16:19 (emphasis added)).

14. Mr. Saunders could not identify any facts to support Defendants' affirmative defense based on Section 10 of the Portal-to-Portal Act:

Q.    What facts do you have to support affirmative defense Number 2 based on Section 10 of the Portal-to-Portal Act?

A.    I don't know.

(*Id.* at 39:3-6).

15. Further, Mr. Saunders admitted that Defendants did not keep records and reimburse drivers for any actual expenses:

Q.    One thing I forgot to ask before. Has the One thing I forgot to ask before. Has the their drivers' actual vehicle costs?

A.    No.

Q.    A repair here?

A.    No.

Q.    An oil change there?

A.    No.

(Ex. 3 at 109:20-110:4).

### III. Corporate Representative Testimony Regarding Affirmative Defense 3: "Defendants assert the defense afforded by Section 11 of the Portal to Portal Act as to liquidated damages."

16. To avoid burdening the Court with repetition, Plaintiffs expressly incorporate by reference the evidence set forth in the prior Section II.

17. Mr. Saunders, could not identify any act or omission that Defendants claim to have occurred in good faith to support their third affirmative defense:

Q. Are the team PJ United companies claiming that any omission of theirs was done in good faith in support of affirmative defense number three?

A. I'm not sure.

Q. What are you unsure about?

A. The answer to that question.

Q. Are the team PJ United companies contending that any act of theirs was done in good faith to support affirmative defense Number 3?

A. Like I said, I don't recall exactly what that was to be able to answer that.

Q. Are the team PJ United companies contending that any act of theirs was done in good faith to support affirmative defense Number 3?

A. Like I said, I don't recall exactly what that was to be able to answer that.

(Ex. 3 at 22:12-23).

18. On August 24, 2017, a week before the discovery cutoff, Defendants first disclosed that they intended to rely on the advice of their counsel, William Hancock, to show good faith. (Ex. 5). Mr. Saunders admitted, however, that Mr. Hancock had no input on Defendants' mileage reimbursement rate. (Ex. 4 at 26:2-4)):

Q. Did Mr. Hancock have any input into what the vehicle mileage reimbursement rate should be?

A. The specific rate, no.

Mr. Saunders further admitted that Defendants did not specifically ask Mr. Hancock what the vehicle reimbursement rate should be. (*Id.* at 24:21-25:3). Mr. Saunders

does not recall whether Defendants explained to Mr. Hancock how they determined their vehicle reimbursement rate. (*Id.* at 28:16-23).

19. Mr. Saunders could not identify any facts to support Defendants' third affirmative defense based on Section 11 of the Portal-to-Portal Act:

> Q.    What facts do you have to support affirmative defense Number
>       3 based on Section 11 of the Portal-to-Portal Act?
> A.    I don't know.

(*Id.* at 38:24-39:2).

## IV. Defendants' Contemporaneous Use of the Attorney-Client Privilege as Both a Shield and a Sword

20. Although Mr. Saunders testified that Mr. Hancock had no input into Defendants' vehicle reimbursement rate, Mr. Saunders also verified that only Mr. Hancock could testify to any legal authority on which he may have relied. (*Id.* at 28:24-29:9).

21. As stated in Paragraph 18, Defendants first indicated their intention to rely on counsel through an email sent August 24, 2017, one week before the close of discovery. (Ex. 5). That email stated that new disclosures pertain "to the statute of limitations issue, and if we get to that point, liquidated damages." (*Id.*). The email further stated that Defendants "offer the emails recognizing that there is likely a limited waiver of the attorney/client privilege with regard to my participation in the reimbursement discussions and FLSA compliance and related legal advice." (*Id.*).

The emails, relied on by Defendants, were sent by Douglas Stephens and Becky Gwarjanski. (*Id.*).

22. Plaintiffs' attorney responded to defense counsel's email a few hours later:

> Based on these new disclosures, can you produce Douglas Stephens and Becky Gwarjanski for depositions at your office on August 30, 2017? If so, what times?
>
> You have now waived the attorney client privilege regarding as to all communications "regarding the same subject matter" including "opinions that were communicated" by counsel to your client and you have waived work-product privilege "for any documents or opinions that embodies or discusses a communication to or from" your clients. *See, e.g., Outside the Box Innovations, LLC v. Travel Caddy, Inc.,* 455 F.Supp.2d 1374, 1376-77 (N.D. Ga. Oct. 6, 2006); *SEC v. Wall St. Capital Funding, LLC,* 2011 U.S. Dist. LEXIS 63186, *22 (S.D. Fla. June 10, 2011). Please produce all of those documents by Monday afternoon at the very latest.

(Ex. 6).

23. On August 28, 2017, Defendants expressly refused to produce Mr. Stephens or Ms. Gwarjanski for depositions. (Ex. 7). Defense counsel failed to respond to the request to take his deposition and further failed to respond to the request for further disclosures based on waiver of the attorney-client privilege. (*Id.*).

24. On September 1, 2017, Plaintiffs attorney wrote defense counsel:

> We adamantly disagree with your refusal to produce Mr. Stephens and Ms. Gwarjanski for depositions. You did not address our request for your deposition. Last week was the first time that your clients disclosed an intent to rely on counsel. Thus, we need to depose you. Please provide dates for that deposition or be clear about your refusal to appear.

(Ex. 8). To date, Defendants have not responded to the requests to depose their attorneys nor to requests for additional document production based on their waiver of the attorney-client privilege. (Ex. 9 (Declaration of Richard M. Paul III)).

## V. Corporate Representative Testimony Regarding Affirmative Defense 4: "Defendants assert the FLSA's *de minimis* defense with regard to each workweek worked by each Plaintiff during the statutory recovery period."

25. During one of his repeated, and improper, efforts to answer deposition questions on behalf of his clients, Mr. Hancock admitted that Defendants are not contending that anything sought by Plaintiffs in this litigation is *de minimis*:

> Q.   Are the team PJ United companies claiming that anything sought
>       by the plaintiffs in this lawsuit is de minimus?
> MR. HANCOCK: No.

(Ex. 4 at 36:9-12). Consistent with his attorney, Mr. Saunders could not identify anything Plaintiffs seek in this lawsuit that is *de minimis*:

> Q.   Are the team PJ United companies claiming in this lawsuit that
>       anything sought by the plaintiffs was de minimus?
> A.   I'm not sure.
> Q.   Is team PJ United claiming in this lawsuit that any time worked
>       by the plaintiffs is de minimus?
> A.   I'm not sure.

(*Id.* at 36:9-37:6).

26. Mr. Saunders was unable to testify to whether Defendants are claiming that it was administratively impractical to record any time worked by the Plaintiffs:

> Q.   Is team PJ United claiming in this lawsuit that it was
>       administratively impractical to record any time worked by the
>       plaintiffs?
> A.   Impractical to record any time worked by the plaintiffs?

Q.  Yes.
A.  We have all of their time records, to the best of my knowledge.
(*Id.* at 37:7-14).

27. Mr. Saunders explained that Defendants' fourth affirmative defense is based on some "shortfall to total minimum wage" but could not quantify an amount he would consider *de minimis.* (*Id.* at 37:15-38:7, 38:14-19).

28. Mr. Saunders could not identify any facts to support Defendants' fourth affirmative defense based on the *de minimis* rule:

Q.  What facts do you have to support affirmative defense Number
4 based on the de minimus defense?
A.  I don't know.
(*Id.* at 38:20-23).

## VI. Defendants' Corporate Structure

29. Mr. Stephens is the Defendant entities' "President and CEO." (Ex. 3 at 25:2-15).

30. Mr. Stephens is a director of all of the Defendant entities. (*Id.* at 35:4-11).

31. Mr. Stephens is at the top of the management hierarchy for all of the Defendant entities. (*Id.* at 37:6-38:12).

32. Mr. Stephens "is over the entire company." (*Id.* at 13:10-16 ("All of the companies are managed out of that address as far as Doug Stephens, my boss, who is over the entire company…")).

33. Mr. Stephens performs future planning for all of the Defendant entities. (*Id.* at 25:2-10).

11

34. Mr. Stephens "manages and directs" the Defendant entities "toward [their] primary objectives based on profit and return of fund capital." (*Id.* at 45:9-46:1; Ex. 10).

35. Mr. Stephens "establishes current and long-range objectives, plans, and policies." (*Id.* at 45:9-46:9; Ex. 10).

36. Mr. Stephens "dispenses advice, guidance, direction, and authorization to carry out major plans and procedures" for all Defendants. (*Id.* at 46:10-47:3; Ex. 10).

37. Mr. Stephens "oversees the adequacy and soundness of the [Defendant entities'] financial structure." (*Id.* at 47:4-13: Ex. 10).

38. Mr. Stephens "reviews operating results of the [Defendant entities], compares them to established objective, and takes steps to ensure that appropriate measures are taken to correct unsatisfactory results." (*Id.* at 47:14-48:5; Ex. 10).

39. Mr. Stephens can sign checks on behalf of the Defendant entities. (*Id.* at 44:10-16).

40. Mr. Stephens, along with his subordinates, has control over wages and reimbursements. (*Id.* at 61:2-13).

41. Defendants' vehicle reimbursement method "was a collaboration between Mr. Saunders, Bill Green, and Doug [Stephens]." (*Id.* at 42:7-19).

42. Both Mr. Saunders and Mr. Green report to Mr. Stephens. (*Id.* at 11:11-12, 13:1-16, 25:11-13, 25:16-17).

43. Mr. Stephens reviewed in detail and approved the Defendants' vehicle reimbursement method. (*Id.* at 109:2-14, 116:17-20).

44. Mr. Stephens participated in creating Defendants' written "Delivery Driver Mileage Reimbursement" policy. (Ex. 4 at 41:14-20; Ex. 11).

45. That same vehicle reimbursement method has been used by all of the Defendant entities. (Ex. 3 at 41:23-42:3 ("Q. Have any of the operating partners used a vehicle reimbursement method different from the others? A. No."), 42:10-19 ("Q. And the vehicle reimbursement method that you, Doug Stephens, and Bill Green came up with together is used at all the Team PJ United operating companies? A. Yes, its used as the minimum reimbursements.")).

46. Mr. Stephens ultimately determined Defendants' tip credit. (*Id.* at 60:20-22).

47. Mr. Stephens maintains an ownership interest in the Defendant entities. (*Id.* at 31:6-13).

## VII. Defendants' Policies with Regard to Driver Insurance

48. Defendants employ delivery drivers who are responsible for delivering pizzas and other food items to their customers. (Doc. 38 at ¶20; Doc. 58 at ¶20).

49. These drivers have all been non-exempt employees. (Ex. 3 at 65:13-20).

50. Defendants have required all their delivery drivers to pay for vehicle insurance in performing their jobs. (*Id.* at 65:21-66:16 (delivery vehicles must be insured), 206:9-207:10, 211:3-212:9, 215:20-216:2, 230:7-19, 232:14-234:1; Ex. 12

(Depo. Ex. 14) (Defendants require "proof of insurance"); Ex. 13 (Depo. Ex. 15) at p.12 (Defendants "require insurance in place at the time of hire [and Defendants] require insurance to be maintained at all times…"); Ex. 14 (Depo. Ex. 17) at p.2 (requiring insurance); Ex. 15 (Depo. Ex. 35) (requiring insurance); Ex. 16 (Depo. Ex. 36) ("Our drivers must … have … current automobile insurance…")).

51. Defendants concede that nearly all of the components of the overall cost of driving must be reimbursed to the extent such costs reduce net wages below the minimum, specifically including "gasoline consumed while delivering," "parts, fluids, repair, maintenance, and depreciation." (Doc. 142 at ¶¶ 3-4).

52. That leaves "automobile insurance" as the only one of the seven cost components that Defendants challenge the need to reimburse. (*Id.*).

53. Defendants employee handbook states:

> All Delivery Drivers are required to have automobile insurance in place at that time of hire. We require insurance to be maintained at all times that each driver carry his/her state's mandatory minimum insurance limits. Drivers are solely responsible for determining whether they have adequate insurance coverage, and should make appropriate inquiry with their insurance carrier. **Delivery Drivers insurance will be the primary source of automobile coverage**. PJU is not responsible for your car insurance payment. PJU, or our agents, reserve the right to verify either verbally or in writing from a delivery driver's insurance company or agent that the required insurance limits are in force, along with information relating to the duration of the policy. Delivery Drivers are required to provide a valid and current Declarations Page or an insurance card when hired and upon each and every renewal date of his/her policy. Drivers must also provide a Declarations Page or insurance care at the requires of his/her manager. All auto related

incidents and accidents must be reported to the driver's insurance carrier within 24 hours.

(Ex. 13 (Depo. Ex. 15) at p.12 (emphasis added); Ex. 3 at 209:22-212:2).

54. Defendants' "Risk Management Rules and Procedures" state that "[t]he Team Member's personal auto insurance is required as **primary coverage** for all accidents and/or incidents." (Ex. 15 at p.1 (emphasis added); Ex. 3 at 232:27-233:9).

## VIII.  Defendants' Reimbursement Rate Policy

55. Defendants employ delivery drivers who are responsible for delivering pizzas and other food items to Papa John's customers. (Doc. 38 at ¶20; Doc. 58 at ¶20).

56. This collective action is comprised of Defendants' former and current delivery drivers who filed a consent to join in this litigation. (Doc. 80).

57. These drivers are non-exempt employees. (Ex. 3 at 65:13-20).

58. Defendants have required all of their delivery drivers to provide, maintain, and pay for a vehicle that is legally-operable, reliable, safe and insured. (*Id.* at 65:21-66:16 (delivery vehicles must be "legally operable" and insured), 206:9-207:10, 211:3-212:9, 215:20-216:2, 230:7-19, 232:14-234:1; Ex. 17 (Delivery Driver Job Description, stating that Defendants require "proof of insurance"); Ex. 18 at p.12 (PJ United "Team Member Handbook, stating that Defendants "require insurance in place at the time of hire [and Defendants] require insurance to be maintained at all times…"); Ex. 19 at p.2 (PJ United Job Application of James Sullivan, stating that insurance is required); Ex. 20 (PJ United Driving Rules and Procedures, state that

"Unsafe and/or illegal driving will not be tolerated."); Ex. 21 (PJ United Risk Management Rules and Procedures, stating that "the state minimum limits of liability insurance should be kept active at all times."); Ex. 22 (PJ United Franchise Website, stating that "Our drivers must … have … reliable transportation, current automobile insurance…")).

59. Defendants did not track or maintain their delivery drivers' actual vehicle expenses. (Ex. 4 at 109:20-110:4 ("Q. … Has the Team PJ United entities ever kept track of their drivers' actual vehicle costs? A. No. Q. A repair here? A. No. Q. An oil change there? A. No.").)

60. Defendants' reimbursement rates have never exceeded the IRS standard business mileage rate, with only a few possible exceptions. (Ex. 4 at 32:17-33:25 (identifying 3 stores that reimburse over IRS rate due to small delivery areas, suggesting that reimbursements higher than IRS rate reimbursements have happened "randomly" at other stores, and acknowledging that such reimbursements over IRS rate may occur on specific days but not on workweek basis)).[2]

61. Defendants have produced their purported per-mile reimbursement rates for each 4-week period for most of their stores. (Ex. 23 (Defendants' spreadsheet titled "Historic Mileage with Miles Per Del – 071317 – Updated July 2017," Tab titled

---

[2] Minimum wage compliance is determined on a workweek basis, not on a daily basis. 29 U.S.C. § 206(a).

"Cents Per Mile")).

62. Defendants' per-mile reimbursement rates equate to the following annual average reimbursement rates:

| Year | Defendants' Average Annual Per-Mile Reimbursement Rate |
|------|--------------------------------------------------------|
| 2012 | $.2873 |
| 2013 | $.2837 |
| 2014 | $.2829 |
| 2015 | $.2786 |
| 2016 | $.2765 |
| 2017 | $.2768 |

(*Id.* at columns BL-BQ).

63. To the extent that Defendants have disclosed their reimbursements and average mileage, such reimbursements have been about half of the IRS standard business mileage rates:

| Year | IRS Standard Business Mileage Reimbursement Rate | Defendants' Average Annual Rate | Percentage Difference |
|------|--------------------------------------------------|--------------------------------|-----------------------|
| 2012 | $.555 | $.2873 | 48.2% |
| 2013 | $.565 | $.2837 | 49.8% |
| 2014 | $.560 | $.2829 | 49.5% |
| 2015 | $.575 | $.2786 | 51.5% |

17

| 2016 | $.540 | $.2765 | 48.8% |
| 2017 | $.535 | $.2768 | 48.3% |

(*Compare with* Ex. 24 (IRS Standard Mileage Rates webpage)).

## IX. Defendants' Failure to Keep Accurate Records

64. Plaintiffs allege that their net wages fell below the federal minimum wage due to unreimbursed vehicle costs. (Doc. 58).

65. Defendants did not keep records of Plaintiffs' actual vehicle costs. (Ex. 3 at 109:2-110:4).

66. Pursuant to Fed. R. Civ. P. 30(b)(6), Defendants corporate representative testified:

> Q.      …Has the Team PJ United entities ever kept track of their drivers actual vehicle costs?
> A.      No.
> Q.      A repair here?
> A.      No.
> Q.      An oil change there?
> A.      No.

(*Id.*).

67. Defendants did not and have not reimbursed their delivery drivers at the IRS rate, with only a possibly few exceptions. (Ex. 4 at 32:17-33:25).

68. To the extent that Defendants have disclosed their reimbursements and average mileage, such reimbursements have been about half of the IRS standard business mileage rates:

| Year | IRS Standard Business Mileage Reimbursement Rate | Defendants' Average Annual Rate | Percentage Difference |
|------|------|------|------|
| 2012 | $.555 | $.2873 | 48.2% |
| 2013 | $.565 | $.2837 | 49.8% |
| 2014 | $.560 | $.2829 | 49.5% |
| 2015 | $.575 | $.2786 | 51.5% |
| 2016 | $.540 | $.2765 | 48.8% |
| 2017 | $.535 | $.2768 | 48.3% |

(*Compare* Ex. 23 *with* Ex. 24).

## X. Defendants Are a Single, or Alternatively Joint, Employer

69. TPH Holdings, Inc. owns PJU Holdings, Inc., which owns PJ United, Inc. PJ United, Inc. owns 100% of the other Defendant entities. (Ex. 3 at 49:17-51:18, 34:18-35:3, 51:4-11; Ex. 25 (Corporate Organization Chart)).

70. President and CEO Douglas Stephens and the top management of the Defendant entities own stock in TPH Holdings. (Ex. 3 at 33:3-21, 34:9-13).

71. Stephens "manages and directs" all the Defendant entities "toward [their] primary objectives based on profit and return of fund capital." (*Id.* at 45:9-46:9; Ex. 10).

72. Stephens "establishes current and long-range objectives, plans, and policies" for all Defendant entities and "dispenses advice, guidance, direction, and authorization to carry out major plans and procedures" for all Defendants. (Ex. 3 at 45:9-47:3).

73. Stephens further "oversees the adequacy and soundness of the [Defendant entities'] financial structure" and "reviews operating results of the [Defendant entities], compares them to established objective, and takes steps to ensure that appropriate measures are taken to correct unsatisfactory results." (Ex. 3 at 47:4–48:5; Ex. 10).

74. All Defendants are managed out of the same office, which is located at 2800 Resource Drive in Birmingham, Alabama. (Ex. 3 at 13:8-14:5).

75. All Defendant entities exclusively operate Papa John's franchise stores. (*Id.* at 26:5-9, 26:17-27:13).

76. The Defendant entities management hierarchy is the same, with Douglas Stephens, President and CEO, at the top. (*Id.* at 37:6-38:10).

77. Stephens and PJU Holdings oversee and control all Defendant entities, and all Defendant entities have the same board of directors. (*Id.* at 13:10-16, 35:13-36:2, 35:4-12).

78. Stephens owns a part of each Defendant entity. (*Id.* at 31:6-13).

79. Bill Green is the Vice-President of all the Defendant entities, except PJ Cheese, but he oversees some of the PJ Cheese stores. (*Id.* at 24:5-25:1).

80. Stephen Saunders is the Vice-President of all Defendant entities. (*Id.* at 11:11-11:23).

81. Stephen Saunders has been in charge of all line items on the profit and loss statement and budgeting projections for both PJ Cheese and Ohio Pizza Delivery. (*Id.* at 12:7-19, 47:14-48:5).

82. Brad Leonard is the Chief Financial Officer ("CFO") for all Defendant entities. (*Id.* at 17:5-11).

83. Leonard is in charge of accounting for all Defendant entities and can sign checks for all entities that issue checks. (*Id.* at 42:23-44:16).

84. Stephens, Saunders, Green, Leonard, and "the operating partners" hold control over wages and reimbursements provided to employees of all Defendant entities. (*Id.* at 61:2-13).

85. Stephens determined all of the Defendant entities' tip credit. (*Id.* at 60:20-22).

86. Becky Gwarjanski is head of human resources and in charge of payroll records for all Defendant entities. (*Id.* at 43:6-17).

87. All of the Defendant entities' human resources functions are performed at the Defendant entities shared office. (*Id.* at 13:10-15, 213:14-214:1, 214:23-215:3).

88. Stacy Okelo is in charge of payroll for all the Defendant entities. (*Id.* at 39:22-40:17, 41:4-9).

89. All Defendant entities have used the same vehicle reimbursement method since 2008, which was devised by Stephens, Saunders, and Green and was ultimately

approved by Stephens. (*Id*. at 17:5-11, 41:23-42:22, 109:2-14, 116:17-20; Ex. 26 (PJ United, Inc. & Subsidiaries Mileage Reimbursement Amounts (per delivery)).

90. All the Defendant entities utilize the same employment documents, job applications, policies, handbooks, and training materials for all their delivery drivers. (Ex. 3 at 206:11-207:10, 211:12-212:11, 217:14-17, 217:21-218:15, 219:5-10, 219:14-224:13, 225:15-226:1, 226:3-227:6, 227:23-228:4, 228:8-229:4, 229:8-230:6, 230:10-231:12, 231:15-232:3, 232:3-233:9; Ex. 17; Ex. 18; Ex. 19; Ex. 20; Ex. 21; Ex. 27 (Background check form for delivery drivers); Ex. 28 (Motor vehicle record release form listing all defendant entities); Ex. 29 (Team PJ United Status Sheet); Ex. 30 (Direct deposit authorization form listing all Defendant entities); Ex. 31 (Standard "All-In-One" information sheet to record employee data); Ex. 32 (Papa John's New Hire Packet listing all the Defendant entities); Ex. 33 (Papa John's rules for employment listing all Defendant entities); Ex. 34 ("Dispute Resolution Program" handbook listing all Defendant entities); Ex. 35 (Agreement and receipt document for dispute resolution program listing all Defendant entities); Ex. 36 (Tip credit acknowledgment form titled "Notice to All Tipped Employees"); Ex. 37 (Team PJ United Distracted Driving Policy); Ex. 38 (Document titled "What to do in the event of auto accident" listing all Defendant entities); Ex. 39 (Safety and Security Policy)).

91. All Defendant entities use the same website. (Ex. 3 at 235:11-236:3; Ex. 22).

92. All Defendant entities provide the same employee benefits. (Ex. 3 at 235:20-236:2).

93. All Defendant entities use the same on-line hiring portal found on the same website used by all Defendant entities. (*Id*. at 236:3-237:8).

## XI. Defendants Are Not Entitled to Offset Damages with a Tip Credit

94. The opt-in period in the prior arbitration that was transferred to this Court began on December 16, 2015, and ended on March 15, 2016. (Ex. 40, ¶2 (Declaration of Mark Potashnick)).

95. Defendants operate approximately 169 Papa John's franchise stores. (Ex. 3 at 28:3-5, 29:7-18).

96. Defendants have used a tip credit to pay all of their delivery drivers, except for delivery drivers at one or two stores in Tennessee and one store in Louisiana. (*Id.* at 53:9-54:19).

97. Since about June 21, 2011, Defendants have expressly notified their delivery drivers in a form document that they "take[] a tip credit in the amount of the difference between minimum wage and $4.00 per hour, not to exceed the value of tips actually received" while the delivery drivers "are 'on-the-road.'" (*Id*. at 229:5-230:6; Ex. 36).

98. Before the summer of 2016, which covers the vast majority of the recovery period, Defendants never used a tip credit to increase the wages of their delivery

drivers above the minimum wage in states in which the federal minimum wage applies. (*Id.* at 57:7-58:9).[3]

99. Defendants have operated stores where opt-in Plaintiffs worked in Ohio, Missouri, and Illinois, each of which impose a minimum wage higher than the federal minimum. (*Id.* at 56:9-57:6).

100. Defendants did not use a tip credit to increase wages paid to their Ohio delivery drivers above Ohio's minimum wage prior to the summer of 2016. (*Id.* at 59:3-7).

101. Defendants never used a tip credit to increase their Illinois and Missouri delivery driver's wages above the applicable state minimum wages. (*Id.* at 60:9-19).

102. Defendants have calculated the delivery drivers' overtime rates by multiplying the amount of their hourly cash wages plus the amount of the tip credit actually taken by one and a half, and then deducting the tip credit for "on the road" time. (Ex. 41 (sampling of Defendants' pay stubs reflecting payment of overtime at 1.5 times the employee's regular rate (or less), and applying the tip credit taken)).

103. Defendants have not included any tips in excess of the amount of hourly cash wages plus the amount of the tip credits actually taken in calculating the delivery drivers overtime pay. (*Id.*).

---

[3] Beginning in Summer 2016, Defendants increased wages in "specific stores" above the minimum wage using a tip credit "[d]ue to staffing challenges." (Ex. 3 at 57:13-58:2).

104. In sum, before the summer of 2016, Defendants used a tip credit that applied to time spent "on-the-road" to achieve the delivery drivers' applicable minimum wage, for all of their 169 stores except possibly about 3 stores in Tennessee and Louisiana. (Ex. 3 at 53:9-54:19, 56:9-57:6, 57:7-58:9, 59:3-7, 60:9-19, 59:22-60:4, 229:5-230:6; Ex. 36).

105. In identifying minimum-wage violations and calculating damages by subtracting unreimbursed vehicle expenses from wages paid, Plaintiffs have given Defendants credit for all hourly wages paid and all tip credits actually taken by Defendants. (Ex. 41).

## STANDARD FOR SUMMARY JUDGMENT

One of the "principal purposes" of summary judgment is to isolate and dispose of issues and factually unsupported defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Without weighing the evidence or determining credibility, the Court may grant summary judgment when no genuine issue of material fact exists as to an issue and the movant is entitled to judgment as a matter of law. *Id.* at 322; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Partial summary judgment is a disposition of less than the whole action and serves as a useful tool to streamline litigation by establishing certain issues before trial where there is no genuine issue of material fact." *SEC v. BankAtlantic Bancorp, Inc.,* 661 Fed. App'x. 629, 630 n.1 (11th Cir. 2016). "Once the moving party has adequately supported its motion, the

nonmovant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**ARGUMENT**

## I. Defendants Admit No Facts Support Their Second, Third, and Fourth Affirmative Defenses

Defendants untimely asserted four affirmative defenses. (Doc. 121, at p.17). Those affirmative defenses are each one short sentence with no factual support. (*Id.*). Plaintiffs noticed a Rule 30(b)(6) deposition to identify the supporting facts. Mr. Stephens, Defendants' Director of Operations and Corporate Representative designee, admitted Defendants are not aware of any facts supporting three of their four affirmative defenses:

> Q.  What facts do you have to support affirmative defense Number 4 based on the *de minimus* defense?
> A.  I don't know.
> Q.  What facts do you have to support affirmative defense Number 3 based on Section 11 of the Portal-to-Portal Act?
> A.  I don't know.
> Q.  What facts do you have to support affirmative defense Number 2 that is based on Section 10 of the Portal-to-Portal Act?
> A.  I don't know.

(Ex. 3 at 38:20-39:6). Thus, summary judgment on these affirmative defenses is clearly warranted because Defendants have not, and cannot, come forth with evidence to show a genuine issue of material fact regarding those defenses.

**A. Defendants Have the Burden of Proof to Establish Affirmative Defense.**

It is axiomatic that a party asserting an affirmative defense holds the burden of proving that defense. *See, e.g., U.S. v. Vernon,* 723 F.3d 1234, 1269 (11th Cir. 2013).

**B. Summary Judgment Should Be Granted on Defendants' Second Affirmative Defense ("Section 10 of the Portal to Portal Act," 29 U.S.C. § 259).**

Section 10 of the Portal to Portal Act, 29 U.S.C. § 259, provides an affirmative defense for employers who prove they relied in good faith on administrative guidance, but nevertheless violated the FLSA:

> In any action or proceeding based on any act or omission on or after the date of the enactment of this Act [enacted May 14, 1947], no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

(*Id.* (hereinafter "the Section 259 Defense")).

The Eleventh Circuit recognizes that to successfully invoke the Section 259 Defense, an employer must "plead[] and prove[] that the act or omission complained of was (1) taken in good faith and was (2) in conformity with and (3) in reliance on

a written administrative interpretation by a designated agency." *Cole v. Farm Fresh Poultry, Inc.,* 824 F.2d 923, 926 (11th Cir. 1987) (citing 29 U.S.C. § 259 and collecting cases). "The administrative interpretation relied upon must provide a clear answer to the particular situation in order for the employer to rely on it." *Id.* at 928. "In passing this statute, 'Congress intended to exonerate only those who relied upon formal rulings.'" *Dean v. 1715 Northside Dr., Inc.,* 224 F. Supp. 3d 1302, 1312 (N.D. Ga. 2016) (quoting *Murphy v. Miller Brewing Co.,* 307 F. Supp. 829, 838 (E.D. Wis. 1969)).

In *Cole*, the Eleventh Circuit reversed a district court's finding that the employer was exonerated by Section 259 for two reasons: (1) the administrative guidance relied on did not provide a clear answer to the particular situation and (2) the employer did not act in compliance with that administrative guidance, *Cole*, 824 F.2d at 927-30. First, the Eleventh Circuit found that an interpretive bulletin ("the Bulletin") issued by the U.S. Department of Labor Wage and Hour Division contained only "general rules" regarding the amount of waiting time that may go uncompensated, which depend on the circumstances. *Id.* at 927. That Bulletin did not establish any specific amount of waiting time that may go uncompensated and provided no clear answer:

> Nothing in the regulations printed within the Bulletin contained any dispositive elaboration regarding how to choose a particular length of waiting period that must be compensated beyond the general language that "periods during which an employee is completely relieved from

28

> duty and which are long enough to enable him to use the time
> effectively for his own purposes are not hours worked." 29 C.F.R.
> 785.116. Thus the guidelines provided some general advice about
> appropriate factors to consider in determining whether time in
> particular situations was compensable under the FLSA, but they left
> individual employers to their own devices in determining compensable
> time under all the particular circumstances not specifically mentioned
> as examples in the guidelines. And nothing in the Bulletin provided
> even any general guidance regarding how to determine how much
> waiting time would be long enough in particular circumstances to allow
> employees to make effective personal use of the waiting period.

*Id.* at 927-29. Moreover, although the Bulletin provided some examples, none were

closely analogous to the employer's business. *Id.* The Eleventh Circuit found that

because "the Bulletin itself does not claim to establish a particular rule upon which

an employer may rely in order to determine what length and type of waiting period

is compensable time worked under the particular facts of this case … it was in fact

simply impossible for [the employer] to rely on it." *Id.* at 927. Moreover, in rejecting

the employer's reliance on general principles set forth in the Bulletin, the Eleventh

Circuit pointed out that "[a]ccepting [the employer's] argument that the Bulletin

provides sufficient guidance to satisfy the reliance requirement of section 259 would

mean that any employer could establish a good-faith defense simply by showing that

it 'relied' on a general administrative guideline that provided no opinion regarding

the employer's particular situation." *Id.* at 928 (citing *EEOC v. Home Ins. Co.,* 672

F.2d 252, 264-65 (2nd Cir. 1982) (holding that reliance was not possible and

therefore Section 259's requirements were not satisfied where guidelines in question failed to provide relevant guidance)).

Like in *Cole*, Defendants here identify no administrative guidance of any kind that they relied on that provides a clear answer regarding the amount of vehicle reimbursements. (SOF ¶¶ 6, 7, 8, 9, 10, 11, 12, and 13.). Further, Mr. Saunders admitted Defendants **"did not rely on anything specific because it's all up to interpretation."** (SOF ¶6 (emphasis added)). He also admitted that **"[t]here's no specific guidance on reimbursements other than for anything the employees come out of pocket for primary benefit of the employer that should be reimbursed."** (SOF ¶13 (emphasis added)). Defendants also admit they cannot identify any facts supporting their Section 259 Defense. (SOF ¶14). These admissions warrant summary judgment on Defendants' Section 259 Defense.

Assuming *arguendo* that the DOL's Bulletin referenced in *Cole* provided administrative guidance sufficient to support the Section 259 Defense, the Eleventh Circuit found that the Section 259 Defense also failed to apply because the employer did not act in conformity with the administrative guidance. The Eleventh Circuit relied on the district court's finding that waiting time of less than at least one hour must be compensated according to the general principles set forth in the Bulletin, but the employer did not compensate such time. *Cole* 824 F.2d at 929.

Far worse than the employer in *Cole*, Defendants here completely missed the mark on compliance with the actual written administrative guidance regarding vehicle reimbursement rates. The Department of Labor's Field Operations Handbook ("FOH") specifically advises employers operating **"pizza or other carry-out type restaurants"** to either reimburse their delivery drivers at the IRS standard business mileage rate or track and reimburse actual vehicle expenses:

> **Car expenses – employee's use of personal car on employer's business.**
>
> In some cases it is necessary to determine the costs involved when employees use their cars on the employer's business in order to determine MW [minimum wage] compliance. For example, car expenses are frequently an issue for delivery drivers employed by pizza or other carry-out type restaurants.
>
> (a) As an enforcement policy, the Internal Revenue Service (IRS) standard business mileage rate found in IRS Publication 917, "Business Use of a Car" may be used (in lieu of actual costs and associated recordkeeping) to determine or evaluate the employer's wage payment practices for FLSA purposes. The IRS standard business mileage rate (currently 28 cents per mile) represents depreciation, maintenance and repairs, gasoline (including taxes), oil, insurance, and vehicle registration fees. In situations where the IRS rate changes during the investigation period, the applicable rates should be applied on a pro-rata basis.
>
> (b) The IRS standard business mileage rate may be used in lieu of actual costs for FLSA purposes whether or not the employee will be able to take a deduction on his or her tax return for the business use of the employee's car.

FOH § 30c15 (emphasis in original).

By their own admission, and contrary to FOH § 30c15, at best Defendants only reimburse a small percentage of their delivery drivers at or above the IRS standard business mileage rate. (*Compare* Ex. 4 at 31:22-33:18 (claiming that reimbursements at or above IRS rate sometimes occur at 3 stores with small delivery areas)[4] *with* Ex. 3 at 28:3-5; 29:7-18 (Defendants operate total of 169 stores)). Moreover, Defendants admit they did not keep records and reimburse drivers for any actual expenses. (SOF ¶15 (Q. …Has the Team PJ United entities ever kept track of their drivers' actual vehicle costs? A. No. Q. A repair here? A. No. Q. An oil change there? A. No.")). Because Defendants failed to comply with the only written administrative guidance regarding the proper vehicle reimbursement rate, their Section 259 Defense fails. *Cole,* 824 F.2d at 929.

## C. Summary Judgment Should Be Granted on Defendants' Third Affirmative Defense ("Section 11 of the Portal to Portal Act," 29 U.S.C. § 260).

Section 11 of the Portal to Portal Act, 29 U.S.C. § 260, provides an affirmative defense to an award of statutory liquidated damages, but not to liability:

> In any action commenced prior to or on or after the date of the enactment of this Act [May 14, 1947] to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended [29 USCS §§ 201 et seq., generally; for full classification, consult USCS Tables volumes], if the employer shows to the satisfaction of the court that the act or

---

[4] Plaintiffs dispute Defendants' contention that they reimbursed delivery drivers at three stores at or above the IRS reimbursement rate, but Plaintiffs accept that contention for purposes of this motion.

> omission giving rise to such action was in good faith and that he had
> reasonable grounds for believing that his act or omission was not a
> violation of the Fair Labor Standards Act of 1938, as amended [29
> USCS §§ 201 et seq., generally; for full classification, consult USCS
> Tables volumes], the court may, in its sound discretion, award no
> liquidated damages or award any amount thereof not to exceed the
> amount specified in section 16 of such Act [29 USCS § 216].

*Id.* (hereinafter "the Section 260 Defense"). There are two requirements to such an

exercise of discretion by the court: "(1) [t]he employers must show to the satisfaction

of the court that the act or omission giving rise to such action was in good faith; and

(2) that [they] had reasonable grounds for believing that his act or omission was not

a violation of the [FLSA]." 29 C.F.R. § 790.22(b). "What constitutes good faith on

the part of an employer and whether he had reasonable grounds for believing that

his act or omission was not a violation of the [FLSA] are mixed questions of fact

and law, which should be determined by objective tests." 29 C.F.R. § 790.22(c).

"Under the FLSA, liquidated damages are mandatory absent a showing of good faith

by the employer." *Reyes v. Aqua Life Corp.,* 632 Fed. App'x. 552, 555 (11th Cir.

2015) (citing 29 U.S.C. § 216(b); *Joiner v. City of Macon*, 814 F.2d 1537, 1538-39

(11th Cir. 1987)).

Defendants cannot claim reliance on administrative guidance to support their

Section 260 Defense for the same reasons they could not rely on administrative

guidance to support their Section 259 Defense. Only one week before the discovery

cutoff, Defendants first claimed they were relying on advice of counsel to support

33

their Section 260 Defense. (SOF ¶17). But Defendants admit their counsel had no input into determining their vehicle reimbursement rate. (*Id.*). They also admit they did not specifically ask their attorney what the vehicle reimbursement rate should be (*Id.*) and Defendants do not know whether they even explained to their attorney how they determined their vehicle reimbursement rate (*Id.*). The single crux of this case is whether Defendants' reimbursement rate was reasonable. *See, e.g., Perrin v. Papa John's Int'l., Inc.,* 2013 WL 6885334, *6-7 (E.D. Mo. Dec. 31) (recognizing that class claim revolves on reasonableness of employer's vehicle reimbursement method); *Perrin v. Papa John's Int'l., Inc.,* 2014 WL 4749547, *5 (E.D. Mo. Sept. 24) (recognizing both sides hired experts to advocate for competing reasonable vehicle reimbursement rates). Defendants admit their attorney did not participate in that decision. Thus, Defendants' Section 260 Defense must fail as a matter of law.

Moreover, Defendants cannot offer any admissible evidence regarding reliance on counsel because they attempt to contemporaneously use advice of counsel as a "shield and sword." Defendants refused to produce their two representatives who may have sought advice of counsel for depositions; they refused to respond to requests to depose their counsel who purportedly provided legal advice; and they refused to produce documents regarding the same subject matter. These refusals to waive the attorney/client privilege preclude a reliance on counsel defense. *See, e.g., Pena v. Handy Wash, Inc.,* 114 F. Supp. 3d 1239, 1243-45 (S.D. Fla. 2013) (barring

defendants from relying on advice of counsel to show good faith and lack of willfulness in FLSA claims because defendants refused to disclose related evidence); *Outside the Box Innovations, LLC v. Travel Caddy, Inc.,* 455 F. Supp. 2d 1374, 1376-77 (N.D. Ga. 2006) ("'when a party defends its actions by disclosing an attorney-client communication, it waives the attorney-client privilege as to all such communications regarding the same subject matter.'") (quoting *In re EchoStar Commc'ns. Corp.,* 448 F.3d 1294, 1301 (D.C. Cir. 2006)).

Still further, Defendants improperly attempt to rely on impermissible "inferential hearsay." *Pena,* 114 F. Supp. 3d at 1243-45. The *Pena* Court refused to permit evidence of communications with counsel to create an inference of an attempt to comply with the FLSA, without disclosure of the full contents of the communications with counsel. *Id.*

Importantly, the *Pena* Court also recognizes that "'mere reliance on the advice of counsel is insufficient to satisfy defendants' burden in proving their good faith....'" *Id.* at 1244 (quoting *Fuentes v. CAI Int'l., Inc.,* 728 F. Supp. 2d 1347, 1358 (S.D. Fla. 2010) (denying summary judgment to defendants on defense of good faith reliance on advice of counsel where defendants failed "to identify record evidence to establish what they disclosed to their attorney in seeking and obtaining his advice and whether that legal advice was reasonable") (citing *Rakip v. Paradise Awnings Corp.,* 2010 WL 4553675, *6 (S.D. Fla. Nov. 3) (denying summary judgment on

defense of good faith reliance on advice of counsel, finding declaration "that simply states that Paradise Awnings received legal advice about whether it was properly paying the Plaintiffs, and that the advice was that the Plaintiffs were exempt from the FLSA," insufficient).  Moreover, the *Pena* Court also explained that "'[t]o reap the benefit of the good faith defense of [29 U.S.C. §] 260 based on the advice of counsel the defendant must honestly and truly seek the advice of counsel, counsel must give advice that is reasonable in a legal sense, and the defendant must act in strict conformity with that advice.'" *Id.* (quoting *Fuentes,* 728 F. Supp. 2d at 1358)). Thus, Defendants' reliance on communications with counsel should be rejected because, absent revealing counsel's actual advice and the related documents, such reliance fails as a matter of law.

### D. Summary Judgment Should Be Granted on Defendants' 4th Affirmative Defense ("The *De Minimis* Exception").

The FLSA's *de minimis* affirmative defense is set forth in 29 C.F.R. § 785.47:

> In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis. (*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)). This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him. *See Glenn L. Martin Nebraska Co. v. Culkin*, 197 F.2d 981, 987 (8th Cir. 1952), cert.

> denied, 344 U.S. 866 (1952), rehearing denied, 344 U.S. 888 (1952), holding that working time amounting to $1 of additional compensation a week is 'not a trivial matter to a workingman,' and was not de minimis; *Addison v. Huron Stevedoring Corp.*, 204 F.2d 88, 95 (2d Cir. 1953), cert. denied 346 U.S. 877, holding that 'To disregard workweeks for which less than a dollar is due will produce capricious and unfair results.' *Hawkins v. E.I. du Pont de Nemours & Co.*, 12 W.H. Cases 448, 094 (E.D. Va., 1955), holding that 10 minutes a day is not de minimis.

29 C.F.R. § 785.47 (emphasis added); *see also, e.g., Chao v. Tyson Foods, Inc.,* 568 F. Supp. 2d 1300, 1321 (N.D. Ala. 2008) ("29 C.F.R. § 785.47 provides for application of the de minimis defense 'only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities.'"); *Sanchez v. Bland Farms, LLC,* 2011 WL 2457519, *9 (S.D. Ga. June 16) (same). The employer holds the burden of proving the *de minimis* defense. *See, e.g., Rodriguez v. Nike Retail Servs.,* 2017 WL 4005591, *6 (N.D. Cal. Sept. 12); *Rikard v. U.S. Auto Prot., LLC,* 2013 WL 5671342, *4 (E.D. Mo. Oct. 17); *Arnold v. Schreiber Foods, Inc.*, 690 F. Supp. 2d 672, (M.D. Tenn. 2010).

Summary judgment is warranted on Defendants' *de minimis* defense as Defendants cannot show that time worked by their delivery drivers was either insubstantial or insignificant or that such time cannot be practically recorded. 29 C.F.R. § 785.47. Mr. Saunders admitted both that there was no amount of time too small to be paid that there was no amount of time worked by the employees that was

infeasible to track. (SOF ¶25). Moreover, Mr. Saunders clearly admitted he had no facts to support the *de minimis* defense. (SOF ¶26).

In *Rikard v. U.S. Auto Prot., LLC*, the Court granted summary judgment on a *de minimis* affirmative defense based on strikingly similar facts. There, the defendants' corporate representative denied there was any work time that was impractical to track. *Rikard,* 2013 WL 5671342 at *5. *Rikard* recognized that the *de minimis* defense "applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities." *Id.* (citing 29 C.F.R. 785.47). That Court concluded that "[i]n the instant case two individual Defendants, including Defendants' Rule 30(b)(6) designee, affirmed during their depositions that there were no periods of time incapable of being recorded for payroll purposes. Under these circumstances, Defendants cannot establish the de minimis affirmative defense, and so this portion of Plaintiffs' Motion for Summary Judgment must be granted." *Id.* Defendants' *de minimis* defense fails as a matter of law for the same reason.

Defendants' *de minimis* defense also fails because Defendants are claiming that a minimum wage deficit can be *de minimis,* rather than an amount of work time being *de minimis.* That is simply not an affirmative defense under 29 U.S.C. § 785.47.

## II. Defendant Douglas Stephens Is Individually Liable

The Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, provides for liability of individuals as well as entities. The Eleventh Circuit holds that "a corporate officer with operational control of a corporation's covered enterprise" is jointly and severally liable, along with the employing entity, under the FLSA for unpaid wages. *Lamonica v. Safe Hurricane Shutters, Inc.,* 711 F.3d 1299, 1309 (11th Cir. 2013). In this case, Defendants' own admissions establish overwhelmingly that Defendant Douglas Stephens is "a corporate officer with operational control" over all of the Defendant entities, and he may therefore be held jointly and severally liable, along with the Defendants-entities, for any damages owed as a result of a judgment in Plaintiffs' favor.

### A. Applicable Substantive Law.

The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Further, the term "person" is also broadly defined by the FLSA to include an "individual." 29 U.S.C. § 203(a). Thus, an individual who acts directly or indirectly in the interest of an employer in relation to an employee may be subject to individual liability under the FLSA. *Id.*; 29 C.F.R. § 791.2(b)(2). "Supreme Court precedent holds that there may be several simultaneous employers of any individual worker." *De Leon-*

*Granados v. Eller & Sons Trees, Inc.,* 581 F. Supp. 2d 1295, 1303 (N.D. Ga. 2008) (citing *Falk v. Brennan,* 414 U.S. 190, 195 (1973)).

The Eleventh Circuit has concluded that this definition of "employer" extends liability to "a corporate officer with operational control of a corporation's covered enterprise." *Lamonica*, 711 F.3d at 1309. Such persons are jointly and severally liable, along with the employing entity, for unpaid wages. *Id.* The determination of whether an individual is an employer is a question of law for the court. *Garay v. Hosp. Housekeeping Sys., LLC,* 2013 WL 12152673, *6 (M.D. Fla. Mar. 12) (citing *Patel v. Wargo,* 803 F.2d 632, 634 & n.1 (11th Cir. 1986)); *Solano v. A Navas Party Prod.,* 728 F. Supp. 2d 1334, 1340 (S.D. Fla. 2010) (citing *Patel*, 803 F.2d at 634 & n.1).

Accordingly, courts in this Circuit have repeatedly granted plaintiffs' motions for partial summary judgment on the issue of individual liability in FLSA cases where the uncontroverted facts establish that individual defendants at issue had operational control of the entity defendant. *See, e.g., Moreno v. Palmetto Printing, Inc.,* 2017 WL 2505962, *3 (S.D. Fla. June 9); *Torres v. Rock & River Food, Inc.,* 244 F. Supp. 2d 1320, 1331-32 (S.D. Fla. 2016); *Partridge v. Mosley Motel of St. Petersburg Inc.,* 2016 WL 70705, *7-8 (M.D. Fla. Jan. 6); *Rezendes v. Domenick's Blinds & Décor, Inc.,* 2015 WL 3484835, *14 (M.D. Fla. June 2); *Stuart v. Resurgens Risk Mgmt,* 2013 WL 2903571, *11-14 (N.D. Ga. June 12); *Lamonica v. Safe Hurricane*

*Shutters, Inc.,* 2011 WL 13173035, *5 (S.D. Fla. Jan. 18), aff'd. at 711 F.3d 1299;

*Leal v. Delta Drivers Serv.,* 2010 WL 326051, *3-4 (S.D. Fla. Jan. 21).

### B. There is No Genuine Issue of Material Fact Regarding Mr. Stephens' Status as an "Employer" Under the FLSA.

Corporate officers with operational control of a corporation's covered enterprise are individually liable under the FLSA. *Lamonica,* 711 F.3d at 1309. Defendants admit that Mr. Stephens is a corporate officer with operational control of a corporation's covered enterprise. (SOF ¶¶ 31-47).

First, Defendants clearly admit that Mr. Stephens is a corporate officer. (SOF ¶¶ 29-30). Specifically, he is the President and CEO of all the Defendant entities. (SOF ¶29). He serves as a director of all of the Defendant entities (SOF ¶30). Mr. Stephens is at the top of the management hierarchy for all of the Defendant entities. (SOF ¶31). Mr. Stephens "is over the entire company." (SOF ¶32).

Second, Defendants admit that Mr. Stephens maintains operational control over all of the Defendant entities. Defendants admit that he performs future planning for all of the Defendant entities (SOF ¶33); he "manages and directs" the Defendant entities "toward [their] primary objectives based on profit and return of fund capital" (SOF ¶34); he "establishes current and long-range objectives, plans, and policies" (SOF ¶35); Mr. Stephens "dispenses advice, guidance, direction, and authorization to carry out major plans and procedures" for all the Defendant entities (SOF ¶36); he "oversees the adequacy and soundness of the [Defendant entities'] financial

41

structure" (SOF ¶37); he "reviews operating results of the [Defendant entities], compares them to established objective, and takes steps to ensure that appropriate measures are taken to correct unsatisfactory results" (SOF ¶38); and Mr. Stephens signs checks on behalf of the Defendant entities (SOF ¶39).

Third, and specific to the violations alleged in this suit, Defendants admit that Mr. Stephens has control over wages and vehicle cost reimbursements (SOF ¶40); Defendants' vehicle reimbursement method was a collaboration between Mr. Stephens and two of his subordinates (SOF ¶¶ 41-42); Mr. Stephens reviewed in detail, and approved, the Defendants' vehicle reimbursement method (SOF ¶43); and Mr. Stephens participated in creating Defendants' written "Delivery Driver Mileage Reimbursement" policy. (SOF ¶¶ 44-45). Further, Defendants admit that Mr. Stephens ultimately determined Defendant's tip credit. (SOF ¶46).

In sum, the undisputed facts, wholly based on Defendants' own express admissions, overwhelmingly establish that Mr. Stephens was a corporate officer with operational control over all of the Defendant entities, he is an "employer" under the FLSA, and he should be found jointly and severally liable to the same extent as the other Defendants as a matter of law.

## III.    Defendants Must Reimburse a Portion of the Fixed Costs of Driving

Defendants seek to avoid reimbursing for vehicle insurance costs that reduce net wages below the federal minimum wage. However, Defendants specifically require

that the employees purchase vehicle insurance that provides the "primary coverage" for accidents that occur on the job as a condition of working as a delivery driver. Defendants must reimburse for such insurance to the extent that the cost reduces net wages below the federal minimum wage pursuant to (a) the express language of the U.S. Department of Labor's ("DOL's") "anti-kickback regulation," (b) the DOL's interpretative guidance, (c) a controlling pre-split Fifth Circuit Decision, (d) a controlling Eleventh Circuit decision, and (e) the law applicable to minimum wage claims based on under-reimbursed vehicle costs. Thus, the Court should grant summary judgment on the issue of whether Defendants must reimburse for insurance costs.

### A. Employee-Paid Costs Required by Employers to Perform the Job Must Be Reimbursed.

Employers must pay minimum wage, 29 U.S.C. § 206, "free and clear" of job-related expenses incurred by the employee. 29 C.F.R. § 531.35. Otherwise, an employer can avoid the minimum-wage requirements by shifting job-related costs onto the employee. *Id.*; *Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696, 705 (E.D.N.C. 2009).

Thus, "if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employers' particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the

minimum or overtime wages required to be paid him under the Act." *Id.* Any expense incurred by an employee on his employer's behalf or for the convenience of his employer must be reimbursed for purposes of determining minimum-wage compliance. *Perrin*, 2013 WL 6885334 at *4-7; *Garcia,* 644 F. Supp. 2d at 705; 29 C.F.R. § 778.217(a).

The Department of Labor's "anti-kickback regulation" provides:

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. For example, **if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act**. See also in this connection, § 531.32(c).

29 C.F.R. § 531.35 (emphasis added). This Court has specifically found in this litigation that this "anti-kickback regulation" is "entitled to deference." (Doc. 197 at p.17).

It is undisputed that Defendants require Plaintiffs to maintain vehicle insurance in order to perform their jobs, and require such insurance as an express condition of their employment. (SOF ¶ 50). Thus, under the clear language of the "anti-kickback"

regulation highlighted above, Defendants must reimburse for the delivery drivers' cost of insurance.

**B. The DOL Demands Reimbursement for Vehicle Insurance.**

The DOL has further interpreted the "anti-kickback" regulation, 29 C.F.R. § 531.35, in the specific context of reimbursing vehicle costs paid by **"delivery drivers employed by pizza or other carry-out type restaurants."** Section 30c15 of the DOL's FOH advises:

> <u>**Car expenses – employee's use personal car on employer's business.**</u>
>
> In some cases it is necessary to determine the costs involved when employees use their cars on the employer's business in order to determine MW [minimum wage] compliance. For example, car expenses are frequently an issue for **delivery drivers employed by pizza or other carry-out type restaurants**.
> (a) <u>As an enforcement policy</u>, the Internal Revenue Service (IRS) <u>standard business mileage rate</u> found in IRS Publication 917, "Business Use of a Car" may be used (in lieu of actual costs and associated recordkeeping) to determine or evaluate the employer's wage payment practices for FLSA purposes. The IRS standard business mileage rate (currently 28 cents per mile) represents depreciation, maintenance and repairs, gasoline (including taxes), oil, **insurance**, and vehicle registration fees. …

DOL FOH § 30c15 (emphasis added).

The Eleventh Circuit has found that the DOL FOH is "persuasive, even though it is not entitled to Chevron deference." *Morgan v. Family Dollar Stores,* 551 F.3d 1233, 1275 n.65 (11th Cir. 2008); *Klinedinst v. Swift Invs., Inc.,* 260 F.3d 1251, 1255 (11th Cir. 2001) (same)). Likewise, the Court has already held in this litigation that

another DOL interpretation of its own regulations regarding reimbursement of vehicle costs was "highly persuasive" in part because of the "DOL's role in enforcing FLSA provisions." (Doc. 197 at p.18).

The Eleventh Circuit has also held that "'[a]n agency's interpretation of its own regulations is 'controlling unless plainly erroneous or inconsistent with the regulation.'" *Harrison v. Ocean Bank,* 614 Fed. App'x. 429, 437 (11th Cir. 2015) (quoting *Sierra Club v. Johnson,* 436 F.3d 1269, 1274 (11th Cir. 2006) (quoting *Auer v. Robbins,* 519 U.S. 452, 461 (1997))). DOL FOH § 30c15 is clearly interpreting the DOL's own regulations, specifically 29 C.F.R. §§ 531.35 (the "anti-kickback rule"), 29 C.F.R. § 531.32(c) (incorporated into 29 C.F.R. § 531.35), and 778.217 (incorporated into § 531.32(c)). Thus, the Court should afford controlling weight to DOL FOH § 30c15.

Simply stated, Section 30c15 of the DOL FOH demands that employers either track and reimburse actual costs or reimburse at the IRS rate, which specifically includes reimbursement for "insurance." *Id.* Thus, the Court should find Defendants have a duty to reimburse for vehicle insurance used on the job by following the DOL's interpretation as set forth in its FOH. That handbook is, at minimum, "highly persuasive" (*Morgan,* 551 F.3d at 1275 n.65; *Klinedinst,* 260 F.3d at 1255; Doc. 197 at p.18) if not controlling, because it is an agency's interpretation of its own

regulation (*Harrison,* 614 F.3d at 437; *Sierra Club,* 436 F.3d at 1274 (quoting *Auer,* 519 U.S. at 461)).

### C. Payments Shift Part of an Employer's Business Expense to Employees Must Be Reimbursed.

The standard is set forth in the "anti-kickback rule" and was recognized in the decision of *Mayheu's Super Liquor Store v. Hodgson*, 464 F.2d 1196 (5th Cir. 1972). Before the circuit split, the Fifth Circuit held that an employee-paid expense constitutes a "kick back" if it **tend[s] to shift part of the employers business expense to the employees**."*Id.* at 1199 (emphasis added). In so holding, *Mayheu's* interpreted and applied the language of the anti-kickback rule stating that "[t]he wage requirements of the Act will not be met where the employee kicks-back directly or indirectly to the employer or to another person **for the employer's benefit** the whole or part of the wage delivered to the employee." 464 F.2d at 1199 (quoting 29 C.F.R. § 531.35 (emphasis added)). *Mayheu's* recognized that "these regulations are entitled to controlling weight." *Id.* at 1199 (citing *Schultz v. Hinojosa,* 432 F.2d 259 (5th Cir. 1970)).

The Eleventh Circuit, sitting *en banc*, later adopted *Mayheu's* as "binding precedent." *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981); *Jory v. U.S.*, 562 Fed. App'x. 926, 928 n.1 (11th Cir. 2014) (same).

Here, Defendants are clearly shifting the cost of insuring their delivery vehicles by requiring their delivery drivers purchase insurance to perform their jobs. Even

47

more obvious, Defendants are shifting that insurance cost to their delivery drivers by requiring those drivers to pay for the "primary [insurance] coverage" in the event of any on-the-job accident. (SOF ¶¶ 50, 53-54). Thus, following *Mayheu's,* the Court should find that Defendants must reimburse vehicle insurance costs.

### D. All Transportation Costs Needed to Perform the Job of Delivery Driver Must Be Reimbursed.

The duty to reimburse "transportation costs" that reduce net wages below the minimum was recognized by the Eleventh Circuit in *Arriaga v. Florida Pac. Farms, L.L.C.,* 305 F.3d 1228 (11th Cir. 2002). "Transportation costs" must be reimbursed "depending on whether the travel is "an incident of and necessary to the employment." *Id.* at 1241 (citing 29 C.F.R. § 531.32(a); 29 C.F.R. § 531.32(c) ("transportation charges where such transportation is an incident of and necessary to the employment (as in the case of maintenance-of-way employees of a railroad)" are "primarily for the benefit or convenience of the employer")). *Arriaga* recognized that using alien workers "necessitates" that their "transportation costs be paid by someone." *Id.* Thus, *Arriaga* holds that such "transportation costs" are "an incident of and necessary to the employment." *Id. Arriaga* relied on the dictionary definitions of "incident" and "necessary". "Incident" is defined as "'dependent on, subordinate to, arising out of, or otherwise connected with' something else." *Id.* (citing Black's Law Dictionary 765 (7th ed. 1999)). Necessary is defined as "of an inevitable nature: inescapable." *Id.* (citing Merriam-Webster's Collegiate Dictionary 776 (10th ed.

48

1995). Thus, *Arriaga* concluded that transportation charges must be reimbursed because those costs are "an inevitable and inescapable consequence" of employing alien workers. *Arriaga,* 305 F.3d at 1241. Following *Arriaga*'s specific holding regarding "transportation costs," the costs of driving to deliver pizza, including the required insurance needed to legally drive those deliveries to Defendants' customers, must "be paid by someone" and such "transportation costs," including insurance, are "an incident of and necessary to the employment." Basically, pizza delivery could not occur without vehicle insurance, and Defendants require their delivery drivers to provide it. Thus, under the express holding of *Arriaga*, all costs that facilitate Defendants' delivery of pizzas must be reimbursed (of course only to the extent they reduce net wages below the minimum).

### E. Defendants' Argument about Delivery Drivers' Purchase of Vehicle Insurance Regardless of Their Employment Are Contrary to Law.

Defendants will inevitably argue that they need not reimburse for insurance because their delivery drivers would purchase vehicle insurance regardless of their employment. But that argument is contradicted by the Eleventh Circuit's holding in *Arriaga*: "there is simply no legal difference between an employer requiring a worker to have the tools before the first day of work, requiring the tools to be purchased during the first workweek, or deducting the cost of the tools from the first week's wages." *Id.* at 1237.

Defendants' franchisor, Papa John's International, Inc., took an even broader stance. In other similar litigation, it argued on summary judgment that no "fixed cost" of driving, which included vehicle insurance and other costs, need be reimbursed because such costs are incurred regardless of employment. *Perrin v. Papa John's Int'l., Inc.,* 114 F. Supp. 3d 707, 729-30 (E.D. Mo. 2015). That argument was rejected based on very similar reasoning to *Arriaga*. *Id*. *Perrin* recognized that the "regulatory guidance and industry practice reveals a general acceptance that at least a portion of such fixed costs [including vehicle insurance] are for the benefit of the employer, and are thus properly reimbursable expenses under the FLSA." *Id*. at 730. *Perrin* recognized that it "makes logical sense" for employers to "reimburse their drivers for a portion of their fixed vehicle expenses" as "courts have decided that, for the purposes of determining minimum wage compliance, expenses incurred for the benefit of the employer include costs that are 'essential for the . . . employment relationship to come to fruition.'" *Id*. (citing *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 898 (9th Cir. 2013)). Next, *Perrin* recognized that "having a safe, clean, and legal vehicle is as necessary for Plaintiffs to be employed as drivers, as it is for Defendants to maintain a delivery operation without its own fleet of vehicles." *Id*. Thus, *Perrin,* just like *Arriaga*, found that transportation costs, including the required insurance, are necessary to perform the job, and therefore such costs must be reimbursed. *Id*.

*Perrin* further recognized that the DOL advises that, in order to comply with minimum wage laws, businesses may reimburse employee vehicle costs using the IRS standard business mileage rate, which includes amounts for "depreciation, maintenance and repairs, gasoline (including taxes), oil, **insurance**, and vehicle registration fees." *Id.* (emphasis added) (quoting DOL FOH § 30c15). Moreover, as observed in *Perrin*, the DOL advises such reimbursements "'for delivery drivers employed by pizza . . . restaurants.'" *Id.*

## IV.   Defendants Used an Unlawful Reimbursement Rate

Plaintiffs are entitled to partial summary judgment on whether Defendants failed to reasonably approximate vehicle expenses to ensure minimum-wage compliance. Defendants use a vehicle-reimbursement methodology that is contrary to the law. Specifically, for purposes of computing minimum wage, employers must either: (1) track, record, and reimburse their employees' actual vehicle expenses incurred on the job, or (2) reimburse their employees at the IRS standard business mileage rate. Defendants admit they did neither. They do not track or record actual vehicle expenses, and they reimburse their delivery drivers at a per-mile rate of only about half the IRS standard business mileage rate. Consequently, Defendants have failed to reasonably reimburse their drivers as required by applicable law.

Because Defendants have failed to track and reimburse actual vehicle costs and have reimbursed at less than the IRS rate, granting partial summary judgment on this issue will substantially narrow the issues for trial.

### A. Employers Must Reimburse at the IRS Standard Business Mileage Rate if They Do Not Track or Reimburse Actual Vehicle Costs.

Employers must pay minimum wage (29 U.S.C. § 206) "free and clear" of job-related expenses incurred by the employee. 29 C.F.R. § 531.35. Otherwise, an employer can avoid the minimum-wage requirements by shifting job-related costs onto the employee. *Id*.; *Garcia*, 644 F. Supp. 2d at 705.

Thus, "if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act." 29 C.F.R. § 531.35. Any expense incurred by an employee on his employer's behalf or for the convenience of his employer must be reimbursed for purposes of determining minimum-wage compliance. *Perrin*, 2013 WL 6885334; *Garcia,* 644 F. Supp. 2d at 705; 29 C.F.R. § 778.217(a). If it is not, the employer has improperly "shift[ed] part of the employer's business expense to the employees." *Mayheu's*, 464 F.2d at 1199.

The Secretary of Labor has promulgated regulations to address how employers should measure certain business-related expenses. With respect to vehicle-related

52

expenses, an employer can reimburse using actual expenses (29 C.F.R. § 778.217(b)(3)), which must be accompanied by required recordkeeping (29 C.F.R. §§ 516.2(10) & 516.6(c)), or it can "reasonably approximate" those expenses (29 C.F.R. § 778.217(b)(3); *Perrin*, 2013 WL 6885334; *Wass v. NPC Int'l, Inc.*, 688 F. Supp. 2d 1282, 1285-86 (D. Kan. 2010)). Although the regulations themselves do not give greater specificity as to what constitutes a reasonable approximation, the DOL has given greater specificity as it relates to reasonably approximating the cost of driving a personal vehicle to perform an employer's business.

When an employee uses his or her "personal car on [the] employer's business," such as "delivery drivers employed by pizza or other carry-out restaurants," the DOL permits two reimbursement methodologies. DOL FOH § 30c15(a). "[T]he employer should reimburse the employee at the IRS per mile rate or keep detailed records of the employees' expenses to justify another reimbursement rate." *Zellagui v. MCD Pizza, Inc.*, 59 F. Supp. 3d 712, 716 (E.D. Pa. 2014); ("Because [Defendant] failed to keep detailed contemporaneous records of its delivery drivers' actual expenses, Plaintiff and the Class members are entitled to be reimbursed at the IRS rate.") (citing DOL FOH § 30c15(a)). According to the DOL FOH:

**Car expenses – employee's use personal car on employer's business.**

In some cases it is necessary to determine the costs involved when employees use their cars on the employer's business in order to determine MW [minimum wage] compliance. For example, car

expenses are frequently an issue for delivery drivers employed by pizza or other carry-out type restaurants.

(a) As an enforcement policy, the Internal Revenue Service (IRS) standard business mileage rate found in IRS Publication 917, "Business Use of a Car" may be used (in lieu of actual costs and associated recordkeeping) to determine or evaluate the employer's wage payment practices for FLSA purposes. …

(b) The IRS standard business mileage rate may be used in lieu of actual costs for FLSA purposes whether or not the employee will be able to take a deduction on his or her tax return for the business use of the employee's car.

DOL FOH § 30c15.

It is undisputed that Defendants did not reimburse their delivery drivers using the IRS standard business mileage rate, with only a few possible exceptions, nor did Defendants keep records and reimburse drivers for their actual expenses. (SOF ¶¶ 58-63).

Defendants may argue the Court should disregard the clear import of the DOL FOH. However, the weight of existing authority has determined that employers must track and reimburse actual costs or reimburse at the IRS standard business mileage rate. *Zellagui* followed the DOL FOH explicitly in finding that a pizza chain must track and reimburse actual vehicle costs or reimburse at the IRS rate:

When minimum wage law requires an employer to reimburse an employee for using the employee's vehicle for the employer's benefit, the employer should reimburse the employee at the IRS per mile rate or keep detailed records of the employees' expenses to justify another reimbursement rate. See Department of Labor Field Operations Handbook, § 30c15(a) (issued June 30, 2000) (for minimum wage purposes, employer may either reimburse employees who drive a personal vehicle for business use at the IRS rate or keep accurate,

contemporaneous expense records and reimburse the employee accordingly); *Gattuso* [*v. Harte-Hanks Shoppers, Inc.*], 42 Cal.4th [554,] at 566 [(Cal. 2007)] ("If an employer wants to pay less than the established IRS rate, it bears the cost of proving the employee's cost of operating the vehicle for work is actually less."); *Darrow* [*v. WKRP Mgmt., LLC*], 2011 U.S. Dist. LEXIS 59388, [at *10-12,] 2011 WL 2174496, at *4 [(D. Colo. June 3)] (holding the IRS rate to be a reasonable approximation of a pizza delivery driver's mileage expense).

59 F. Supp. 3d at 716.

Importantly, in placing reliance and weight on the DOL FOH, *Zellagui* expressly followed the Eleventh Circuit's holdings in *Morgan* and *Klinedinst* that "'the DOL Field Operations Handbook is persuasive" in the minimum wage context." *Zellagui*, 59 F. Supp. 3d at 716 n.2 (following *Morgan*, 551 F.3d at 1274 n.65; *Klinedinst*, 260 F.3d at 1255; *Fast v. Applebee's Int'l., Inc.,* 638 F.3d 872, 874 (8th Cir. 2011) (affirming that DOL's FOH is "reasonable, persuasive and entitled to deference.")).

In *Cornish v. Deli Mgmt., Inc.*, the court similarly followed the DOL FOH:

> While it is true, as Defendant asserts, that employers are not required to reimburse at the IRS rate, at least some courts have held that, if employers fail to do so, they must "keep detailed records of the employees' expenses to justify another reimbursement rate." *Zellagui v. MCD Pizza, Inc.,* 59 F. Supp. 3d 712, 716 (E.D. Pa. 2014); *see also*, *Gattuso v. Harte-Hanks Shoppers, Inc.,* 42 Cal.4th 554, 67 Cal.Rptr.3d 468, 169 P.3d 889, 896 (Cal. 2007) (holding, in the context of a California statute mandating reimbursement of employees' expenses, that "[i]f an employer wants to pay less than the established IRS rate, it bears the cost of proving the employee's cost of operating the vehicle for work is actually less"). Furthermore, the Department of Labor (DOL) Field Operations Handbook instructs that, for minimum wage purposes, an employer may either reimburse employees who drive a personal vehicle for business use at the IRS standard business mileage rate or keep accurate, contemporaneous expense records and reimburse

the employee accordingly. DOL Field Operations Handbook §
30c15(a) (issued 6/30/2000).

2016 WL 5934077, *3 (D. Md. Oct. 12).

The California Supreme Court, in *Gattuso v. Harte-Hanks Shoppers, Inc.*,
similarly held:

> The mileage reimbursement rate is compiled by the IRS by taking into
> account all factors involved with the use of a vehicle: fuel, maintenance,
> repairs, depreciation, insurance, etc. by annually conducting a national
> survey and coming up with appropriate averages…. If an employer
> wants to pay less than this established IRS rate, the employer bears the
> burden of proving that the employee's costs of operating the vehicle for
> work is actually less. If the employee seeks a rate of reimbursement
> higher than the IRS rate, the employee bears … the burden [of] proving
> that his or her actual operating costs are higher.

42 Cal. 4th 554, 169 P.3d at 889, 896 (2007).

Additionally, in two recent arbitrations, an arbitrator considering the same claims
also independently concluded in reasoned opinions that where an employer does not
track and pay actual expenses, the IRS standard business mileage rate is used to
determine minimum-wage compliance. *In the Matter of an Arbitration,* 2015 WL
8682313 (AAA); *In the Matter of an Arbitration,* 2015 WL 8682319 (AAA).

Given that the DOL FOH and the majority of case law require that employers of
"*pizza or other carry-out type restaurants*" either track and reimburse actual vehicle
costs or reimburse at the IRS standard business mileage rate, and Defendants
admittedly have not tracked or reimbursed actual vehicle costs, the Court should find

as a matter of law that minimum-wage compliance should be evaluated using the IRS rate.

### B. Partial Summary Judgment Will Materially Simplify the Case.

Granting this motion will materially simplify this matter for trial. If the IRS standard business mileage rate is used as the appropriate benchmark, then the question of reasonableness of Defendants' reimbursements (approximately half of the IRS rate) and willfulness will be the sole remaining issues for trial. Damages can easily be calculated through a spreadsheet that factors in Defendants' own time, pay, and reimbursement records.

### V. The *Mt. Clemens* Burden Shifting Applies and Plaintiffs' Claims May Be Proven by Representative Evidence

The Supreme Court's Mt. Clemens standard permits employees to prove their Fair Labor Standards Act ("FLSA") claims by "just and reasonable inference" when employers fail to comply with their recordkeeping duties. Not only that, but the Eleventh Circuit recognizes that representative evidence is permitted when employers fail to comply with those recordkeeping duties.

Defendants were required to keep records of their delivery drivers' actual vehicle costs under the applicable DOL regulations. It is undisputed that Defendants failed to keep such records. They readily admit such failure.

Moreover, Defendants fail to qualify for the only recordkeeping exception provided in the administrative guidance because they admittedly failed to reimburse for vehicle costs at the IRS standard business mileage rate.

Thus, either partial summary judgment or an in limine order is warranted because there remains no genuine issue of material fact regarding Defendants failures to (a) keep records of Plaintiffs' actual vehicle costs and (b) reimburse at the IRS rate. Simply stated, this Court should find that the Mt. Clemens burden of proof applies and that Plaintiffs may rely on representative evidence.

### A. The *Mt. Clemens* Burden of Proof and Representative Testimony.

In *Anderson v. Mt. Clemens Pottery Co. ("Mt. Clemens"),* "the Supreme Court authorized a burden-shifting scheme designed to facilitate the ability of plaintiffs to prove an FLSA violation where the employer failed to maintain proper records (such as how many hours its employees worked and the amount of pay)." *Morgan,* 551 F.3d at 1278 (citing *Mt. Clemens,* 328 U.S. 680, 686-88 (1946)). "To prevent workers from being penalized by the employer's failure to keep adequate records, the Supreme Court provided that plaintiffs could meet their burden of proof so long as they 'prove[] that [they have] in fact performed work for which [they were] improperly compensated' and 'produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Id.* (quoting *Mt. Clemens*, 328 U.S. at 687).

The Eleventh Circuit has recognized that although *Mt. Clemens* never used the term "representative testimony," subsequent courts have interpreted it to authorize some employees to testify "so that other non-testifying plaintiffs could show the same thing by inference." *Id.* at 1278-79 (citing, *e.g.*, *Reich v. Southern Md. Hosp.,* 43 F.3d 949, 951 (4th Cir. 1995) ("Under *Mt. Clemens*, the Secretary can present testimony from representative employees as part of his proof of the prima facie case."); *Donovan v. Bel-Loc Diner, Inc.,* 780 F.2d 1113, 1116 (4th Cir. 1985) ("There is no requirement that to establish a *Mt. Clemens* pattern or practice, testimony must refer to all nontestifying employees. Such a requirement would thwart the purposes of the sort of representational testimony clearly contemplated by Mt. Clemens."); *Sec. of Labor v. DeSisto,* 929 F.2d 789, 792 (1st Cir. 1991) (interpreting *Mt. Clemens* burden-shifting and noting that the plaintiff "can rely on testimony and evidence from representative employees to meet the initial burden of proof requirement"); *McLaughlin v. Ho Fat Seto,* 850 F.2d 586, 589 (9th Cir. 1988) ("We hold that the *Mt. Clemens Pottery* standard allows district courts to award back wages under the FLSA to non-testifying employees based upon the fairly representative testimony of other employees.").

## B. The Regulations Provide the Duty to Keep Records of Actual Costs.

Defendants have a duty to keep records of actual vehicle costs under the regulations promulgated by the U.S. Department of Labor. 29 C.F.R. § 516.2(10)

expressly requires that:

> Every employer shall maintain and preserve payroll or other records containing the following information and data with respect to each employee to whom section 6 or both sections 6 and 7(a) of the Act apply:
> *****
> (10)   Total additions to or deductions from wages paid each pay period including employee purchase orders or wage assignments. Also, in individual employee records, the dates, amounts, and nature of the items which make up the total additions and deductions…

*Id.*

29 C.F.R. § 516.6(c) likewise requires:

> (c) Records of additions to or deductions from wages paid:
> (1)   Those records relating to individual employees referred to in § 516.2(a)(10) and
> (2)   **All records used by the employer in determining the original cost, operating and maintenance cost, and depreciation and interest charges, if such costs and charges are involved in the additions to or deductions from wages paid**.

*Id.* (emphasis added). As the Court recently observed, these regulations are entitled to "*Chevron* deference" because the FLSA's record keeping provision, 29 U.S.C. § 211(c), does not address the specific records which must be kept. (Doc. 197 at p.16 ("The Court applies *Chevron* deference to the DOL's regulations implementing the FLSA when the statutory text is ambiguous.") (citing *Josendis v. Wall to Wall Resident Repairs, Inc.,* 662 F.3d 1292, 1299 (11th Cir. 2011) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984))). Rather, 29 U.S.C. § 211(c) only generally provides that "[e]very employer subject to any

provision of this Act or of any order issued under this Act shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him." *Id.* 29 U.S.C. §§ 516.2(10) and 516.6(c) are entitled to controlling weight because they are DOL regulations that elucidate and explain 29 U.S.C. § 211(c).

In 29 U.S.C. § 516.6(c), the Department of Labor expressly recognized that employers must record "**costs**" that constitute either "**additions to or deductions from wages paid**." *Id.* As the Eleventh Circuit recognizes, "there is simply no legal difference between an employer requiring a worker to have the tools before the first day of work, requiring the tools to be purchased during the first workweek, or deducting the cost of the tools from the first week's wages." *Arriaga*, 305 F.3d at 1237.

In the more common context of determining whether employers may credit the cost of "facilities," such as housing and meals, toward payment of the minimum wage, the Eleventh Circuit has determined that the *Mt. Clemens* burdens of proof apply to proof of costs that plaintiffs claim reduce net wages below the minimum. *Caro-Galvan v. Curtis Richardson, Inc.,* 993 F.2d 1500, 1513-14 (11th Cir. 1993); *Donovan v. New Floridian Hotel, Inc.,* 676 F.2d 468, 474-75 & n.12 (11th Cir. 1982).

Courts have likewise found that the *Mt. Clemens* burdens of proof apply to proof of vehicle costs and other employee-paid expenses when there is a duty to reimburse those costs. In so holding, the courts in *Villalpando v. Exel Direct, Inc.* and *Melgar v. CSK Auto, Inc.* both observed that when there is a duty to reimburse employees for vehicle costs and other expenses, "it is 'obvious [] [that] some recordkeeping [on the part of the employer] is required." 2016 WL 1598663, *9 (N.D. Cal. April 21) (quoting *Melgar v. CSK Auto, Inc.,* 2015 WL 9303977, *9 (N.D. Cal. Dec. 22)). Thus, *Villalpando* and *Melgar* found that *Mt. Clemens* applied. 2016 WL 1598663 at *9; 2016 WL 9030977 at *9. *Villalpando* and *Melgar* arose in the context of state laws that had no recordkeeping requirements. In contrast, the FLSA regulations specifically require recordkeeping of all "deductions" from wages and all "costs" that reduce net wages. 29 C.F.R. §§ 516.2(10), 516.6(c).

In sum, the applicable regulations, 29 C.F.R. §§ 516.2(10) and 516.6(c), require employers to keep records of employee-paid costs which reduce net wages.

## C. Defendants Fail to Qualify for the DOL's Exception to Keeping Records of Actual Vehicle Costs.

The DOL FOH provides an alternative to employers' tracking of actual vehicle costs for **"delivery drivers employed by pizza or other carry-out type restaurants."** Section 30c15 advises:

**Car expenses – employee's use personal car on employer's business.**

> In some cases it is necessary to determine the costs involved when employees use their cars on the employer's business in order to determine MW [minimum wage] compliance. For example, car expenses are frequently an issue for **delivery drivers employed by pizza or other carry-out type restaurants**.
> (a) <u>As an enforcement policy</u>, **the Internal Revenue Service (IRS) standard business mileage rate found in IRS Publication 917, "Business Use of a Car" may be used (in lieu of actual costs and associated recordkeeping) to determine or evaluate the employer's wage payment practices for FLSA purposes**. …

DOL FOH § 30c15 (underlining in original, bolding added).

Simply stated, Section 30c15 of the DOL FOH demands that employers operating "pizza and other carry-out type restaurants" either track and reimburse actual vehicle costs or reimburse at the IRS standard business mileage rate. *Id.* It is undisputed, subject to only a few possible exceptions, that Defendant has not reimbursed at the IRS standard business mileage rate. (SOF ¶¶ 64-68). Thus, because Defendants failed to qualify for the recordkeeping exception provided in DOL FOH 30c15, Defendants must have tracked and reimbursed actual vehicle costs. But, it is also undisputed that Defendants failed to keep such records.

## VI.    Defendants Are a Single, or Alternatively Joint, Employer

The Eleventh Circuit has long recognized that nominally separate business entities may be held jointly and severally liable for each other's violations of the Fair

63

Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.,* when those business entities comprise a "single employer" or they are "joint employers" under applicable law.

Plaintiffs are entitled to summary judgment on the issue of whether the Defendant entities comprise a "single employer" because there is no genuine issue of material fact regarding those Defendants' (1) interrelated operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. Notably, Plaintiffs' evidence comes from Defendants' own admissions and documents.

Alternatively, Plaintiffs are entitled to summary judgment on the issue of whether the Defendant entities are "joint employers" under 29 C.F.R. § 791.2(b)(3) because there is no genuine issue of material fact regarding (1) those Defendants' common benefit from their delivery drivers' labor; (2) the lack of Defendants complete disassociation with respect to the delivery drivers' employment; and (3) common control of Defendants. Again, Plaintiffs' evidence comes from Defendants' own admissions and documents.

Therefore, summary judgment should be granted in Plaintiffs' favor on the issues of Defendants' status as a "single employer" and "joint employers."

## A. Standard for Determining Single and Joint Employer.

Whether Defendants "are joint employers is a legal determination to be made by the Court." *Jones v. Ward*, 2011 WL 1187807, *14 (M.D. Ala. March 30) (citing

*Patel v. Wargo*, 803 F.2d 632, 634 (11th Cir. 1986). "[I]ty is one that can be better made on summary judgment." *Id*.

The Eleventh Circuit and this District have recognized that the relevant facts to determine if nominally-separate entities constitute a "single integrated enterprise" or "single employer" for liability purposes are "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. The showing required to warrant a finding of single employer status has been described as 'highly integrated with respect to ownership and operations.'" *McKenzie v. Davenport-Harris Funeral Home,* 834 F.2d 930, 933 (11th Cir. 1987); *Varner v. Video Indus. Servs.,* 2012 U.S. Dist. LEXIS 196855, *24-26 (N.D. Ala. April 2) (recognizing factors apply in FLSA claims) (attached hereto at Ex. 42); *Klein v. L-3 Commc'ns. Corp.,* 2013 WL 5913776, *7-8 & n.14 (M.D. Ala. Nov. 1); *Dellsperger v. HPA Subway, Inc.*, 2012 WL 6728049, * 4n.8, *12 n.8 (S.D. Ala. Dec. 28) ("[S]uperficially distinct entities may be exposed to liability upon a finding that they represent a single, integrated enterprise (i.e., a single employer)").

Alternatively, "[w]here the employee performs work which simultaneously benefits two or more employers … a joint employment relationship generally will be considered to exist in situations such as … [w]here the employers are not completely disassociated with respect to the employment of a particular employee

and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer." 29 C.F.R. § 791.2(b)(3).

### B. There Is No Genuine Issue of Material Fact Regarding the Defendant Entities' Status as a "Single Integrated Enterprise."

There is no genuine issue of material fact that the Defendant entities comprise a "single integrated employer." The evidence shows that all four factors supporting a "single integrated enterprise" are fulfilled.

#### 1. Defendant entities have interrelated operations.

The undisputed facts overwhelmingly establish the Defendant entities' common and interrelated operations as shown most specifically by the fact that they share management, share control of human resources, share the same office, use the same employment policies and operational documents, and share financial systems. (SOF ¶¶ 70-93).

#### 2. Defendant entities have centralized control of labor relations.

"Of the four criteria applied in determining single-employer status, the most critical is the degree to which control of labor relations is centralized." *Fike v. Gold Kist, Inc.,* 514 F. Supp. 722, 727 (N.D. Ala. 1981) (collecting cases); *Nealey v. University Health Servs.,* 114 F. Supp. 2d 1358, 1367 (S.D. Ga. 2000) ("The most important factor … is the second, centralized control of labor relations."); *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 763 (5th Cir. 1997) (same).

The Defendant entities' centralized control of labor relations is clearly established by the evidence showing that Stephens, Saunders, Green, and "the operating partners" hold control over wages and reimbursements provided to employees of all Defendant entities. (SOF ¶84). The same vehicle reimbursement policy devised by Stephens, Saunders, Green, and "the operating partners" has been in use by all Defendant entities since 2008, and was ultimately approved by CEO and President of all Defendant entities, Douglas Stephens. (SOF ¶89). Further, Stephens was responsible for determining all the Defendant entities' tip credit. (SOF ¶85).

The Defendant entities share the same human resources department. Becky Gwarjanski is the head of human resources for all Defendant entities and she maintains all Defendants' payroll records. (SOF ¶86). All Defendants' human resources functions are performed at the Defendant entities' shared office. (SOF ¶74). All Defendant entities direct their employees to the same PJ United HR department, which provides human resources services to the employees of all of the Defendant entities. (SOF ¶¶ 86-88). All Defendant entities provide the same human resources website to their delivery drivers. (SOF ¶¶ 91-93). All Defendant entities employ the same individuals to oversee payroll and accounting for all the entities. (SOF ¶¶ 82, 86-88). There is no dispute that all Defendant entities' human relations department also operates in a completely unified and centralized fashion.

Finally, an overwhelming amount of evidence shows that all Defendant entities use the exact same employment documents, forms, agreements, policies, protocols, training manuals, new hire paperwork, applications, and job descriptions, among other items, in the operation of their business and in the management of the employment of delivery drivers. (SOF ¶90). That is the obvious result of closely-integrated control of labor relations. Many of these documents list all Defendant entities in the titles or headers of the documents, clearly indicating their common enterprise. (*Id.*). Additionally, all Defendant entities utilize the same on-line hiring portal with access to the same employee benefits information for their delivery driver employees. (SOF ¶¶ 91-93).

Aside from Defendants' unsupported argument that they are separate entities, there is no evidence relating to Defendants' compensation policies, the structure of their human resources department, or any of their employment-related documentation to suggest that their labor control operations are anything but centralized.

### 3. Defendant entities share common management.

The Defendant entities' common management is clearly established by the evidence that all Defendant entities are managed out of one office location, by one umbrella company, and under control of the same board of directors. (SOF ¶¶ 69-71, 74, 77). The management hierarchy over all Defendant entities is the same, with

the President and CEO, Defendant Douglas Stephens, at the top. (SOF ¶71). Stephens "manages and directs" all the Defendant entities "toward [their] primary objectives based on profit and return of fund capital." (*Id.*). He further "establishes current and long-range objectives, plans, and policies" for all the Defendant entities and "dispenses advice, guidance, direction, and authorization to carry out major plans and procedures" for all Defendants. (SOF ¶72). Finally, Stephens "oversees the adequacy and soundness of the [Defendant entities'] financial structure" and "reviews operating results of the [Defendant entities], compares them to established objective, and takes steps to ensure that appropriate measures are taken to correct unsatisfactory results." (SOF ¶73). Undoubtedly, Stephens is the CEO and President of this singular enterprise and is in control of all the Defendants.

This common management structure pervades because Vice Presidents Stephen Saunders and Bill Green fall just under Douglas Stephens in the management hierarchy of all Defendant entities. (SOF ¶¶ 78-80). Together, the three of them perform future planning for all Defendant entities. (SOF ¶89). They control the wages and reimbursements provided to employees of all Defendant entities. (SOF ¶¶ 84, 89). Mr. Stephens ultimately determined all Defendant entities' tip credit. (SOF ¶85). Additionally, all Defendant entities employ the same head of human resources, the same CFO and head of accounting, and the same head of payroll. (SOF ¶¶ 79-80, 82, 86, 88).

69

### 4. Defendant entities have common ownership and financial control.

The Defendant entities' common ownership and financial control is clearly established by the evidence that all Defendant entities are owned by TPH Holdings, Inc., which owns PJU Holdings, Inc. (SOF ¶ 69). PJU Holdings, Inc. owns Defendant PJ United, Inc., which in turn owns 100% of the other Defendant entities. (*Id.*). Thus, all Defendant entities are under common ownership of TPH Holdings, Inc. (*Id.*).

Further, Douglas Stephens and the top management of the Defendant entities own stock in TPH Holdings, and PJU Holdings oversees and controls all Defendant entities. (SOF ¶¶ 70, 77). All Defendant entities have the same board of directors. (*Id.*). Stephens, as President and CEO, maintains the same management hierarchy over all Defendant entities and he "oversees the adequacy and soundness of the [Defendant entities'] financial structure." (SOF ¶ 73).

Additionally, all Defendant entities share the same CFO, who holds the authority to sign checks for all of the Defendant entities that issue checks. (SOF ¶¶ 82-83).

Thus, there is no discernable difference between the financial control or common ownership of one Defendant entity from any other. All Defendant entities are ultimately run by a single parent company and their single President and CEO, Douglas Stephens, and all Defendant entities share common financial structure and sources of control under this umbrella.

## C. There Is No Genuine Issue of Material Fact Regarding the Defendant Entities' Status as "Joint Employers."

Department of Labor regulations provide that "[w]here the employee performs work which simultaneously benefits two or more employers … a joint employment relationship generally will be considered to exist in situations such as … [w]here the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer." 29 C.F.R. § 791.2(b)(3).

### 1. All Defendant entities benefit from the delivery drivers' labor.

The undisputed facts establish that the Defendant entities are all part of the same business enterprise. Thus, all of the Defendant entities and Defendant Stephens, who is an owner of the Defendant entities, benefitted from the labor of the delivery drivers and are joint employers of Plaintiffs. (SOF ¶¶ 69-70, 75, 89-90).

### 2. All Defendant entities are not completely disassociated with respect to the delivery drivers' employment.

The Defendant entities are associated. PJU Holdings oversees and controls all the Defendant entities. (SOF ¶¶ 69-72). The Defendant entities' centralized control of the delivery driver's employment is clearly established by the evidence that Stephens, Saunders, Green, and "the operating partners" hold control over wages and reimbursements provided to employees of all Defendant entities. (SOF ¶84).

71

The delivery drivers have been subject to the same vehicle reimbursement policy devised by the operating partners since 2008, which was ultimately approved by CEO Stephens. (SOF ¶89). Further, Mr. Stephens was responsible for determining all the Defendant entities' tip credit paid to their delivery drivers. (SOF ¶75).

The structure and operations of Defendants' human resources department also shows a complete lack of dissociation regarding Plaintiffs' employment with the Defendant entities. Becky Gwarjanski is the head of human resources for all Defendant entities and she maintains all Defendant entities' payroll records. (SOF ¶¶ 86-88). All Defendant entities' human resources functions are performed at the Defendant entities' shared office. (SOF ¶74). All Defendant entities direct their delivery drivers to the same PJ United HR department which provides human resources services to the employees of all of the Defendant entities. (SOF ¶¶ 91-92). All Defendant entities provide the same human resources website and employee benefits to their delivery drivers. (*Id.*). All Defendant entities employ the same individuals to oversee payroll for all the entities. (SOF ¶88).

There is no dispute that Defendants' human resources department operates in a completely unified and centralized fashion over the employment of delivery drivers.

Finally, it is undisputed that all Defendant entities use the same employment documents, forms, agreements, policies, protocols, training manuals, new hire paperwork, applications, and job descriptions in managing and overseeing the

employment of their delivery drivers. (SOF ¶90). Many of these documents list all the Defendant entities in the titles or headers of the documents, clearly indicating their relationship as the common employer of the Plaintiffs. (*Id.*). Additionally, all the Defendant entities utilize the same on-line hiring portal with access to the same employee benefits information for their delivery driver employees. (SOF ¶¶ 92-93). Once again, there is no evidence of Defendants' actions regarding compensation, or the structure of their human resources activities, or their employment policies, procedures, and materials to suggest that any of the Defendants are completely dissociated with respect to delivery driver employment.

### 3. All Defendant entities share control of the delivery drivers because they are under common control.

The Defendant entities share control of the delivery drivers because the Defendant entities themselves are under common control. All Defendant entities are owned by TPH Holdings, Inc., which owns PJU Holdings, Inc. (SOF ¶69). PJU Holdings, Inc. owns defendant PJ United, Inc., which in turn owns 100% of the other Defendant entities. (*Id.*). Therefore, all Defendant entities are under common control of TPH Holdings, Inc., and thus share control of the delivery drivers. (*Id.*).

Further, Stephens and the top management of the Defendant entities own stock in TPH Holdings, and PJU Holdings oversees and controls all Defendant entities. (SOF ¶¶ 70-72). All Defendant entities have the same board of directors. (SOF ¶77). Stephens, as President and CEO, maintains the same management hierarchy over all

Defendant entities.  (SOF ¶76).  He "oversees the adequacy and soundness of the [Defendant entities'] financial structure." (SOF ¶73).

Additionally, all Defendant entities' funds are under common control because they share the same CFO, who can sign checks for all Defendant entities that issue checks. (SOF ¶¶ 82-83). Thus, there is no discernable difference between the ownership or control of one Defendant entity from any other. All Defendant entities are under the common control of a single parent company and their single President and CEO, Stephens. This puts the Defendants collectively in control of their delivery driver employees.

## VII. Tips in Excess of the Amount of the Tip Credit Are Not Considered in Determining Net Wages

In businesses where tipping is customary, the tips, in the absence of an explicit contrary understanding, belong to the tipped employee. *Williams v. Jacksonville Terminal Co.*, 315 U.S. 386, 397 (1942). Consistent with this long-standing principle, the Fair Labor Standards Act ("FLSA") permits employers to use tips as a credit towards its minimum-wage obligations, but only if the employer provides (1) advanced notice to its tipped employees and (2) the employer factors the entire amount of the tip credit into the overtime rate.

Before the summer of 2016, which covers the vast majority of the recovery period, Defendants applied a tip credit to time their delivery drivers spent "on-the-road" to achieve the applicable minimum wage. Any tips received in excess of the

74

amount of the tip credit remained property of the driver. Defendants cannot take credit for tips received above the minimum wage.

Importantly, Defendants' form document notifying delivery drivers of the tip credit tells them that Defendants "take[] a tip credit in the amount of the difference between minimum wage and $4.00 per hour, not to exceed the value of tips actually received" while the delivery drivers "are 'on-the-road.'"

In computing minimum wage damages for unreimbursed vehicle expenses, Plaintiffs have given Defendants credit for all wages paid, including all tip credits actually taken by Defendants. But Defendants seek to apply all tips received above the tip credit to offset these damages. That is not allowed. Every court to consider this issue has expressly held that tips in excess of the amount of a lawfully invoked tip credit (1) cannot offset minimum wage violations and (2) do not count toward net wages. Thus, partial summary judgment in Plaintiffs' favor is warranted.

## A. Tips in Excess of the Amount of a Tip Credit Cannot Offset Minimum Wage Deficits.

Defendants' attempted claim to the benefit of all tips received has been uniformly rejected in minimum wage claims, specifically including claims by pizza delivery drivers alleging minimum wage violations resulting from under-reimbursed vehicle costs. The most comprehensive explanation was set forth in *Perrin v. Papa John's Int'l., Inc.,* 114 F. Supp. 3d 707, 728-29 (E.D. Mo. 2015). There, the court granted summary judgment against Defendants' own franchisor, Papa John's International,

where it sought the benefit of the maximum tip credit of $5.12 per hour (although it took tip credits less than the maximum). *Id.*

Here, Defendants' argument misses the mark even further than the argument by the franchisor in *Perrin*. Defendants here argue they should receive credit for **all** tips received regardless of either (1) the amount of the actual tip credits they took, or (2) the amount of the maximum tip credit of $5.12 per hour. Defendants' argument is misguided and not supported by any case law.

A "tip credit" refers to "an additional amount based on the tips received by the employee that is equal to the difference between the cash wage and the current rate required by 29 U.S.C. § 206(a)(1) ($7.25 per hour)." *Perrin,* 114 F. Supp. 3d at 728 (citing *Fast v. Applebee's Int'l., Inc.,* 638 F.3d 872, 876 (8th Cir. 2011); 29 U.S.C. § 203(m)). That amount "allows the employer to avoid a larger cash payment to the employee as long as the employee's tips make up the difference between $2.13 per hour and the current minimum wage." *Id.* (citing *Fast,* 638 F.3d at 876).

*Perrin* observed that the tip credit comes with "conditions." First, pursuant to 29 U.S.C. § 203(m), the tip credit "shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee." *Id.* at 728 (citing 29 U.S.C. § 203(m)). "This notice provision is strictly construed and normally requires that an employer take affirmative steps to inform

affected employees of the employers' intent to claim the tip credit." *Id.* (citing *Perez v. Lorraine Enterpr., Inc.,* 769 F.3d 23, 27 (1st Cir. 2014)). The regulations further prohibit employers from claiming a tip credit unless they have informed employees in advance of "[t]he amount of the cash wage that is to be paid to the tipped employee by the employer [and] the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer…". *Perrin,* 114 F. Supp. 3d at 728-29 (quoting 29 C.F.R. § 531.59(b)).

The *Perrin* Court granted summary judgment for the plaintiffs because it was undisputed that Papa John's International never notified its delivery drivers that it would take a tip credit greater than the difference between Plaintiffs' cash wage and the applicable minimum wage rate. *Id.* the Court also granted summary judgment for the plaintiffs based on an alternative reason: any tip credit that increases wages above the minimum must also be applied to calculating the overtime pay rate. *Perrin* recognized that the DOL regulations "provide that, for overtime purposes, 'a tipped employee's regular rate of pay includes the amount of tip credit taken by the employer per hour.'" *Id.* at 729 (quoting 29 C.F.R. § 531.60). Further, *Perrin* observed that the DOL FOH advises that "'[a]n employer may not take a different tip credit during [overtime] hours than is taken during non-OT hours' because '[t]o so allow would conflict with the purposes of the OT provisions of the FLSA.'" *Perrin,* 114 F. Supp. 3d at 729 (quoting DOL FOH § 30d07(a)). *Perrin* concluded:

> Although the Plaintiffs do not raise overtime claims in this litigation, the Court agrees with Plaintiffs that the relationship among the FLSA's tip credit, minimum wage, and overtime provisions highlights the importance of the FLSA's tip credit notice requirements. By limiting their tip credit to the difference between Plaintiffs' cash wage and the applicable minimum wage, and so notifying Plaintiffs, Defendants were permitted to similarly limit Plaintiffs' regular rate of pay for overtime purposes to minimum wage. Had Defendants taken a higher tip credit to offset against potential unreimbursed expenses, as they claim the DOL guidance documents allow, this would have increased Plaintiffs' regular rate of pay and, correspondingly, increased the amount Defendants owed Plaintiffs for overtime.

114 F. Supp. 3d at 729; *see also, U.S. Dept. of Labor v. Cole Enters., Inc.*, 62 F.3d 775, 780 (6th Cir. 1995) (rejecting the argument that employer can claim maximum tip credit in litigation when it only took smaller tip credit).

Recently, another district court considered, and soundly rejected, a pizza company's argument that all tips are considered in determining a minimum wage violation in the same claim by pizza delivery drivers alleging minimum wage violations resulting from under-reimbursed vehicle costs. *Meetz v. Wisconsin Hospitality Grp. LLC,* 2017 WL 3736776, *5 (E.D. Wis. Aug. 29). In that case, the employer took a $2.00 per hour tip credit to achieve the minimum wage. *Id.* at *1. The employer, just like Defendants here, argued that tips in excess of the amount of the tip credit actually taken offset any deficiencies in the payment of the federal minimum wage resulting from under-reimbursed vehicle costs. *Id.* at *5. *Meetz* recognized that "[a]lthough an employer may use a tip credit to count an employee's

tips toward the employer's minimum wage obligations, the employee must receive advance notice of the tip credit." *Id.* (citing 29 U.S.C. § 203(m); 29 C.F.R. § 531.59(b); *Perrin,* 114 F. Supp. 3d at 727 ("Defendants may not claim a tip credit in an amount greater than the difference between Plaintiffs' cash wage and minimum wage because they failed to notify Plaintiffs in advance that they were doing so."). Accordingly, *Meetz* held that the employer "may not rely on … tips in excess of the tip credit to offset any deficiencies in his receipt of the federal minimum wage arising from under-reimbursement of his vehicle expenses as a result of Defendants' alleged unreasonable approximation of his actual expenses." *Id.*

The District of Colorado reached the same conclusion that tips in excess of a tip credit amount **do not count** toward minimum wage compliance in another claim by Papa John's pizza delivery drivers alleging minimum wage violations resulting from under-reimbursed vehicle costs. *Bass v. PJCOMN Acq. Corp.,* 2011 U.S. Dist. LEXIS 58359, *3 (D. Colo. June 1) (attached as Ex. 43); *see also Bass v. PJCOMN Acq. Corp.,* Case No. 09–cv–01614–REB–MEH (D. Colo.) (ECF Doc. 35 at p.11, ¶26 and p.12, ¶27; Doc. 51, p.8-8; Doc. 56, pp. 2-3; Doc. 67, pp. 2-3).

All other courts to consider the same issue of whether tips can offset minimum wage violations have uniformly reached the same conclusion. *See, e.g., Martin v. Tango's Rest., Inc.*, 969 F.2d 1319, 1323 (1st Cir. 1992) ("It may at first seem odd to award back pay against an employer, doubled by liquidated damages, where the

employee has actually received and retained base wages and tips that together amply satisfy the minimum wage requirements" but that result was prescribed by Congress); *Lanzetta v. Florio's Enters.*, 763 F. Supp. 2d 615, 623 (S.D.N.Y. 2011) (refusing to consider employer's argument that tips provided employee minimum wage "ten times over"); *Bernal v. Vankar Enterprises, Inc.*, 579 F. Supp. 2d 804, 810 (W.D. Tex. 2008) (holding that where defendant "deducted losses due to cash register shortages and unpaid tabs" from employee's paycheck or tips, it was not entitled to tip credit as offset to minimum-wage claim); *Chisolm v. Gravitas Rest. Ltd.*, 2008 WL 838760, *3 n.12, *5 (S.D. Tex. March 25) ("The FLSA provides that an employer who violates its minimum wage provisions be liable in the full amount of the minimum wage…" when an employer deducts the cost of "tools of the trade"); *Chan v. Sung Yue Tung Corp.*, 2007 WL 313483, *19 (S.D.N.Y. Feb. 1) (holding that tips are gifts from customers, not wages); *Harrell v. Diamond A Entm't., Inc.*, 992 F. Supp. 1343, 1357-58 (M.D. Fla. 1997) (rejecting defendants' argument that entertainers who received as much as $1,000.00 per week in tips do not need minimum wage protection and holding that funds received from customers are tips, not wages, which cannot offset employer's obligation to pay minimum wage); *Bonham v. The Cooper Cellar Corp.*, 476 F. Supp. 98, 102 (E.D. Tenn. 1979) (refusing to allow employer to credit tips against minimum wage absent tip credit "despite [the] plaintiff's admissions that their actual income, including tips, greatly

exceeded the minimum wage for the relevant period" and finding violations because wages, without considering tips, were below minimum wage); *see also, e.g.*, *Reich v. Chez Robert*, 28 F.3d 401, 404 (3rd Cir. 1994) (holding that district court erred in crediting tips against FLSA minimum wage damages in claim that unreimbursed job expenses caused minimum wage deficiencies).

Likewise, in *Chan v. Triple 8 Palace, Inc.,* 2006 WL 851749, *2 (S.D.N.Y. March 30), employees alleged minimum-wage violations on account of unreimbursed uniform costs. The district court rejected the employer's argument that so long as the plaintiffs' total compensation, including tips, exceeded the statutory minimum wage those plaintiffs could not show any minimum wage violation. *Id.* at *11. The court held that "[s]uch a rule cannot be reconciled with the language of [29 U.S.C.] § 203(m), which clearly prohibits employers from confiscating **any** portion of employees' tips if the employers rely on the tip credit to satisfy the minimum wage." *Id.* (emphasis in original). The court then recognized that "Courts have consistently rejected arguments similar to [the employers'] for precisely this reason." *Id.* (collecting cases).

The DOL has taken the same position in the DOL FOH. Illustrations in the DOL FOH from the 1980's demonstrate the fallacy of Defendants' argument. During that period, the federal minimum wage was $3.35 per hour. The DOL FOH clearly

instructs that if tips exceed the "tip credit" taken, it does **not** push the hourly rate

beyond the minimum wage, nor can those tips be used to offset job-related expenses:

> (a) Where, for example, the employer pays $2.01 per hour in cash
> wages and employees earn $2.00 per hour in tips, then the maximum
> tip credit is $1.34 per hour (*see* footnote in FOH 30d06(a)) and,
> therefore, the employees' R/R [real rate] is $3.35 [the minimum wage].
> **Accordingly, the employer may not make any deductions for**
> **uniform purchases or maintenance, etc., since tips received by an**
> **employee in excess of $1.34 per hour (40 percent of the MW) are**
> **not deemed wages for purposes of FLSA.**

*Id.* (emphasis added).

## B. The Undisputed Facts Show No Genuine Issue of Material Fact Precluding Summary Judgment in Plaintiffs' Favor.

Here, there is no dispute that Defendants paid a sub-minimum cash wage

applicable to time spent "on-the-road." (SOF ¶¶ 96-105). Defendants took a tip credit

of a pre-specified amount and Defendants notified its delivery drivers of the pre-

specified amount of that tip credit in advance. (SOF ¶¶ 96-97). Defendants' form

notice provided to delivery drivers clearly reflects these facts. (SOF ¶ 97).

Alternatively, there is no dispute that Defendants only used the amount of the tip

credit they actually took in calculating overtime wages. (SOF ¶¶ 102-105).

Defendants' paystubs clearly reflect this fact. (SOF ¶ 102).

Thus, for either or both of these alternative reasons recognized in *Perrin, Meetz*,

and numerous other cases, summary judgment should be granted in Plaintiffs' favor,

finding that tips in excess of the amount of a tip credit actually taken (1) cannot offset minimum wage violations and (2) do not count toward net wages.

## CONCLUSION

For all the reasons discussed, partial summary judgment should be entered in Plaintiffs' favor on all issues.

Dated: November 30, 2017                Respectfully submitted,

**HENINGER GARRISON**                   **PAUL LLP**
**DAVIS, LLC**                          */s/ Richard M. Paul III*
*/s/ William L. Bross*                  Richard M. Paul III
W. Lewis Garrison, Jr.                  (MO Bar #44233)
William L. Bross                        601 Walnut Street, Suite 300
Taylor C. Bartlett                      Kansas City, Missouri 64106
2224 First Avenue North                 Telephone:  (816) 984-8100
Birmingham, Alabama 35203               Facsimile:   (816) 984-8101
Telephone:   (205) 326-3336             Rick@PaulLLP.com
Facsimile:   (205) 326-3332
wlbross@hgdlawfirm.com

                                        **WEINHAUS & POTASHNICK**
                                        Mark A. Potashnick
                                        11500 Olive Boulevard, Suite 133
                                        St. Louis, Missouri 63141
                                        Telephone:  (314) 997-9150
                                        Facsimile:   (314) 997-9170
                                        markp@wp-attorneys.com

## ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

The foregoing was served on November 30, 2017, via the Court's CM/ECF electronic filing system on all counsel of record.

*/s/ Richard M. Paul III*